Matthew S. Barr
Michael L. Hirschfeld
Alan J. Stone
Andrew M. Leblanc
Karen Gartenberg
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGHTSQUARED INC., *et al.*, | ) Case No. 12-12080 (SCC) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |

**LIGHTSQUARED'S MOTION FOR ENTRY OF**
**ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 363, AUTHORIZING**
**LIGHTSQUARED TO (A) ENTER INTO AND PERFORM UNDER LETTERS**
**RELATED TO $1,515,000,000 SECOND LIEN EXIT FINANCING ARRANGEMENTS,**
**(B) PAY FEES AND EXPENSES IN CONNECTION THEREWITH,**
**AND (C) PROVIDE RELATED INDEMNITIES**

---

[1]     The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Jurisdiction ................................................................................................................... 1

Preliminary Statement .................................................................................................. 2

Background .................................................................................................................... 3

Background to Motion .................................................................................................. 3

Relief Requested .......................................................................................................... 5

Basis for Relief ............................................................................................................ 5

Waiver of Bankruptcy Rule 6004(h) ........................................................................... 8

Motion Practice ............................................................................................................ 9

Notice ........................................................................................................................... 9

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
  722 F.2d 1063 (2d Cir. 1983)..........................................................................6

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)
  60 B.R. 612 (Bankr. S.D.N.Y. 1986)...............................................................7

In re Adelphia Communications Corp.
  No. 02-41729 (Bankr. S.D.N.Y. June 28, 2004) ...........................................7

In re Delta Air Lines
  No. 05-17923 (Bankr. S.D.N.Y. Apr. 17, 2007)..............................................7

In re Global Crossing Ltd.
  295 B.R. 726 (Bankr. S.D.N.Y. 2003)..............................................................6

In re Ionosphere Clubs, Inc.
  100 B.R. 670 (Bankr. S.D.N.Y. 1989)..............................................................6

In re Eastman Kodak Company
  No. 12-10202 (Bankr. S.D.N.Y. March 8, 2013) ............................................7

In re The Great Atlantic & Pacific Tea Company, Inc.
  No. 10-24549 (Bankr. S.D.N.Y. Jan. 27, 2012) .............................................7

In re LCI Holding Company, Inc.
  No. 12-13319 (Bankr. D. Del. May 21, 2013)..................................................7

In re Lyondell Chemical Company
  No. 09-10023 (Bankr. S.D.N.Y. March 24, 2010)...........................................7

In re Meridian Auto Sys.-Composites Operations, Inc.
  No. 05-11168 (Bankr. D. Del. June 14, 2006)................................................7

In re New World Pasta Co.
  No. 04-2817 (Bankr. M.D. Pa. Sept. 23, 2005) .............................................7

In re NewPage Corp.
  No. 11-12804 (Bankr. D. Del. November 6, 2012) ........................................7

In re Owens Corning
  No. 00-3837 (Bankr. D. Del. July 20, 2006)...................................................7

In re Pliant Corp.
    No. 06-10001 (Bankr. D. Del. May 9, 2006) ............................................................7

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated
    Res., Inc.)
    147 B.R. 650 (S.D.N.Y. 1992) ................................................................................6

Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. The LTV
    Corp. (In re Chateaugay Corp.)
    973 F.2d 141 (2d Cir. 1992) ...................................................................................6

**STATUTES**

11 U.S.C. § 1107(a) ....................................................................................................3

11 U.S.C. § 1108 .........................................................................................................3

11 U.S.C. § 105(a) ............................................................................................1, 5, 6, 8

11 U.S.C. § 363(b) ...........................................................................................1, 5, 6, 8

28 U.S.C. § 157(b)(2) .................................................................................................1

28 U.S.C. § 1334 .........................................................................................................1

28 U.S.C. § 1408 .........................................................................................................1

28 U.S.C. § 1409 .........................................................................................................1

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 6004(h) ...........................................................................................9

Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York .................9

LightSquared Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, "LightSquared") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), file this motion (the "Motion"), at the direction of the special committee of the boards of directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., and on behalf of the Plan Proponents,[2] for entry of an order (the "Order"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), authorizing LightSquared to (a) enter into and perform under (i) a commitment letter (substantially in the form attached to this Motion as Exhibit A, the "Commitment Letter") with Jefferies Finance LLC ("Jefferies") and (ii) a fee letter (substantially in the form attached to this Motion as Exhibit B, the "Fee Letter"[3] and, together with the Commitment Letter, the "Exit Financing Letters") with Jefferies, (b) pay certain fees and expenses associated with the Exit Financing Letters, and (c) provide related indemnities. In support of this Motion, LightSquared respectfully states as follows:

### Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Commitment Letter (each, as defined below), as applicable.

[3]     The Fee Letter contains proprietary and confidential information relating to fees that Jefferies intends to charge LightSquared in connection with its obligations thereunder. LightSquared is filing simultaneously herewith a motion pursuant to section 107 of the Bankruptcy Code seeking authority to file the Fee Letter under seal. Pursuant to such motion, the fully unredacted Fee Letter will only be available to the Court, the United States Trustee for the Southern District of New York, and counsel subject to the *Stipulation and Agreed Order Establishing Procedures for the Protection of Confidential Information* [Docket No. 437].

## Preliminary Statement

4.    On January 20, 2015, LightSquared, on behalf of the Plan Proponents,

filed the *Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No.

2035] (the "Initial Plan").  On March 17, 2015, LightSquared, on behalf of the Plan Proponents,

filed the *Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code*

[Docket No. 2238] (as may be further amended or supplemented in accordance with the terms

thereof, the "Plan").

5.    As the Court is aware, the Initial Plan provided for the satisfaction of the

Prepetition LP Facility Claims – whether held by SPSO or other Prepetition LP Lenders – by the

issuance of Second Lien Exit Term Loans by New LightSquared, secured by substantially all of

its assets.   Since filing the Initial Plan, LightSquared, the Special Committee, and the New

Investors have been working diligently to build consensus around the Initial Plan and to resolve

objections filed in connection therewith, including the objection filed by SPSO.  As a result of

these efforts, the parties have achieved what had been previously unattainable:  payment in full,

in cash of the Prepetition LP Facility SPSO Claims on the Effective Date.  LightSquared

obtained a fully underwritten commitment in connection with the Second Lien Exit Facility in

the amount of $1.515 billion – the aggregate principal amount necessary to satisfy SPSO's

claims in full assuming a December 15, 2015 effective date (the "Commitment").  These second

lien lenders will provide LightSquared with the cash necessary to repay SPSO and will receive in

return Second Lien Exit Term Loans in an amount equivalent to that which SPSO would have

otherwise received under the Plan.  With SPSO rendered unimpaired and conclusively presumed

to have accepted the Plan, and with all voting classes now supportive of the Plan, these Chapter

11 Cases are at their end.

6.  To effectuate this remarkable result, LightSquared now seeks authority to enter into the Exit Financing Letters.  For the reasons set forth below, LightSquared respectfully submits that entry into the Exit Financing Letters is necessary, appropriate, in the best interests of all stakeholders, and should be approved.

## Background

7.  On May 14, 2012 (the "Petition Date"), LightSquared filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.  LightSquared continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee has been appointed in the Chapter 11 Cases.  No trustee or examiner has been appointed in the Chapter 11 Cases.

## Background to Motion

9.  In consideration of the time and resources expended by Jefferies to negotiate and attain the Commitment, the Exit Financing Letters provide, in part, that LightSquared will provide the following fees, expenses, and indemnities:[4]

(a)  LightSquared will provide Jefferies an arrangement fee in a de minimis amount – a few million dollars – payable on the earlier of (i) the Effective Date and (ii) the date of the termination of the Commitment Letter.  The arrangement fee shall be payable regardless of whether the Effective Date occurs.

(b)  LightSquared will provide Jefferies an annual administration fee payable in advance of the Closing Date and on each anniversary thereafter.

(c)  LightSquared will provide Jefferies a commitment fee, which shall only be fully earned upon the consummation of the transactions contemplated under the Commitment Letter and the occurrence of the Effective Date and shall be paid on the Effective Date in the form of Second Lien Exit

---

[4]  The summary of the Exit Financing Letters are only included herein for descriptive purposes.  To the extent any conflict exists with the terms of the Exit Financing Letters, the terms of the Exit Financing Letters shall control.

Term Loans in a principal amount equal to $174,225,000 (the "Commitment Fee").

(d)    LightSquared will retain Jefferies as a joint lead arranger and joint bookrunner in respect of (i) the First Lien Exit Facility or (ii) any similar financing issued, offered or placed in lieu of the First Lien Exit Facility ((i) and (ii) above, collectively, "Senior Lien Financings").  In connection with the foregoing, LightSquared will pay to Jefferies on and subject to the occurrence of the closing date relating to any commitments for any such Senior Lien Financings, a fee in a certain percentage of the aggregate total amount of all of the fees and other economics to be paid to all arrangers in connection with the Senior Lien Financings, and such aggregate arrangement fees payable to all arrangers in connection therewith will not be less than a certain percentage of the aggregate total amount of the Senior Lien Financings.

(e)    If the Effective Date occurs and the transactions contemplated under the Commitment Letter are consummated, LightSquared will reimburse (i) Jefferies, upon presentation of a reasonably detailed summary statement, for all reasonable documented out-of-pocket expenses (including but not limited to the fees, disbursements, and other charges of Jefferies's counsel) incurred by Jefferies in connection with the Commitment Letter, the Second Lien Exit Facility, the Plan, and the transactions contemplated thereunder (the "Expenses") and (ii) certain lenders participating in the Second Lien Exit Facility upon presentation of a reasonably detailed summary statement for their respective Expenses, provided that such reimbursements shall not exceed $500,000 in the aggregate for all such lenders.  Without regard to any limitation set forth in Section 6 of the Commitment Letter and without regard to whether the Transactions are consummated or the Commitment Letter expires or is terminated or otherwise, LightSquared shall pay, or cause to be paid, to Jefferies promptly as billed, all reasonable and documented disbursements and out-of-pocket expenses incurred by Jefferies or on its behalf in connection with its services to be rendered under the Fee Letter and under the Commitment Letter and the Transactions (including (i) expenses of its due diligence investigation, consultants' fees, syndication expenses, travel expenses, fees, disbursements and other expenses of counsel, and (ii) the overnight cost of providing funds for the provision of loans under the Second Lien Exit Facility if the closing does not occur on the date specified by LightSquared as the closing date).

(f)    LightSquared will indemnify and hold harmless Jefferies, its affiliates (including Jefferies LLC), and its and its respective affiliates' respective directors, officers, employees, advisors, agents, and other representatives (each, an "Indemnified Person") from and against any and all losses, claims, damages, and liabilities to which any such Indemnified Person may become subject arising out of or in connection with the Commitment

4

Letter, the Commitment, the use of the proceeds thereof or any claim, litigation, investigation, or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by LightSquared, its equity holders, affiliates, creditors, or any other person, and to reimburse promptly each Indemnified Person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending, or otherwise related to a Proceeding; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities, or related expenses to the extent they (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person or (ii) result from a claim brought by a Debtor against an Indemnified Person for breach in bad faith of such Indemnified Person's obligations under the Commitment Letter or under any other documentation in respect of the Commitment, if such Debtor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  The indemnity shall not survive consummation of the Plan and occurrence of the Effective Date and no Indemnified Person may assert any claims for indemnification under the Commitment Letter against the Reorganized Debtors (it being understood such waiver shall not modify Jefferies's indemnity rights as a Second Lien Exit Term Lender as set forth in the Second Lien Exit Credit Agreement).[5]

## Relief Requested

10.    LightSquared respectfully requests that, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Court enter the Order authorizing LightSquared to (a) enter into and perform under the Exit Financing Letters, (b) pay fees and expenses associated with the Exit Financing Letters, and (c) provide related indemnities.

## Basis for Relief

11.    LightSquared is seeking authority to enter into and perform under the Exit Financing Letters, pay fees and reimburse of expenses associated therewith, and provide related indemnities under sections 105(a) and 363 of the Bankruptcy Code.  Section 105(a) of the

---

[5]    This Court approved a substantially similar indemnity to Jefferies earlier in these Chapter 11 Cases.  *See Order, Pursuant to 11 U.S.C. §§ 105(a) and 363, Authorizing LightSquared To (A) Enter Into and Perform*

Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In addition, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

12.     A debtor in possession's decision to use, sell, or lease assets outside the ordinary course of business must be based upon its sound business judgment. See Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that judge determining section 363(b) application must find from evidence presented good business reason to grant such application); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining section 363(b) motion is "good business reason").

13.     The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v.

---

*Under Engagement Letter Related to Exit Financing Arrangements, (B) Pay Fees and Expenses in Connection Therewith, and (C) Provide Related Indemnities* [Docket No. 667].

Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

Courts in this district consistently and appropriately have been reluctant to interfere with

corporate decisions absent a showing of bad faith, self-interest, or gross negligence and have

upheld such decisions as long as they are attributable to any "rational business purpose."

Integrated Res., 147 B.R. at 656.

14.    Debtors in large chapter 11 cases commonly seek and obtain approval to

enter into exit financing commitments.  See, e.g., In re Eastman Kodak Co., No. 12-10202

(Bankr. S.D.N.Y. March 8, 2013); In re LCI Holding Co., No. 12-13319 (Bankr. D. Del. May 21,

2013); In re NewPage Corp., No. 11-12804 (Bankr. D. Del. Nov. 6, 2012); In re The Great Atl.

& Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Jan. 27, 2012); In re Lyondell Chem. Co., No.

09-10023 (Bankr. S.D.N.Y. March 24, 2010); In re Delta Air Lines, No. 05-17923 (Bankr.

S.D.N.Y. Apr. 17, 2007); accord In re Owens Corning, No. 00-3837 (Bankr. D. Del. July 20,

2006); In re Pliant Corp., No. 06-10001 (Bankr. D. Del. May 9, 2006); In re Meridian Auto

Sys.-Composites Operations, Inc., No. 05-11168 (Bankr. D. Del. June 14, 2006); In re New

World Pasta Co., No. 04-2817 (Bankr. M.D. Pa.  Sept.  23, 2005); In re Adelphia Commc'ns

Corp., No. 02-41729 (Bankr. S.D.N.Y. June 28, 2004).

15.    Since filing the Initial Plan, LightSquared and the Special Committee have

remained committed to their goal of building as much consensus as possible and formulating an

exit from bankruptcy that maximizes value for all stakeholders across all of LightSquared's

estates.  LightSquared has determined that the restructuring proposal set forth in the Plan

represents LightSquared's best and most value-maximizing option for exiting bankruptcy.  To

effectuate the Plan, LightSquared will require the Commitment, the proceeds of which will be

used to repay SPSO in full, in cash on the Effective Date.  As such, entry into the Exit Financing

Letters is thus both necessary and beneficial to all of LightSquared's estates and their stakeholders.

16.    LightSquared submits that the Plan Proponents negotiated the Exit Financing Letters at arm's length and in good faith.  Given the size and duration (up to nine months) of the Commitment and the fact that it will be used to pay the Prepetition LP Facility SPSO Claims in full, in cash, the relatively modest amount of the cash fees requested and the Commitment Fee, which is only payable upon the occurrence of the Effective Date and which is paid in kind through the issuance of Second Lien Exit Term Loans, are appropriate and particularly beneficial to LightSquared and its stakeholders.  LightSquared submits that its anticipated entry into and performance under the Exit Financing Letters, the payment of the fees, the reimbursement of expenses (some of which are capped by the Commitment Letter), and the provision of indemnities in connection therewith represent a sound exercise of its business judgment and are for a valid business purpose – allowing LightSquared to emerge from chapter 11 expeditiously.

17.    Accordingly, LightSquared submits that its entry into and performance under the Exit Financing Letters as well as the payment of fees, the reimbursement of expenses, and the provision of indemnities in connection with the Exit Financing Letters represent an exercise of LightSquared's sound business judgment and should be authorized pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

## **Waiver of Bankruptcy Rule 6004(h)**

18.    To implement the foregoing successfully, LightSquared respectfully requests a waiver of the fourteen (14)-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr.

P. 6004(h). LightSquared requires prompt approval of the Exit Financing Letters so that

Jefferies can commence its work thereunder expeditiously. Accordingly, LightSquared submits

that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule

6004(h), to the extent it applies.

## Motion Practice

19.    This Motion includes citations to the applicable rules and statutory

authorities upon which the relief requested herein is predicated, and a discussion of their

application to this Motion. As such, LightSquared submits that this Motion satisfies Rule 9013-

1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Notice

20.    LightSquared has caused notice of this Motion to be provided by

electronic mail, facsimile, regular or overnight mail, and/or hand delivery to (a) the United States

Trustee for the Southern District of New York, (b) the entities listed on the Consolidated List of

Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d),

(c) counsel to the Special Committee, (d) counsel to the Prepetition Agents, (e) counsel to the

Existing DIP Agent and Existing DIP Lenders,[6] (f) counsel to the ad hoc secured group of

Prepetition LP Lenders, (g) counsel to Harbinger Capital Partners, LLC, (h) the Internal Revenue

Service, (i) the United States Attorney for the Southern District of New York, (j) the Federal

Communications Commission, (k) Industry Canada, (l) counsel to Jefferies, and (m) parties in

interest who have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy

---

[6]    For the avoidance of doubt, LightSquared views White & Case LLP and Brown Rudnick LLP as the only
counsel for the LP DIP Lenders.

Rule 2002.  LightSquared respectfully submits that no other or further notice is required or

necessary.

    **WHEREFORE**, for the reasons set forth above, LightSquared respectfully

requests that the Court (i) enter the Order, substantially in the form attached hereto as <u>Exhibit C</u>,

granting the relief requested herein, and (ii) grant such other and further relief as the Court may

deem just and proper.

New York, New York      <u>/s/ Matthew S. Barr</u>
Dated:  March 18, 2015      Matthew S. Barr
               Michael L. Hirschfeld
               Alan J. Stone
               Andrew M. Leblanc
               Karen Gartenberg
               MILBANK, TWEED, HADLEY & M$^{\text{C}}$CLOY LLP
               1 Chase Manhattan Plaza
               New York, NY  10005-1413
               (212) 530-5000

               *Counsel to Debtors and Debtors in Possession*

## Exhibit A

**Commitment Letter**

March 17, 2015

<u>CONFIDENTIAL</u>

LightSquared LP
10802 Parkridge Boulevard
Reston, VA 20191

<u>Commitment for $1,515,000,000 Second Lien Exit Facility</u>

Ladies and Gentlemen:

1.      <u>Background</u>

LightSquared Inc., a Delaware corporation, and certain of its affiliates (collectively, the "<u>Debtors</u>"), including LightSquared LP ("<u>you</u>") filed on May 14, 2012 voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). Capitalized terms not defined in this letter (as amended, supplemented or otherwise modified, this "<u>Commitment Letter</u>") shall have the meanings set forth in the Modified Plan (as defined below).

On January 20, 2015, the Debtors and the other Plan Proponents referenced therein filed the *Second Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2035] (the "<u>Plan of Reorganization</u>"). The Debtors, the Plan Proponents and the other New Investors have agreed to amend the Plan of Reorganization substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Modified Plan</u>"). Pursuant to, and subject to the terms and conditions set forth in the Modified Plan and this Commitment Letter, it is contemplated that, among other things, on the Effective Date, Jefferies Finance LLC (the "<u>Commitment Party</u>" or "<u>Jefferies</u>") shall provide up to $1.5 billion of the Second Lien Exit Facility the proceeds of which will be used to pay all or a part of the Prepetition LP Facility SPSO Claims and the Prepetition LP Facility SPSO Guaranty Claims pursuant to the Modified Plan.

2.      <u>Commitment</u>

Jefferies hereby commits to provide to New LightSquared $1,515,000,000 in aggregate principal amount of the Second Lien Exit Facility (the "<u>Commitment</u>"), subject to the terms and conditions of this Commitment Letter, the Jefferies Fee Letter (as defined below) and the Modified Plan.

3.      <u>Conditions</u>

The Commitment Party's Commitment and agreements hereunder are subject to (i) the terms and conditions set forth herein; and (ii) your compliance in all material respects with the terms of this Commitment Letter and the Jefferies Fee Letter (defined below).

In addition, the Commitment Party's Commitment and agreements hereunder are subject to the following terms and conditions:

(a)    The Second Lien Exit Credit Agreement shall be substantially in the form attached hereto as <u>Exhibit B</u> (subject to (i) such conforming changes to the First Lien Exit Facility as may be necessary or appropriate, (ii) changes necessary to reflect the terms of the Modified Plan, and (iii) changes to reflect the standard agency, assignment and other operational or agency provisions of

Jefferies in its capacity as administrative agent and collateral agent), and shall be executed and delivered by the parties thereto and all conditions precedent for funding set forth therein shall be satisfied.

(b) The execution and delivery of the First Lien Exit Facility and other loan documents (including a customary intercreditor agreement) related thereto, all of which shall be consistent with the Second Lien Exit Credit Agreement and the loan documents executed in connection therewith and otherwise shall be in form and substance reasonably satisfactory to us.

(c) The Commitment Party shall have been reimbursed for all reasonable and invoiced out-of-pocket costs, fees, and expenses (including, without limitation, reasonable, documented and out-of-pocket legal fees and expenses) owed to it pursuant to the terms of this Commitment Letter, the Jefferies Fee Letter or the Modified Plan to the extent earned, due and payable on or before the Effective Date.

(d) The Modified Plan shall have been confirmed pursuant to the Confirmation Order and the Confirmation Recognition Order, which orders shall (i) be in form and substance reasonably satisfactory to the Commitment Party, (ii) be in full force and effect and unstayed, (iii) shall specifically (x) authorize the fees, costs and indemnities as outlined herein and in the Jefferies Fee Letter, (y) authorize the reimbursement of Jefferies for all reasonable and documented costs and out-of-pocket expenses incurred in connection with the Transactions and as set forth herein, in each case without any further court order and, whether or not the Effective Date occurs or any of the transactions contemplated hereby are consummated, and (z) provide that all claims for such fees (to the extent earned, due and payable and excluding any fees described in Section 5(a) hereof), costs and expenses shall be entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, whether or not the Second Lien Exit Facility is consummated, and may not be disgorged and (iv) not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to materially adversely affect the interests of the Commitment Party.

(e) (i) All conditions precedent to effectiveness of the Modified Plan and the Plan Documents shall have been satisfied, waived or modified in accordance with the terms of the Modified Plan and the Plan Support Agreement other than the funding of the Commitments, (ii) the Effective Date shall occur concurrently with the funding of the Commitments, (iii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Modified Plan in accordance with its terms shall occur substantially contemporaneously with the Effective Date, and (iv) no provision of the Modified Plan shall have been waived, amended, supplemented or otherwise modified in any manner that could be reasonably expected to materially adversely affect the interests of the Commitment Party.

(f) New LightSquared shall have delivered all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, in each case prior to the Effective Date.

2

4.    <u>No Other Agreements</u>

By signing this Commitment Letter, the parties hereto acknowledge that, except for the Modified Plan, the Jefferies Fee Letter and the documents attached thereto or referenced therein, this Commitment Letter supersedes any and all discussions and understandings, written or oral, between or among the Commitment Party and the Debtors as to the subject matter hereof.  No amendments, waivers or modifications of this Commitment Letter or any of its contents shall be effective unless expressly set forth in writing and executed by the Commitment Party and you.

5.    <u>Fees</u>

As consideration for the Commitments of the Commitment Party you agree to pay or cause to be paid to the Commitment Party (a) a commitment fee equal to $174,225,000 (the "<u>Commitment Fee</u>"), and (b) the other fees set forth in the separate syndication and fee letter dated as of the date hereof between you and Jefferies (the "<u>Jefferies Fee Letter</u>"). The Commitment Fee shall be fully earned upon the consummation of the transactions contemplated hereby and the occurrence of the Effective Date, and shall be paid on the Effective Date in the form of Second Lien Exit Term Loans in a principal amount equal to the Commitment Fee.

6.    <u>Indemnity and Expenses</u>

You agree to indemnify and hold harmless the Commitment Party, its affiliates (including Jefferies LLC) and its and its respective affiliates' respective directors, officers, employees, advisors, agents and other representatives (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages and liabilities to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Commitment, the use of the proceeds hereof or any claim, litigation, investigation or proceeding (a "<u>Proceeding</u>") relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse promptly each Indemnified Person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or otherwise related to a Proceeding; <u>provided</u> that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they (a) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person or (b) result from a claim brought by a Debtor against an Indemnified Person for breach in bad faith of such Indemnified Person's obligations hereunder or under any other documentation in respect of the Commitment, if such Debtor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction; <u>provided</u> <u>further</u> that, the foregoing indemnity shall not survive consummation of the Modified Plan and occurrence of the Effective Date and no Indemnified Person may assert any claims for indemnification hereunder against the Reorganized Debtors (it being understood such waiver shall not modify the Commitment Party's indemnity rights as a Second Lien Exit Term Lender as set forth in the Second Lien Exit Credit Agreement).

If the Effective Date occurs and the transactions contemplated hereby are consummated, you further agree to reimburse (x) the Commitment Party upon presentation of a reasonably detailed summary statement, for all reasonable documented out-of-pocket expenses (including but not limited to the fees, disbursements and other charges of the Commitment Party's counsel) incurred by the Commitment Party in connection with this Commitment Letter, the Second Lien Exit Facility, the Modified Plan and the transactions contemplated hereby and thereby (the "<u>Expenses</u>") and (y) the lenders participating in the Second Lien Facility and listed on Schedule I hereto upon presentation of a reasonably detailed summary

3

statement for their respective Expenses, provided, that, the reimbursements payable pursuant to this clause (y) shall not exceed $500,000 in the aggregate for all such lenders, and you shall have no obligations in excess of such amount.

7.    Other Relationships

You further hereby acknowledge that the Commitment Party (and its affiliates) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, your affiliates and of other companies that may be the subject of, and/or affect, the transactions contemplated by this Commitment Letter. The Commitment Party hereby acknowledges and agrees that it shall not take, and shall cause its affiliates not to take, any action in respect of any such position that would adversely affect the obligations of the Commitment Party under this Commitment Letter or the interests of the Commitment Party (or its affiliates) in respect thereof.  In addition, the Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on their behalf by virtue of the transactions contemplated hereby in connection with the performance by the Commitment Party and its affiliates of services for other companies or persons and the Commitment Party and its affiliates will not furnish any such information to any of their other customers.  You also acknowledge that the Commitment Party and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

8.    Confidentiality of Terms

You further acknowledge and agree that this Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of their terms or substance, nor the activities of the Commitment Party pursuant hereto, shall be disclosed, directly or indirectly, to any other person except that such existence and contents may be disclosed (a) to you and your officers, directors, employees, attorneys, accountants and professional advisors on a confidential and "need-to-know" basis; provided, that they are informed of and agree to the confidentiality provisions set forth herein or therein  (b) as required in connection with the Bankruptcy Cases, by applicable law or compulsory legal process (in which case you agree to inform the Commitment Party promptly thereof) or (c) in a Bankruptcy Court filing, as to which the Commitment Party had given its prior consent, in order to implement the transactions contemplated hereunder.

9.    Limited Relationship

The Debtors further acknowledge and agree that (i) no fiduciary, advisory or agency relationship between or among you and the Commitment Party is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Party has advised or are advising you on other matters, (ii) the Commitment Party, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Party, (iii) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (iv) you have been advised that the Commitment Party is engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Party has no obligation to disclose such interests and transactions to you, (v) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (vi) the Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any

4

other person or entity and (vii) the Commitment Party has no obligation or duty (including any implied duty) to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by the Commitment Party and you or any such affiliate.

10.    No Recourse

Notwithstanding anything that may be expressed or implied in this Commitment Letter, except in the case of fraud or willful misconduct, you acknowledge and agree that no Person other than the Commitment Party has any obligation hereunder and that, notwithstanding that the Commitment Party may be a limited partnership or limited liability company, no Person (a) has any right of recovery or recourse under this Commitment Letter in respect of any oral representations made or alleged to be made in connection herewith and (b) shall have any recourse against, any former, current or future equity holders, controlling Persons, directors, officers, employees, affiliates, members, managers or general or limited partners of the Commitment Party, or any former, current or future equity holder, controlling person, director, officer, employee, general or limited partner, member, manager or affiliate of any of the foregoing, in each case of (a) and (b), arising out of, relating to or in connection with the transactions contemplated by this Commitment Letter (collectively, the "Commitment Party Affiliates"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of you against any Commitment Party Affiliate, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise.  It is expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Commitment Party Affiliate, as such, for any obligation of the Commitment Party under this Commitment Letter, in respect of any oral representations made or alleged to have been made in connection herewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

11.    Termination

This Commitment Letter may be terminated by the Commitment Party on the earliest to occur of: (i) the date the Plan Support Agreement is terminated other than solely as to MAST or any Plan Support Party that is not a Plan Proponent or a JPM Investment Party; (ii) the Confirmation Order has not been entered by the Bankruptcy Court by 5:00 p.m., New York City time, on April 15, 2015, which Confirmation Order is not subject to a stay, (iii) one (1) Business Day after entry of the Confirmation Order if this Commitment Letter is not countersigned by you and delivered to the Commitment Party; (iv) the date upon which any of the conditions precedent set forth in Section 3 cannot be satisfied; (v) if the Bankruptcy Court shall enter any order (a) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Bankruptcy Proceedings, (b) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Bankruptcy Proceedings or (c) dismissing the Bankruptcy Proceedings or converting the Bankruptcy Proceedings to proceedings pursuant to Chapter 7 of the Bankruptcy Code; (vi) if a plan of reorganization other than the Modified Plan is confirmed by the Bankruptcy Court; and (vii) 5:00 p.m., New York City time, on December 31, 2015.  This Commitment Letter shall terminate automatically upon the funding of the Commitment in accordance with the terms hereof and of the Second Lien Exit Credit Agreement.  Sections 6 through 12 of this Commitment Letter and the Jefferies Fee Letter shall survive any termination of this Commitment Letter.

12.    Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Party (and any purported assignment without such consent shall be null and void, except that you may assign your rights and obligations under this Commitment Letter to New LightSquared but in the event of any such assignment you shall remain responsible for all of your obligations hereunder). This Commitment Letter is intended to be solely for the benefit of the parties hereto, New LightSquared and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, New LightSquared and the Indemnified Persons to the extent expressly set forth herein. The Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby, and to satisfy its obligations hereunder through, or assign its rights and obligations hereunder to, one or more of its affiliates, separate accounts within its control or investments funds under its or its affiliates' management (collectively, "Commitment Party Assigned Affiliates"); provided that, unless otherwise agreed by you in writing, no assignment to a Commitment Party Assigned Affiliate shall relieve the Commitment Party of its obligations hereunder.

**EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING UNDER THIS COMMITMENT LETTER, ANY OTHER DOCUMENTS, INSTRUMENTS OR AGREEMENTS THAT MAY BE EXECUTED AND DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER DOCUMENTS, INSTRUMENTS OR AGREEMENTS THAT MAY BE EXECUTED AND DELIVERED IN CONNECTION HEREWITH, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR (SUBJECT TO THE ENTRY OF AN APPROPRIATE ORDER BY THE BANKRUPTCY COURT) IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES ANY OBJECTION WHICH SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR INCONVENIENT FORUM.**

This Commitment Letter is governed by and shall be construed in accordance with the laws of the State of New York applicable to contracts made and performed in that state and the Bankruptcy Code, to the extent applicable.

The provisions of this Commitment Letter pertaining to (i) indemnification of the Commitment Party and other Indemnified Persons by you, subject to the limitations herein, (ii) waivers of certain rights by you and/or the Commitment Party and (iii) the payment by you of reasonable and documented out-of-pocket expenses of the Commitment Party as set forth herein shall remain in full force and effect regardless of whether any definitive documentation relating to the Commitments shall be executed and delivered.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Debtors or New LightSquared, which information includes names, addresses, tax identification numbers and other information that will allow the Commitment Party to identify the Debtors or New LightSquared in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

[*Remainder of Page Intentionally Left Blank*]

We look forward to continuing to work with you toward completing this transaction.

Sincerely,

**JEFFERIES FINANCE LLC**

By: _____
    Name: Brian Buoye
    Title: Managing Director

**AGREED AND ACCEPTED AS OF THE
DATE FIRST SET FORTH ABOVE:**

**LIGHTSQUARED LP, as Debtor**

By: _____
    Name:
    Title:

[Signature Page to Second Lien Exit Facility Commitment Letter]

EXHIBIT A – FORM OF MODIFIED PLAN

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGHTSQUARED INC., *et al.*, | ) | Case No. 12-12080 (SCC) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

---

### MODIFIED SECOND AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF BANKRUPTCY CODE

---

**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**
*One Chase Manhattan Plaza*
New York, New York 10005
(212) 530-5000
*Counsel for the Debtors*

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
One New York Plaza
New York, New York 10004
(212) 859-8000
*Counsel for Centerbridge Partners, L.P.*

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**
1633 Broadway
New York, New York 10019
(212) 506-1700
*Counsel for Harbinger Capital Partners LLC*

**STROOCK & STROOCK & LAVAN LLP** 180 Maiden Lane
New York, New York 10038
(212) 806-5400
*Counsel for Fortress Credit Opportunities Advisors LLC*

Dated:   New York, New York
         March __, 2015

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal or foreign tax or registration identification number, are: LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040). The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

CHI-181960186v1

# TABLE OF CONTENTS

**Page**

ARTICLE I.    DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW ...............................2

    A.    Defined Terms ...............................................2
    B.    Rules of Interpretation ....................................31
    C.    Computation of Time .......................................32
    D.    Governing Law .............................................32
    E.    Reference to Monetary Figures .............................32
    F.    Approval Rights Over Plan Documents .......................32
    G.    Rights of the Debtors Under the Plan ......................32
    H.    Nonconsolidated Plan ......................................33

ARTICLE II.    ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL
COMPENSATION
CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND
U.S. TRUSTEE FEES .........................................33

    A.    Administrative Claims .....................................33
    B.    Accrued Professional Compensation Claims ..................35
    C.    DIP Inc. Claims ...........................................36
    D.    DIP LP Claims .............................................36
    E.    New Inc. DIP Claims .......................................37
    F.    New LP DIP Claims .........................................37
    G.    Priority Tax Claims .......................................37
    H.    Payment of Statutory Fees .................................37

ARTICLE III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS ..........................................38

    A.    Summary ...................................................38
    B.    Classification and Treatment of Claims and Equity Interests .........38
    C.    Special Provision Governing Unimpaired Claims and Equity
Interests .................................................49
    D.    Acceptance or Rejection of Plan ...........................49
    E.    Elimination of Vacant Classes .............................50
    F.    Confirmation Pursuant to Section 1129(b) of Bankruptcy Code ...................50
    G.    Controversy Concerning Impairment .........................51

ARTICLE IV.    MEANS FOR IMPLEMENTATION OF PLAN ...........................51

    A.    Sources of Consideration for Plan Distributions ...........51
    B.    Plan Transactions .........................................51
    C.    Issuance of New LightSquared Entities Shares; Reinstatement
of Reinstated Intercompany Interests ......................58
    D.    Section 1145 and Other Exemptions .........................59
    E.    Listing of New LightSquared Entities Shares; Reporting
Obligations ...............................................59

F.      New LightSquared Interest Holders Agreement ..............................................59
G.      Indemnification Provisions in Reorganized Debtors
        Governance Documents ...................................................................................60
H.      Management Incentive Plan ............................................................................61
I.      Corporate Governance ....................................................................................61
J.      Vesting of Assets in Reorganized Debtors .....................................................61
K.      Cancellation of Securities and Agreements ....................................................62
L.      Corporate Existence ........................................................................................63
M.      Corporate Action .............................................................................................63
N.      Effectuating Documents; Further Transactions ..............................................64
O.      Exemption from Certain Taxes and Fees ........................................................64
P.      Preservation, Transfer, and Waiver of Rights of Action ................................64
Q.      Assumption of D&O Liability Insurance Policies ..........................................65
R.      Employee and Retiree Benefits .......................................................................66

ARTICLE V.      TREATMENT OF EXECUTORY CONTRACTS AND
                UNEXPIRED LEASES .......................................................................67

A.      Assumption and Rejection of Executory Contracts and
        Unexpired Leases .............................................................................................67
B.      Claims Based on Rejection of Executory Contracts or
        Unexpired Leases .............................................................................................68
C.      Cure of Defaults for Executory Contracts and Unexpired
        Leases Assumed Pursuant to Plan ...................................................................68
D.      Pre-existing Obligations to Debtors Under Executory Contracts
        and Unexpired Leases ......................................................................................69
E.      Intercompany Contracts, Contracts, and Leases Entered into
        After Petition Date, Assumed Executory Contracts, and
        Unexpired Leases .............................................................................................70
F.      Modifications, Amendments, Supplements, Restatements, or
        Other Agreements ............................................................................................70
G.      Postpetition Contracts and Leases ..................................................................70
H.      Reservation of Rights ......................................................................................70
I.      Nonoccurrence of Effective Date ....................................................................71

ARTICLE VI.     PROVISIONS GOVERNING DISTRIBUTIONS .................................71

A.      Distribution Record Date ................................................................................71
B.      Timing and Calculation of Amounts To Be Distributed ................................71
C.      Disbursing Agent .............................................................................................72
D.      Rights and Powers of Disbursing Agent .........................................................72
E.      Plan Distributions on Account of Claims and Equity Interests
        Allowed After Effective Date .........................................................................73
F.      Delivery of Plan Distributions and Undeliverable or Unclaimed
        Plan Distributions ............................................................................................73
G.      Compliance with Tax Requirements/Allocations ...........................................75
H.      Setoffs .............................................................................................................75
I.      Recoupment .....................................................................................................76
J.      Claims Paid or Payable by Third Parties ........................................................76

ARTICLE VII.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ................................................................77

    A.    Allowance of Claims and Equity Interests........................................77
    B.    Claims and Equity Interests Administration Responsibilities .........77
    C.    Estimation of Claims or Equity Interests .......................................78
    D.    Expungement or Adjustment to Claims or Equity Interests Without Objection..........................................................................79
    E.    No Interest......................................................................................79
    F.    Deadline To File Objections to Claims or Equity Interests ............79
    G.    Disallowance of Claims or Equity Interests....................................79
    H.    Amendments to Claims ..................................................................80

ARTICLE VIII.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................................................................80

    A.    Discharge of Claims and Termination of Equity Interests..............80
    B.    Subordinated Claims.......................................................................81
    C.    Compromise and Settlement of Claims and Controversies .............81
    D.    Releases by Debtors .......................................................................82
    E.    Exculpation ....................................................................................82
    F.    Third-Party Releases by Holders of Claims or Equity Interests .....83
    G.    Injunctions.....................................................................................84
    H.    Release of Liens ............................................................................85

ARTICLE IX.    CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN ................................85

    A.    Conditions Precedent to Confirmation Date ...................................85
    B.    Conditions Precedent to Effective Date ..........................................86
    C.    Waiver of Conditions.....................................................................88

ARTICLE X.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ................................................................88

    A.    Modification and Amendments.......................................................88
    B.    Effect of Confirmation on Modifications .......................................89
    C.    Revocation or Withdrawal of Plan..................................................89
    D.    Validity of Certain Plan Transactions If Effective Date Does Not Occur.......................................................................................89

ARTICLE XI.    RETENTION OF JURISDICTION ................................90

ARTICLE XII.    MISCELLANEOUS PROVISIONS................................92

    A.    Immediate Binding Effect...............................................................92
    B.    Additional Documents ...................................................................93
    C.    Reservation of Rights.....................................................................93
    D.    Successors and Assigns...................................................................93
    E.    Service of Documents ....................................................................93

F.      Term of Injunctions or Stays...................................................................95
G.      Plan Supplement ......................................................................................95
H.      Entire Agreement .....................................................................................95
I.      Non-severability of Plan Provisions ........................................................95
J.      Votes Solicited in Good Faith..................................................................96
K.      Waiver or Estoppel ..................................................................................96
L.      Conflicts...................................................................................................96

## INTRODUCTION

Fortress, Centerbridge, Harbinger, and the Debtors, as the Plan Proponents, hereby respectfully propose the following joint chapter 11 plan for the resolution of outstanding claims against, and interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Plan may be altered, amended, modified, revoked, or withdrawn in accordance with, and subject in all respects to, the terms of the Plan Support Agreement and the Plan, or, in the case of the Debtors, the terms of the Plan only, prior to its substantial consummation.

Among other things, the Plan provides for the satisfaction in full of all Allowed Claims against the Debtors, provides for a recovery to Holders of Existing Inc. Preferred Stock and Existing LP Preferred Units and resolves certain significant issues between the LP Debtors' Estates and the Inc. Debtors' Estates. The Plan is the product of months of mediation and significant negotiations and efforts by the various key constituents in the Chapter 11 Cases, as well as the mediator appointed by the Bankruptcy Court, to broker as much consensus as possible and develop a restructuring plan that will achieve maximum returns for the Estates and stakeholders. Significantly, the Plan is a joint plan for both the Inc. Estates and the LP Estates, which, as numerous parties have consistently stated, is the best means to maximize value for the benefit of all Holders of Claims and Equity Interests and avoids potential litigation over numerous issues that would otherwise arise between the stakeholders of the Inc. Estates and the stakeholders of the LP Estates.

The New Investors, through the provision of new equity investments, new debtor in possession financing and the purchase of certain DIP Claims, are providing the Debtors with additional liquidity to fund the Debtors' operations through the Effective Date and to repay in full the Allowed DIP Inc. Claims and the Allowed DIP LP Claims. Additionally, as set forth herein, the Plan contemplates, among other things, (a) a first lien exit financing facility of $1.25 billion, (b) the issuance of new debt and equity instruments, (c) the assumption of certain liabilities, and (d) the preservation of the Debtors' litigation claims.

Upon their emergence from bankruptcy, the Reorganized Debtors will have a sustainable capital structure and will be stronger and better positioned to avail themselves of significant upside value of the pending spectrum license modification applications. The Plan Proponents accordingly believe that the Plan is the highest and best restructuring offer available to the Debtors that will maximize the value of the Estates for the benefit of the Debtors' creditors and equity holders.

ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.    Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "**Accrued Professional Compensation Claims**" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses, but in all events subject to estimation as provided in Section VII.C hereof. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.

2.    "**Acquired DIP Inc. Claims**" means, collectively, the Fortress/Centerbridge Acquired DIP Inc. Claims and the JPM Acquired DIP Inc. Claims.

3.    "**Acquired Inc. Facility Claims**" means the Allowed Prepetition Inc. Facility Non-Subordinated Claims (inclusive of principal, Inc. Facility Prepetition Interest, and Inc. Facility Postpetition Interest allocable to the Inc. Facility Non-Subordinated Claims accrued through the Inc. Facilities Claims Purchase Closing Date but exclusive of the Prepetition Inc. Facility Repayment Premium and the Prepetition Inc. Fee Claims) purchased for Cash in an amount equal to the Acquired Inc. Facility Claims Purchase Price by SIG from the Prepetition Inc. Facility Claims Sellers on the Inc. Facilities Claims Purchase Closing Date pursuant to, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement.

4.    "**Acquired Inc. Facility Claims Purchase Price**" means an amount equal to the Allowed amount of the Prepetition Inc. Facility Non-Subordinated Claims inclusive of principal, Inc. Facility Prepetition Interest, and Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Non-Subordinated Claims accrued through the Inc. Facilities Claims Purchase Closing Date but exclusive of the Prepetition Inc. Facility Repayment Premium and the Prepetition Inc. Fee Claims, and which amount as of January 15, 2015 equals $337,879,725.54 (which shall increase on a *per diem* basis through and including the Inc. Facilities Claims Purchase Closing Date to account for the Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Non-Subordinated Claims accrued from January 16, 2015 through the Inc. Facilities Claims Purchase Closing Date).

5.    "**Administrative Claim**" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services,

and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Accrued Professional Compensation Claims; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (d) the DIP Claims; (e) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (f) any and all KEIP Payments; (g) the Prepetition Inc. Fee Claims; (h) the DIP Inc. Fee Claims; (i) all indemnification claims arising from the postpetition services of the directors serving on the special committee of the boards of directors for LightSquared Inc. and LightSquared GP Inc., as approved by the Bankruptcy Court pursuant to the *Final Order (I) Approving Compensation for Independent Directors, (II) Authorizing Administrative Expense Priority for Indemnification Claims Arising From Postpetition Services of Independent Directors, and (III) Granting Related Relief* [Docket No. 897]; and (j) any fees and expenses that are earned and payable pursuant to the New DIP Facilities, the Working Capital Facility, the Plan, and the other Plan Documents, including the New Investor Fee Claims.

6. "**Administrative Claims Bar Date**" means the deadline for filing requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

7. "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8. "**Allowed**" means, with respect to Claims, any Claim that (a) is evidenced by a Proof of Claim Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order, (b) is listed on the Schedules as of the Effective Date as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of the Bankruptcy Court, or (d) is Allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to any Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for distribution purposes only by a Final Order. Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. In addition, "**Allowed**" means, with respect to any Equity Interest, such Equity Interest is reflected as outstanding (other than any such Equity Interest held by any Debtor or any subsidiary of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date and is not subject to any objection or challenge.

9.      "**Alternative Transaction**" means any agreement, chapter 11 plan, sale, winding up, liquidation, reorganization, merger, or restructuring of the Debtors other than the Plan that pays in full in Cash (unless a particular Holder of Claims or Equity Interests is offered to be paid in full in Cash and agrees to different treatment in lieu of being paid in full in Cash) all Claims against, or Equity Interests in, the Debtors other than those set forth in Classes 13-16B; provided, however, that to the extent that such Alternative Transaction that pays in full in Cash all Claims against, or Equity Interests in, the Debtors (other than (i) those set forth in Classes 13-16B and (ii) in accordance with the foregoing parenthetical, with respect to those Holders of Claims or Equity Interests who have agreed to different treatment in lieu of being paid in full in Cash) is proposed, sponsored, funded, arranged, or otherwise supported by the Holder of a Claim or Equity Interest or such Holder's equity owner or affiliate (including as to SPSO, any SPSO Affiliate), such Holder's Claim or Equity Interest (as applicable) shall not be required to be paid (or be offered to be paid) in full in Cash.

10.      "**Appeal**" means that certain cause of action captioned *Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. v. SP Special Opportunities LLC, DISH Network Corporation, EchoStar Corporation, Charles W. Ergen, Sound Point Capital Management LP, and Stephen Ketchu*m, No. 14-MC-00234 (S.D.N.Y. filed June 19, 2014).

11.      "**Assets**" means all rights, titles, and interest of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

12.      "**Avoidance Actions**" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

13.      "**Ballot**" means the ballot upon which Holders of Claims or Equity Interests entitled to vote shall cast their vote to accept or reject the Plan.

14.      "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

15.      "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

16.      "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

17.    "**Bid Procedures Order**" means the *Order (A) Establishing Bid Procedures, (B) Scheduling Date and Time for Auction, (C) Approving Assumption and Assignment Procedures, (D) Approving Form of Notice, and (E) Granting Related Relief* [Docket No. 892].

18.    "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.    "**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the CCAA Proceedings.

20.    "**Canadian Proceeding**" means the proceedings commenced with respect to the Chapter 11 Cases in the Canadian Court pursuant to Part IV of the Companies' Creditors Arrangement Act.

21.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

22.    "**Causes of Action**" means any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For purposes of clarity, Causes of Action includes, without limitation, the following: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Actions; and (f) any cause of action listed on the Schedule of Retained Causes of Action.

23.    "**CCAA Proceedings**" means the proceedings commenced by LightSquared LP, in its capacity as foreign representative of the Debtors pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36.

24.    "**Centerbridge**" means Centerbridge Partners, L.P. on behalf of certain of its affiliated funds.

25.    "**Certificate**" means any instrument evidencing a Claim or an Equity Interest.

26.    "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor or group of Debtors, the chapter 11 case or cases pending for that Debtor or group of Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.    "**Claim**" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

CHI-181960186v1 5

28.    "**Claims and Equity Interests Objection Bar Date**" means the deadline for objecting to a Claim or Equity Interest, which shall be on the date that is the later of (a) six (6) months after the Effective Date and (b) such later period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

29.    "**Claims and Solicitation Agent**" means Kurtzman Carson Consultants LLC, the notice, claims, solicitation, and balloting agent retained by the Debtors in the Chapter 11 Cases.

30.    "**Claims Bar Date**" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Order or another Final Order of the Bankruptcy Court.

31.    "**Claims Bar Date Order**" means the *Order Pursuant to 11 U.S.C. § 502(b)(9) and Fed. R. Bankr. P. 2002 and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto and Approving Form and Manner of Notice Thereof* [Docket No. 266].

32.    "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

33.    "**Class**" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

34.    "**Collateral**" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

35.    "**Confirmation**" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

36.    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

37.    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

38.    "**Confirmation Hearing Date**" means the date of the commencement of the Confirmation Hearing.

39.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, and granting other related relief, in form and substance satisfactory to each of the New Investors, the Debtors, and MAST (solely with respect to those provisions of the Confirmation Order that relate to MAST Terms) and reasonably satisfactory to MAST as to all other provisions of the Confirmation Order.

40.    "**Confirmation Recognition Order**" means an order of the Canadian Court, which shall be in form and substance satisfactory to each of the New Investors, the Debtors, and MAST (solely with respect to those provisions of the Confirmation Recognition Order that relate to MAST Terms) and reasonably satisfactory to MAST as to all other provisions of the Confirmation Recognition Order, recognizing the entry of the Confirmation Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interest in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, Claims, charges, interests, or other encumbrances, in accordance with applicable law.

41.    "**Consummation**" means the occurrence of the Effective Date.

42.    "**Cure Costs**" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

43.    "**D&O Liability Insurance Policies**" means all insurance policies of any of the Debtors for directors', managers', and officers' liability.

44.    "**Debtor**" means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

45.    "**Debtors**" means, collectively, the Inc. Debtors and the LP Debtors.

46.    "**DIP Agents**" means the DIP Inc. Agent and the New DIP Agents.

47.    "**DIP Claim**" means a DIP Inc. Claim, a DIP LP Claim, or a New DIP Claim.

48.    "**DIP Facilities**" means the DIP Inc. Facility, the DIP LP Facility, and the New DIP Facilities.

49.    "**DIP Inc. Agent**" means U.S. Bank National Association, as Arranger, Administrative Agent, and Collateral Agent under the DIP Inc. Credit Agreement.

50.    "**DIP Inc. Borrower**" means One Dot Six Corp., as borrower under the DIP Inc. Credit Agreement.

51.    "**DIP Inc. Claim**" means a Claim held by the DIP Inc. Agent or DIP Inc. Lenders arising under or related to the DIP Inc. Facility, including, without limitation, all principal, interest, default interest, commitment fees, and exit fees provided for thereunder.

52.    "**DIP Inc. Claims Sellers**" means the Holders of JPM Acquired DIP Inc. Claims and the Fortress/Centerbridge Acquired DIP Inc. Claims immediately prior to the Inc. Facilities Claims Purchase Closing Date.

53.    "**DIP Inc. Credit Agreement**" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of July 19, 2012 (as amended, supplemented,

restated, or otherwise modified from time to time in accordance with the terms thereof), among the DIP Inc. Obligors, the DIP Inc. Agent, and the DIP Inc. Lenders.

54.    "**DIP Inc. Facility**" means that certain debtor in possession credit facility provided in connection with the DIP Inc. Credit Agreement and DIP Inc. Order.

55.    "**DIP Inc. Fee Claims**" means all Claims for the reasonable, actual documented fees and expenses of the DIP Inc. Lenders and the DIP Inc. Agent, including, but not limited to, the fees and expenses of financial advisors and counsel, in each case to the extent payable pursuant to the DIP Inc. Order.

56.    "**DIP Inc. Guarantors**" means LightSquared Inc., One Dot Four Corp., and One Dot Six TVCC Corp., as guarantors under the DIP Inc. Credit Agreement.

57.    "**DIP Inc. Lenders**" means the lenders party to the DIP Inc. Credit Agreement from time to time.

58.    "**DIP Inc. Obligors**" means the DIP Inc. Borrower and the DIP Inc. Guarantors.

59.    "**DIP Inc. Order**" means the Final *Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, (A) Authorizing Inc. Obligors To Obtain Postpetition Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 224] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

60.    "**DIP Lenders**" means the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders.

61.    "**DIP LP Borrower**" means LightSquared LP, as borrower under the DIP LP Facility.

62.    "**DIP LP Claim**" means a Claim held by the DIP LP Lenders arising under or related to the DIP LP Facility, including, without limitation, all principal, interest, default interest, and fees provided for thereunder.

63.    "**DIP LP Facility**" means that certain debtor in possession credit facility provided in connection with the DIP LP Order and related documents.

64.    "**DIP LP Lenders**" means the lenders under the DIP LP Facility from time to time.

65.    "**DIP LP Order**" means the *Final Order (A) Authorizing LP DIP Obligors To Obtain Seventh Replacement Superpriority Senior Secured Priming Postpetition Financing, (B) Granting Superpriority Liens and Providing Superpriority Administrative Expense Status, (C) Granting Adequate Protection, and (D) Modifying Automatic Stay* [Docket No. 1927] (as amended, supplemented, or modified from time to time in accordance with the terms thereof).

66.    "**Disbursing Agent**" means, for Plan Distributions made prior to the Effective Date, the Debtors or the DIP Inc. Agent, to the extent it makes or facilitates Plan Distributions, and, for Plan Distributions made on or after the Effective Date, the Reorganized Debtors, or the Entity or Entities designated by the Reorganized Debtors, as applicable, to make or facilitate Plan Distributions pursuant to the Plan on or after the Effective Date, including, without limitation, the Prepetition Inc. Agent or the Prepetition LP Agent to the extent they make or facilitate Plan Distributions.

67.    "**Disclosure Statement**" means, collectively, (a) the Specific Disclosure Statement and (b) the General Disclosure Statement (as either may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in each case, in accordance with the terms of the Plan Support Agreement or, in the case of the Debtors, the terms of the Plan).

68.    "**Disclosure Statement Order**" means the order or orders entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance satisfactory to each of the New Investors, MAST, and the Debtors, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

69.    "**Disclosure Statement Recognition Order**" means the order or orders of the Canadian Court, which shall be in form and substance satisfactory to each of the New Investors, MAST, and the Debtors, recognizing the entry of the Disclosure Statement Order.

70.    "**Disputed**" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

71.    "**Disputed Claims and Equity Interests Reserve**" means a reserve to be held by New LightSquared for the benefit of each Holder of a Disputed Claim or Equity Interest, in an amount equal to the Plan Distributions such Disputed Claim or Equity Interest would be entitled to on the Effective Date if such Disputed Claim or Equity Interest were Allowed in its full amount on the Effective Date.

72.    "**Distribution Record Date**" means: (a) for the DIP Inc. Claims, the Inc. Facilities Claims Purchase Closing Date; (b) for the DIP LP Claims, the New LP DIP Closing Date; (c) for the Acquired Inc. Facility Claims and the New DIP Claims, the Effective Date; and (d) for all other Claims and Equity Interests, the Voting Record Date.

73.    "**Effective Date**" means the date selected by the New Investors (upon agreement of all of the New Investors) and the Debtors, that is a Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Section IX.B hereof have been satisfied or waived (in accordance with Section IX.C hereof).

74.    "**Effective Date Investments**" means the cash investments to be provided by certain of the New Investors to New LightSquared in the aggregate principal amount of

$89,500,175.01, of which Fortress shall contribute $68,391,643.16 and Centerbridge shall contribute $21,108,531.85.

75.    "**Eligible Transferee**" means any Person that is not a Prohibited Transferee.

76.    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

77.    "**Equity Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date, any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, any Existing Shares, and any Claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

78.    "**Estate**" means the bankruptcy estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

79.    "**Exculpated Party**" means a Released Party.

80.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

81.    "**Existing Inc. Common Stock**" means the Equity Interests in LightSquared Inc. (other than the Existing Inc. Preferred Stock).

82.    "**Existing Inc. Preferred Stock**" means the Existing Inc. Series A Preferred Stock and Existing Inc. Series B Preferred Stock.

83.    "**Existing Inc. Series A Preferred Stock**" means the outstanding shares of Convertible Series A Preferred Stock issued by LightSquared Inc.

84.    "**Existing Inc. Series B Preferred Stock**" means the outstanding shares of Convertible Series B Preferred Stock issued by LightSquared Inc.

85.    "**Existing LP Common Units**" means the outstanding common units issued by LightSquared LP.

86.    "**Existing LP Preferred Units**" means the outstanding non-voting Series A Preferred Units issued by LightSquared LP.

87.    "**Existing LP Preferred Units Distribution Amount**" means the outstanding liquidation preference of the Existing LP Preferred Units as of the Effective Date (excluding any prepayment or redemption premium).

88.    "**Existing Shares**" means all Equity Interests related to Existing Inc. Common Stock, Existing Inc. Preferred Stock, Existing LP Common Units, Existing LP Preferred Units, and Intercompany Interests.

89.    "**Exit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated on or before the Effective Date, between the Working Capital Lenders, the Second Lien Exit Term Lenders, the agents under the Working Capital Facility and the Second Lien Exit Facility, and the other relevant Entities governing, among other things, the respective rights, remedies, and priorities of claims and security interests held by the Working Capital Lenders, the Second Lien Exit Term Lenders, the agents and the other relevant Entities under the Working Capital Facility and the Second Lien Exit Facility, under the Working Capital Facility Credit Agreement and the Second Lien Exit Credit Agreement.

90.    "**Expense Reimbursement**" means the (i) "Inc. Expense Reimbursement," but solely to the extent such Inc. Expense Reimbursement has not yet been paid or is not subject to payment in connection with a prior order of the Bankruptcy Court, and (ii) "LP Expense Reimbursement," in each case, as such term is used in the Bid Procedures Order.

91.    "**FCC**" means the Federal Communications Commission.

92.    "**FCC Action**" means that certain cause of action captioned *Harbinger Capital Partners, LLC, et al. v. United States of America*, Civil Action No. 14-cv-00597 (Fed. Cl. 2014).

93.    "**FCC Objectives**" means that: (a) the Debtors shall have FCC authority to (i) provide terrestrial communications in the United States on 20 MHz of uplink spectrum comprised of 10 MHz nominally between 1627-1637 MHz and 10 MHz nominally between 1646-1656 MHz, and 10 MHz of downlink spectrum comprised of 5 MHz at 1670-1675 MHz (under the One Dot Six Lease) and 5 MHz at 1675-1680 MHz, (ii) operate in those band segments at transmit power levels commensurate with existing terrestrially-based 4th generation LTE wireless communications networks, and (iii) provide terrestrial signal coverage of (A) 290 million total POPs calculated on a weighted-average basis over the nominal 1627-1637 MHz and 1646-1656 MHz bands and (B) 265 million total POPs calculated on a weighted-average basis over the 1670-1680 MHz band; (b) any build out conditions that may be imposed by the FCC on the Debtors shall be no more onerous than those in effect for DISH Network Corporation's AWS-4 spectrum as of December 2012; and (c) any specific restrictions that may be imposed by the FCC on the Debtors regarding their possible sale to future buyers must not preclude a sale to AT&T Inc., Verizon Communications Inc., T-Mobile USA, Inc., or Sprint Corporation.

94.    "**Federal Judgment Rate**" means the federal judgment rate in effect as of the Petition Date.

95.     "**File,**" "**Filed,**" or "**Filing**" means file, filed, or filing with (i) the Bankruptcy Court or its authorized designee in the Chapter 11 Cases or (ii) the Canadian Court, as applicable.

96.     "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (including the Canadian Court) with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari or leave to appeal has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari or leave to appeal was sought; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or under the Ontario Rules of Civil Procedure, may be Filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the New Investors (upon the consent of each New Investor and the Debtors) reserve the right to waive any appeal period.

97.     "**First Day Pleadings**" means those certain pleadings Filed by the Debtors on or around the Petition Date.

98.     "**Fortress**" means Fortress Credit Opportunities Advisors LLC, by and on behalf of certain of its and its affiliates' managed funds and/or accounts.

99.     "**Fortress/Centerbridge Acquired DIP Inc. Claims**" means DIP Inc. Claims purchased for Cash by Fortress and Centerbridge from the DIP Inc. Claims Sellers on the Inc. Facilities Claims Purchase Closing Date pursuant to, and subject to the terms and conditions of, the Fortress/Centerbridge DIP Inc. Claims Purchase Agreement.

100.    "**Fortress/Centerbridge DIP Inc. Claims Purchase Agreement**" means that certain purchase agreement to be entered into between Fortress, Centerbridge, and the DIP Inc. Claims Sellers on terms mutually acceptable to the parties thereto, pursuant to which Fortress and Centerbridge shall agree to backstop the purchase from the DIP Inc. Claims Sellers of up to $89,500,175.01 of DIP Inc. Claims.

101.    "**General Disclosure Statement**" means the *First Amended General Disclosure Statement* [Docket No. 918].

102.    "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims: (a) Administrative Claim; (b) Priority Tax Claim; (c) DIP Claim; (d) Other Priority Claim; (e) Other Secured Claim; (f) Prepetition Inc. Facility Claim; (g) Prepetition LP Facility Non-SPSO Claim; (h) Prepetition LP Facility SPSO Claim; (i) Prepetition LP Facility Non-SPSO Guaranty Claim; (j) Prepetition LP Facility SPSO Guaranty Claim; or (i) Intercompany Claim.

103.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

104.    "**GPS Action**" means that certain cause of action captioned *Harbinger Capital Partners LLC v. Deere & Co.*, Case No. 13-cv-5543 (RMB) (S.D.N.Y. 2013).

105.    "**Harbinger**" means Harbinger Capital Partners LLC on behalf of itself and each of its and its affiliates' managed funds and/or accounts that hold Claims and/or Equity Interests.

106.    "**Harbinger Litigations**" means, collectively, the Appeal, the FCC Action, the GPS Action, the RICO Action, and any and all of Harbinger's rights to commence any New Action.

107.    "**Holder**" means the Entity holding the beneficial interest in a Claim or Equity Interest.

108.    "**Impaired**" means, with respect to a Class of Claims or Equity Interests, a Class of Claims or Equity Interests that is not Unimpaired.

109.    "**Inc. Debtors**" means, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, One Dot Six TVCC Corp., LightSquared Investors Holdings Inc., and TMI Communications Delaware, Limited Partnership.

110.    "**Inc. Facilities Claims Purchase Closing Date**" means the date upon which (a) all conditions precedent to the consummation of the JPM Inc. Facilities Claims Purchase Agreement have been waived or satisfied in accordance with the terms thereof, (b) the JPM Inc. Facilities Claims Purchase Agreement is consummated, and (c) the Allowed DIP Inc. Claims that are not JPM Acquired DIP Inc. Claims are paid in full in Cash from the proceeds of the Third Party New Inc. DIP Facility and/or pursuant to the New Investor Commitment Documents, as applicable. Subject to the terms of the JPM Inc. Facilities Claims Purchase Agreement, such date shall be no later than one (1) Business Day following the fourteenth (14th) day after entry of the Confirmation Order, provided that there is no stay of the Confirmation Order in effect at such time.

111.    "**Inc. Facility Postpetition Interest**" means all interest and/or default interest (calculated as is set forth in paragraphs E(ii) and 16(b) of the DIP Inc. Order) owed pursuant to the Prepetition Inc. Loan Documents from and after the Petition Date.

112.    "**Inc. Facility Prepetition Interest**" means all interest and/or default interest owed pursuant to the Prepetition Inc. Loan Documents prior to the Petition Date.

113.    "**Inc. General Unsecured Claim**" means any General Unsecured Claim asserted against an Inc. Debtor.

114.    "**Inc. Other Priority Claim**" means any Other Priority Claim asserted against an Inc. Debtor.

115.    "**Inc. Other Secured Claim**" means any Other Secured Claim asserted against an Inc. Debtor.

116.    "**Industry Canada**" means the Canadian Federal Department of Industry, or any successor or any department or agency thereof, administering the Radiocommunication Act, R.S.C., 1985, c. R-2, among other statutes, including its staff acting under delegated authority, and includes the Minister of Industry (Canada) and the Commissioner of Competition (Canada).

117.    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor or a non-Debtor Affiliate.

118.    "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

119.    "**Intercompany Interest**" means any Equity Interest in a Debtor held by another Debtor, including the Existing LP Common Units.

120.    "**Interim Compensation Order**" means the *Order Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 122], as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

121.    "**JPM Acquired DIP Inc. Claims**" means DIP Inc. Claims in the amount of $41,000,000 purchased for Cash by SIG from the DIP Inc. Claims Sellers on the Inc. Facilities Claims Purchase Closing Date pursuant to, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement.

122.    "**JPM Inc. Facilities Claims Purchase Agreement**" means that certain purchase agreement to be entered into between SIG, the DIP Inc. Claims Sellers, and the Prepetition Inc. Facility Claims Sellers on terms mutually acceptable to the parties thereto, pursuant to which SIG shall purchase (a) from the Prepetition Inc. Facility Claims Sellers the Acquired Inc. Facility Claims in exchange for the Acquired Inc. Facility Claims Purchase Price and (b) from the DIP Inc. Claims Sellers the JPM Acquired DIP Inc. Claims in exchange for $41,000,000.

123.    "**JPM Investment Parties**" means SIG, together with any affiliates (but, with respect to such affiliates, solely with respect to the Credit Trading Group and the Credit Trading Group's position in any Claims and/or Equity Interests held through such affiliates, and subject to the terms of the Plan Support Agreement) of SIG that become party to the Plan Support Agreement after the date such Plan Support Agreement becomes effective.

124.    "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

125.    "**KEIP Payments**" means any and all amounts payable under (a) the Debtors' key employee incentive plan approved by the Bankruptcy Court pursuant to the *Order Approving LightSquared's Key Employee Incentive Plan* [Docket No. 394] or (b) any amended, supplemented, or other employee incentive plan of the Debtors approved pursuant to an order of the Bankruptcy Court.

126.    "**LBAC Break-Up Fee**" has the meaning set forth in the Bid Procedures Order.

127. "**License Modification Application**" means, collectively, those certain applications filed by certain of the Debtors with the FCC on or about September 28, 2012, seeking to modify various of their spectrum licenses to (a) authorize their use of the 1675 – 1680 MHz spectrum band on a shared basis with certain government users, including the National Oceanic and Atmospheric Administration, (b) permit them to conduct terrestrial operations "pairing" the 1670-1680 MHz downlink band with two (2) 10 MHz L-band uplink channels in which they currently are authorized to operate, and (c) permanently relinquish their right to use the upper 10 MHz of L-band downlink spectrum for terrestrial purposes (that portion of the spectrum closest to the band designated for Global Positioning System devices).

128. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

129. "**LP Cash Collateral Order**" means the *Amended Agreed Final Order (a) Authorizing Debtors To Use Cash Collateral, (b) Granting Adequate Protection to Prepetition Secured Parties, and (c) Modifying Automatic Stay* [Docket No. 544] (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

130. "**LP Debtors**" means, collectively, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., Lightsquared Bermuda Ltd., and LightSquared GP Inc.

131. "**LP Facility Postpetition Interest**" means all interest owed pursuant to the Prepetition LP Credit Agreement from and after the Petition Date <u>less</u> the amount of adequate protection payments made by LightSquared LP during the Chapter 11 Cases pursuant to the LP Cash Collateral Order (exclusive of Professional Fees (as defined in the LP Cash Collateral Order) paid in accordance with the LP Cash Collateral Order).

132. "**LP Facility Prepetition Interest**" means all interest owed pursuant to the Prepetition LP Loan Documents prior to the Petition Date.

133. "**LP Facility Repayment Premium**" means the repayment premium due and owing pursuant to Section 2.10(f) of the Prepetition LP Credit Agreement.

134. "**LP General Unsecured Claim**" means any General Unsecured Claim asserted against an LP Debtor.

135. "**LP Group**" means that certain ad hoc group of Prepetition LP Lenders, comprised of holders, advisors or affiliates of advisors to holders, or managers of various accounts with investment authority, contractual authority, or voting authority, of the loans under the Prepetition LP Credit Agreement, which, for the avoidance of doubt, shall exclude SPSO.

136. "**LP Group Advisors**" means White & Case LLP, as counsel to the LP Group, Bennett Jones LLP, as Canadian counsel to the LP Group, and Blackstone Advisory Partners L.P., as financial advisor to the LP Group.

137. "**LP Group Fee Claims**" means all Claims for the reasonable, documented fees and expenses of the LP Group Advisors.

138. "**LP Other Priority Claim**" means any Other Priority Claim asserted against an LP Debtor.

139. "**LP Other Secured Claim**" means any Other Secured Claim asserted against an LP Debtor.

140. "**Management Incentive Plan**" means a post-Effective Date equity incentive plan approved by the New LightSquared Board subject to the terms of the New LightSquared Interest Holders Agreement and approved by each of the New Investors, which shall provide for the issuance of equity and/or equity based awards of New LightSquared (which may include but are not limited to New LightSquared Common Interests), to certain officers and employees of the Reorganized Debtors (subject to the terms and conditions of such plan).

141. "**MAST**" means MAST Capital Management, LLC and its managed funds and accounts that are DIP Inc. Lenders and Holders of Prepetition Inc. Facility Non-Subordinated Claims.

142. "**MAST Terms**" has the meaning set forth in the Plan Support Agreement.

143. "**Material Regulatory Request**" means any of the following: (a) the License Modification Application; (b) the Spectrum Allocation Petition for Rulemaking; and (c) the pending petition for rulemaking in RM-11683.

144. "**New Action**" means any unasserted claim or Cause of Action arising out of, relating to, or in connection with, in any manner, the Chapter 11 Cases, the Debtors or the Debtors' businesses, or any obligations or securities of, or interests in, the Debtors for things occurring through and including the date of termination of the Plan Support Agreement.

145. "**New DIP Agents**" means the New Inc. DIP Agent and the New LP DIP Agent.

146. "**New DIP Claim**" means a New Inc. DIP Claim or a New LP DIP Claim.

147. "**New DIP Closing Dates**" means the New Inc. DIP Closing Date and the New LP DIP Closing Date.

148. "**New DIP Credit Agreements**" means the New Inc. DIP Credit Agreement and the New LP DIP Credit Agreement.

149. "**New DIP Facilities**" means the New Inc. DIP Facility and the New LP DIP Facility.

150. "**New DIP Lenders**" means the New Inc. DIP Lenders and the New LP DIP Lenders.

151.   "**New DIP Orders**" means orders of the Bankruptcy Court, in forms and substance satisfactory to each of the New Investors, MAST (solely with respect to any provision in the New DIP Orders relating to MAST Terms), and the Debtors, approving the New DIP Facilities (as may be amended, supplemented, or modified from time to time in accordance with the terms thereof), or amending, supplementing or otherwise modifying the DIP LP Order.

152.   "**New DIP Recognition Order**" means an order of the Canadian Court, which shall be in form and substance satisfactory to each of the New Investors, MAST (solely with respect to any provision in the New DIP Recognition Order relating to MAST Terms), and the Debtors, recognizing the entry of the New DIP Orders to the extent necessary.

153.   "**New Inc. DIP Agent**" means the administrative agent under the New Inc. DIP Credit Agreement or any successor agent appointed in accordance with the New Inc. DIP Credit Agreement.

154.   "**New Inc. DIP Claim**" means a Claim held by the New Inc. DIP Agent or New Inc. DIP Lenders arising under, or related to, New Inc. DIP Loans, including, without limitation, all outstanding principal, interest, default interest, and fees provided for thereunder.

155.   "**New Inc. DIP Closing Date**" means the date upon which the New Inc. DIP Credit Agreement shall have been executed by all of the parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of the obligations pursuant to the New Inc. DIP Facility shall have occurred.

156.   "**New Inc. DIP Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement with respect to the New Inc. DIP Facility to be entered into among the New Inc. DIP Obligors and the New Inc. DIP Lenders, in form and substance satisfactory to each of the New Investors and the Debtors.

157.   "**New Inc. DIP Facility**" means, as applicable, either the New Investor New Inc. DIP Facility or the Third Party New Inc. DIP Facility.

158.   "**New Inc. DIP Lenders**" means the lenders party to the New Inc. DIP Credit Agreement from time to time.

159.   "**New Inc. DIP Loans**" means the loans to be made, or deemed made, under the New Inc. DIP Facility.

160.   "**New Inc. DIP Obligors**" means LightSquared Inc., as borrower, and certain of the other Inc. Debtors, as guarantors, under the New Inc. DIP Credit Agreement.

161.   "**New Investor Break-Up Fee**" means a break-up fee of $200,000,000, which shall be payable on the following basis: (a) 47.65% to Fortress; (b) 37.65% to SIG; and (c) 14.71% to Centerbridge, allowed and irrevocably payable in Cash only (i) upon the closing of an Alternative Transaction as per the New Investor Break-Up Fee Order, which order may be the Confirmation Order, and (ii) if (A) the Plan has not been withdrawn, (B) the Bankruptcy Court has not denied Confirmation of the Plan, and (C) as of the Inc. Facilities Claims Purchase

Closing Date, the Plan Support Agreement, the JPM Inc. Facilities Claims Purchase Agreement, and the New Investor Commitment Documents are in full force and effect, in each case, as to the New Investors.

162.    "**New Investor Break-Up Fee Order**" means an order of the Bankruptcy Court approving the New Investor Break-Up Fee in form and substance satisfactory to each of the New Investors and the Debtors.

163.    "**New Investor Commitment Documents**" means (a) the Fortress/Centerbridge DIP Inc. Claims Purchase Agreement and (b) the New Investor New Inc. DIP Commitment Letter.

164.    "**New Investor Fee Claims**" means all Claims for the reasonable, actual documented fees and expenses of the advisors to the New Investors in an aggregate amount not to exceed $10,000,000, to be shared as agreed to by each of the New Investors.

165.    "**New Investor New Inc. DIP Commitment Letter**" means the commitment letter from the New Investors or certain of their affiliates, dated as of January 15, 2015, as amended by that certain Amendment to Debtor-in-Possession Facility Commitment Letter, dated February 9, 2015 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof), pursuant to which the New Investors or their affiliates commit to provide, among other things, New Inc. DIP Loans of up to $210,811,224.48, comprised of the conversion of the Acquired DIP Inc. Claims into New DIP Loans in the amount of not less than $130,500,175.01 and new money loans of up to $80,311,049.47.

166.    "**New Investor New Inc. DIP Facility**" means that certain debtor-in-possession credit facility provided by the New Investors in connection with the New Inc. DIP Credit Agreement and New DIP Orders on substantially the terms set forth in the New Investor New Inc. DIP Commitment Letter in an aggregate principal amount not less than the aggregate principal amount set forth in the New Investor New Inc. DIP Commitment Letter (after giving effect to the conversion of the Acquired DIP Inc. Claims into New Inc. DIP Loans).

167.    "**New Investors**" means Fortress, SIG, Centerbridge, and Harbinger.

168.    "**New LightSquared**" means LightSquared LP as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

169.    "**New LightSquared Board**" means the board of directors, board of managers, or equivalent governing body of New LightSquared, as initially comprised as set forth in the Plan and as comprised thereafter in accordance with the terms of the applicable Reorganized Debtors Governance Documents.

170.    "**New LightSquared Common Interests**" means those certain limited liability company common interests to be issued by New LightSquared in connection with, and subject to, the Plan, the Confirmation Order, and the New LightSquared Interest Holders Agreement.

171.    "**New LightSquared Entities Shares**" means, collectively, the New LightSquared Interests, the Reorganized LightSquared Inc. Common Shares, and the Reinstated Intercompany Interests.

172.    "**New LightSquared Interest Holders Agreement**" means that certain limited liability company operating agreement of New LightSquared with respect to the New LightSquared Interests, to be effective on the Effective Date and binding on all holders of the New LightSquared Interests.

173.    "**New LightSquared Interests**" means, collectively, the New LightSquared Common Interests, and the New LightSquared Preferred Interests.

174.    "**New LightSquared Obligors**" means New LightSquared and its subsidiaries.

175.    "**New LightSquared Preferred Interests**" means, collectively, the New LightSquared Series A Preferred Interests, New LightSquared Series B Preferred Interests, and New LightSquared Series C Preferred Interests.

176.    "**New LightSquared Series A Preferred Interests**" means, collectively, the New LightSquared Series A-1 Preferred Interests and the New LightSquared Series A-2 Preferred Interests.

177.    "**New LightSquared Series A-1 Preferred Interests**" means those certain series A-1 preferred payable-in-kind interests having an original liquidation preference equal to the New LightSquared Series A-1 Preferred Interests Original Liquidation Preference, issued by New LightSquared in connection with, and subject to, the Plan, the Confirmation Order, and the New LightSquared Interest Holders Agreement.

178.    "**New LightSquared Series A-1 Preferred Interests Original Liquidation Preference**" means a liquidation preference of (subject to any modification pursuant to the proviso of Section IV.B.2(d)(iv)) not less than the sum of (a) the Allowed amount of the Acquired Inc. Facility Claims and the Prepetition Inc. Facility Subordinated Claims, in each case as of the Effective Date, plus (b) $122,000,000.

179.    "**New LightSquared Series A-2 Preferred Interests**" means those certain series A-2 preferred payable-in-kind interests having an original liquidation preference equal to the New LightSquared Series A-2 Preferred Interests Original Liquidation Preference, issued by New LightSquared in connection with, and subject to, the Plan, the Confirmation Order, and the New LightSquared Interest Holders Agreement.

180.    "**New LightSquared Series A-2 Preferred Interests Original Liquidation Preference**" means a liquidation preference of (subject to any modification pursuant to the proviso of Section IV.B.2(d)(iv)) not less than the amount of the Existing LP Preferred Units Distribution Amount attributable to those Holders of Existing LP Preferred Units who elect to receive New LightSquared Series A-2 Preferred Interests under the Plan.

181.    "**New LightSquared Series B Preferred Interests**" means those certain series B preferred payable-in-kind interests having an original liquidation preference of not less than

$130,500,175.01, issued by New LightSquared in connection with, and subject to, the Plan, the Confirmation Order, and the New LightSquared Interest Holders Agreement.

182.    "**New LightSquared Series C Preferred Interests**" means those certain series C preferred payable-in-kind interests having an original liquidation preference equal to the New LightSquared Series C Preferred Interests Original Liquidation Preference, issued by New LightSquared in connection with, and subject to, the Plan, the Confirmation Order, and the New LightSquared Interest Holders Agreement.

183.    "**New LightSquared Series C Preferred Interests Original Liquidation Preference**" means a liquidation preference of (subject to any modification pursuant to the proviso of Section IV.B.2(d)(iv)) not less than (a) the amount of the Existing LP Preferred Units Distribution Amount attributable to those Holders of Existing LP Preferred Units who elect to receive New LightSquared Series C Preferred Interests under the Plan, plus (b) the outstanding liquidation preference of the Existing Inc. Preferred Stock held by the Other Existing Inc. Preferred Equity Holders as of the Effective Date (excluding any prepayment or redemption premium), plus (c) $73,000,000.

184.    "**New LP DIP Agent**" means the administrative agent under the New LP DIP Credit Agreement or any successor agent appointed in accordance with the New LP DIP Credit Agreement.

185.    "**New LP DIP Claim**" means a Claim held by the New LP DIP Agent or New LP DIP Lenders arising under, or related to, New LP DIP Loans, including, without limitation, all outstanding principal, interest, default interest, and fees provided for thereunder.

186.    "**New LP DIP Closing Date**" means the date upon which the New LP DIP Credit Agreement shall have been executed by all of the parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of the obligations pursuant to the New LP DIP Facility shall have occurred.

187.    "**New LP DIP Credit Agreement**" means that certain senior secured, priming, superpriority debtor-in-possession credit agreement with respect to the New LP DIP Facility to be entered into among the New LP DIP Obligors and the New LP DIP Lenders, in form and substance satisfactory to each of the New Investors and the Debtors.

188.    "**New LP DIP Facility**" means that certain debtor-in-possession credit facility provided in connection with the New LP DIP Credit Agreement and New DIP Orders.

189.    "**New LP DIP Lenders**" means the lenders party to the New LP DIP Credit Agreement from time to time.

190.    "**New LP DIP Loans**" means the loans to be made under the New LP DIP Facility.

191.    "**New LP DIP Obligors**" means LightSquared LP, as borrower, and the other LP Debtors, as guarantors, under the New LP DIP Credit Agreement.

192.    "**NOAA Spectrum**" means that 5 MHz of spectrum between 1675-1680 MHz in the United States, currently used on a primary basis by the National Oceanic and Atmospheric Administration.

193.    "**One Dot Six Lease**" has the meaning set forth in the Disclosure Statement.

194.    "**Other Existing Inc. Preferred Equity Holder**" means each Holder of Existing Inc. Preferred Stock other than SIG.

195.    "**Other Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

196.    "**Other Secured Claim**" means any Secured Claim that is not a DIP Claim or Prepetition Facility Claim.

197.    "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

198.    "**Petition Date**" means May 14, 2012.

199.    "**Plan**" means this *Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* (as amended, supplemented, or modified from time to time in accordance with the terms hereof), including, without limitation, the Plan Supplement, which is incorporated herein by reference.

200.    "**Plan Consideration**" means a payment or distribution of Cash, assets, securities, or instruments evidencing an obligation to Holders of Allowed Claims or Equity Interests under the Plan. Unless otherwise expressly specified herein, any Plan Consideration in the form of Cash shall be paid from proceeds of the Working Capital Facility, the Second Lien Exit Facility, and the Debtors' Cash on hand.

201.    "**Plan Distribution**" means a payment or distribution to Holders of Allowed Claims, Allowed Equity Interests, or other eligible Entities under the Plan or Plan Supplement documents.

202.    "**Plan Documents**" means the documents other than the Plan, to be executed, delivered, assumed, or performed in conjunction with the Consummation of the Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement, in each case, in forms and substance satisfactory to each of the New Investors and the Debtors.

203.    "**Plan Proponents**" means Fortress, Centerbridge, Harbinger, and the Debtors.

204.    "**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules and, in each case, (x) in form and substance satisfactory to each of the New Investors and the Debtors and (y) with respect to documents (f) and (g) below, in form and substance satisfactory to MAST in all respects, and with respect to all

other documents, in form and substance satisfactory to MAST solely with respect to the MAST Terms (except as otherwise provided by the Plan or Plan Support Agreement)) to be Filed no later than the Plan Supplement Date or such other date as may be approved by the Bankruptcy Court, including: (a) executed commitment letters, engagement letters, highly confident letters, or form and/or definitive agreements, and related documents with respect to (i) the Working Capital Facility Credit Agreement, (ii) the Second Lien Exit Facility, (iii) the Reorganized LightSquared Inc. Credit Agreement, and (iv) the Effective Date Investments; (b) the Reorganized Debtors Corporate Governance Documents; (c) the terms of a transition plan for the Debtors as may be agreed to among the Debtors and each of the New Investors; (d) the Schedule of Assumed Agreements; (e) the Schedule of Retained Causes of Action; (f) the JPM Inc. Facilities Claims Purchase Agreement; and (g) the New Investor Commitment Documents.

205.    "**Plan Supplement Date**" means (a) January 30, 2015 or (b) such other date agreed to by each of the New Investors and the Debtors or established by the Bankruptcy Court; provided, that such date shall not be later than five (5) days prior to the Confirmation Hearing Date; provided, further, that the Plan Proponents reserve the right to File amended Plan Documents at any time prior to the conclusion of the Confirmation Hearing.

206.    "**Plan Support Agreement**" means that certain Amended and Restated Plan Support Agreement, dated as of January 15, 2015, by and among Fortress, Centerbridge, Harbinger, the JPM Investment Parties, MAST, and the Prepetition Inc. Agent, as may be amended, supplemented, or modified from time to time in accordance with the terms thereof, which agreement is attached hereto as Exhibit A.

207.    "**Plan Support Parties**" means collectively, the Plan Proponents, the JPM Investment Parties, MAST, the Prepetition Inc. Agent and any subsequent person or entity that becomes a party to the Plan Support Agreement.

208.    "**Plan Transactions**" means one or more transactions to occur on or before the Effective Date or as soon thereafter as reasonably practicable, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, equity issuance, sale, dissolution, certificates of incorporation, certificates of partnership, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that are consistent with the terms of the Plan that the New Investors, the Debtors, Reorganized LightSquared Inc. or New LightSquared, as applicable, determine are necessary or appropriate.

209.    "**Prepetition Facilities**" means the Prepetition Inc. Facility and the Prepetition LP Facility.

210.    "**Prepetition Facility Claim**" means a Prepetition Inc. Facility Claim or a Prepetition LP Facility Claim.

211.    "**Prepetition Inc. Agent**" means U.S. Bank National Association, as successor administrative agent to UBS AG, Stamford Branch under the Prepetition Inc. Credit Agreement.

212.    "**Prepetition Inc. Borrower**" means LightSquared Inc., as borrower under the Prepetition Inc. Credit Agreement.

213.    "**Prepetition Inc. Credit Agreement**" means that certain Credit Agreement, dated as of July 1, 2011 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition Inc. Obligors, the Prepetition Inc. Agent, and the Prepetition Inc. Lenders.

214.    "**Prepetition Inc. Facility**" means that certain $278,750,000 term loan credit facility provided in connection with the Prepetition Inc. Credit Agreement.

215.    "**Prepetition Inc. Facility Claim**" means, collectively, any Prepetition Inc. Facility Non-Subordinated Claim and Prepetition Inc. Facility Subordinated Claim.

216.    "**Prepetition Inc. Facility Claims Sellers**" means the Holders of Prepetition Inc. Facility Non-Subordinated Claims immediately prior to the Inc. Facilities Claims Purchase Closing Date.

217.    "**Prepetition Inc. Facility Lender Subordination Agreement**" means that certain Lender Subordination Agreement, dated as of March 29, 2012, between and among certain Affiliate Lenders and Non-Affiliate Lenders (each as defined therein), by which the Affiliate Lenders agreed to subordinate their Liens (as such term is used therein) and Claims under the Prepetition Inc. Loan Documents to the Liens and Claims of the Non-Affiliate Lenders.

218.    "**Prepetition Inc. Facility Non-Subordinated Claim**" means a Claim held by the Prepetition Inc. Agent or Prepetition Inc. Lenders arising under, or related to, the Prepetition Inc. Loan Documents, but excluding any Prepetition Inc. Facility Subordinated Claim.

219.    "**Prepetition Inc. Facility Repayment Premium**" means any repayment or prepayment premium owed pursuant to the Prepetition Inc. Loan Documents.

220.    "**Prepetition Inc. Facility Subordinated Claim**" means a Claim held by a Prepetition Inc. Lender arising under, or related to, the Prepetition Inc. Loan Documents that is subordinated to the Prepetition Inc. Facility Non-Subordinated Claims pursuant to the Prepetition Inc. Facility Lender Subordination Agreement.

221.    "**Prepetition Inc. Fee Claims**" means all Claims for the reasonable, actual documented fees and expenses of the Holders of Inc. Facility Non-Subordinated Claims and the Prepetition Inc. Agent, including, but not limited to, the fees and expenses of financial advisors and counsel.

222.    "**Prepetition Inc. Guarantors**" means One Dot Four Corp., One Dot Six Corp., and One Dot Six TVCC Corp., as guarantors under the Prepetition Inc. Credit Agreement.

223.    "**Prepetition Inc. Lenders**" means the lenders party to the Prepetition Inc. Credit Agreement from time to time.

224.    "**Prepetition Inc. Loan Documents**" means the Prepetition Inc. Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

225.    "**Prepetition Inc. Obligors**" means the Prepetition Inc. Borrower and the Prepetition Inc. Guarantors.

226.    "**Prepetition Loan Documents**" means the Prepetition Inc. Loan Documents and the Prepetition LP Loan Documents.

227.    "**Prepetition LP Agent**" means, collectively, Wilmington Savings Fund Society, FSB, as administrative agent, and Wilmington Trust FSB, as collateral trustee, under the Prepetition LP Credit Agreement.

228.    "**Prepetition LP Borrower**" means LightSquared LP, as borrower, under the Prepetition LP Credit Agreement.

229.    "**Prepetition LP Credit Agreement**" means that certain Credit Agreement, dated as of October 1, 2010 (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the Prepetition LP Obligors, the Prepetition LP Agent, and the Prepetition LP Lenders.

230.    "**Prepetition LP Facility**" means that certain $1,500,000,000 term loan credit facility provided in connection with the Prepetition LP Credit Agreement.

231.    "**Prepetition LP Facility Claim**" means a Claim held by the Prepetition LP Agent or Prepetition LP Lenders arising under, or related to, the Prepetition LP Loan Documents.

232.    "**Prepetition LP Facility Non-SPSO Claim**" means a Prepetition LP Facility Claim that is not a Prepetition LP Facility SPSO Claim.

233.    "**Prepetition LP Facility Non-SPSO Guaranty Claim**" means a Prepetition LP Facility Non-SPSO Claim against any of the Inc. Debtors.

234.    "**Prepetition LP Facility SPSO Claim**" means a Prepetition LP Facility Claim held by SPSO, its affiliates, or each of their successors or assigns.

235.    "**Prepetition LP Facility SPSO Guaranty Claim**" means a Prepetition LP Facility SPSO Claim against any of the Inc. Debtors.

236.    "**Prepetition LP Fee Claims**" means all Claims for the reasonable, actual documented fees and expenses, if any, of the Holders of Prepetition LP Facility Claims, including, but not limited to, the fees and expenses of financial advisors and counsel, to the extent Allowed by Final Order of the Bankruptcy Court under section 506(b) of the Bankruptcy Code.

237.    "**Prepetition LP Guarantors**" means LightSquared Inc., LightSquared Investors Holdings Inc., LightSquared GP Inc., TMI Communications Delaware, Limited Partnership, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., as guarantors under the Prepetition LP Credit Agreement.

238.    "**Prepetition LP Lenders**" means the lenders party to the Prepetition LP Credit Agreement from time to time.

239.    "**Prepetition LP Loan Documents**" means the Prepetition LP Credit Agreement together with all related security agreements, notes, guarantees, pledge agreements, mortgages, fixture filings, transmitting utility filings, deeds of trust, financing statements, instruments, agreements, documents, assignments, account control agreements, or other security documents (as each of the foregoing may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof).

240.    "**Prepetition LP Obligors**" means the Prepetition LP Borrower and the Prepetition LP Guarantors.

241.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

242.    "**Professional**" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to a Final Order granting such relief).

243.    "**Professional Fee Escrow Account**" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by New LightSquared on and after the Effective Date for the purpose of paying all Allowed and unpaid Accrued Professional Compensation Claims.

244.    "**Professional Fee Reserve**" means Cash in an amount equal to the Professional Fee Reserve Amount to be held in reserve by New LightSquared in the Professional Fee Escrow Account.

245.    "**Professional Fee Reserve Amount**" means the aggregate Accrued Professional Compensation Claims through the Effective Date as estimated in accordance with Section II.B.3 hereof.

246.    "**Prohibited Transferee**" means SPSO, any SPSO Affiliate, and any other Entity that may be a competitor of one or more of the Debtors and is identified by the New Investors (upon agreement of all of the New Investors) or the Debtors (with the consent of each of the New Investors) in the Plan Supplement as a Prohibited Transferee and such Entity's successors or any other Entity directly or indirectly controlling, controlled by, or under common control with, any such Entity or its successors; provided, that, for the purposes of this definition, "**control**" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (a) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (b) in the case of a corporation, any officer or director of such corporation, (c) in the case of a partnership, any general partner of such partnership, (d) in the case of a trust, any trustee or beneficiary of such trust, (e) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (a) through (d) above, and (f) any trust for the benefit of any individual described in clauses (a) through (e) above.

247.    "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

248.    "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Equity Interest entitles the Holder of such Claim or Equity Interest so as to leave such Claim or Equity Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Equity Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Equity Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Equity Interest entitles the Holder.

249.    "**Reinstated Intercompany Interests**" means the Intercompany Interests that are Reinstated under, and pursuant to, the Plan.

250.    "**Released Party**" means each of the following: (a) the Debtors; (b) the Reorganized Debtors; (c) each New Investor; (d) each Plan Support Party; (e) each DIP Agent,

(f) each DIP Lender (other than any SPSO Party), and each arranger and book runner of the DIP Facilities; (g) MAST; (h) the Prepetition Inc. Agent; (i) the Second Lien Exit Agent, the agent under the Working Capital Facility, and each arranger and book runner of the Second Lien Exit Facility and the Working Capital Facility; (j) the holder of Reorganized LightSquared Inc. Exit Facility and each agent, arranger, and book runner of the Reorganized LightSquared Inc. Exit Facility; (k) each Holder of an Allowed Prepetition Facility Claim that votes to accept, or is deemed to accept, the Plan (in each case, other than any SPSO Party); (l) the Prepetition LP Agent; (m) the LP Group, (n) each Holder of Allowed Existing Inc. Preferred Stock that votes to accept, or is deemed to accept, the Plan; (o) each Holder of Allowed Existing LP Preferred Units that votes to accept, or is deemed to accept, the Plan; (p) the JPM Investment Parties; and (q) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such). Notwithstanding anything contained in the Plan, the Confirmation Order, or any Plan Document, in no instance shall any SPSO Party be, or be deemed to be, a Released Party.

251.    "**Releasing Party**" has the meaning set forth in Section VIII.F hereof.

252.    "**Reorganized Debtors**" means, collectively, New LightSquared and each of the Debtors other than LightSquared LP, as reorganized under, and pursuant to, the Plan, on or after the Effective Date.

253.    "**Reorganized Debtors Boards**" means, collectively, the Board and the boards of directors or similar governing bodies of each of the Reorganized Debtors other than New LightSquared.

254.    "**Reorganized Debtors Governance Documents**" means, as applicable, the certificates of incorporation, certificates of formation, bylaws, operating agreements, shareholders agreements, and any other applicable organizational or operational documents with respect to the Reorganized Debtors, including the New LightSquared Interest Holders Agreement.

255.    "**Reorganized Inc. Entity**" means Reorganized LightSquared Inc. or any of its wholly owned direct or indirect subsidiaries after the Effective Date. Neither New LightSquared nor any of its subsidiaries shall be deemed a Reorganized Inc. Entity for purposes hereunder.

256.    "**Reorganized LightSquared Inc.**" means LightSquared Inc., as reorganized under, and pursuant to, the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

257.    "**Reorganized LightSquared Inc. Common Shares**" means those certain common shares issued by Reorganized LightSquared Inc. in connection with, and subject to, the Plan and the Confirmation Order.

258.   "**Reorganized LightSquared Inc. Credit Agreement**" means that certain credit agreement with respect to the Reorganized LightSquared Inc. Exit Facility, to be entered into on the Effective Date among Reorganized LightSquared Inc. and SIG.

259.   "**Reorganized LightSquared Inc. Exit Facility**" means a term loan facility in the aggregate principal amount equal to the amount of the Acquired Inc. Facility Claims as of the Effective Date and $41 million of the JPM Acquired DIP Inc. Claims as of the Effective Date, which shall be secured by liens on substantially all of the assets of Reorganized LightSquared Inc.

260.   "**Retained Causes of Action**" means the Causes of Action of the Debtors listed on the Schedule of Retained Causes of Action.

261.   "**Retained Causes of Action Proceeds**" means all proceeds, damages, or other relief obtained or realized from the pursuit and prosecution of any and all Retained Causes of Action.

262.   "**RICO Action**" means that certain cause of action captioned *Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, LLC v. Charles W. Ergen, Dish Network Corporation, L-Band Acquisition LLC, SP Special Opportunities LLC, Special Opportunities Holdings LLC, Sound Point Capital Management LP, and Stephen Ketchum*, No. 14-01907 (D. Co. July 8, 2014).

263.   "**Schedule of Assumed Agreements**" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Debtors pursuant to the Plan, including any Cure Costs related thereto (as the same may be amended, modified, or supplemented from time to time with the consent of each New Investor and the Debtors).

264.   "**Schedule of Retained Causes of Action**" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or otherwise (as the same may be amended, modified, or supplemented from time to time with the consent of each New Investor and the Debtors).

265.   "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time).

266.   "**Second Lien Exit Agent**" means the arranger and administrative agent under the Second Lien Exit Credit Agreement or any successor agent appointed in accordance with the Second Lien Exit Credit Agreement.

267.   "**Second Lien Exit Credit Agreement**" means that certain credit agreement, dated as of the Effective Date (as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof), among the New LightSquared Obligors, the Second Lien Exit Agent, and the Second Lien Exit Term Lenders, in form and substance satisfactory to each of the New Investors and the Debtors.

268.    "**Second Lien Exit Facility**" means that certain second lien term loan facility provided in connection with the Second Lien Exit Credit Agreement in the original aggregate principal amount of (x) the Prepetition LP Facility Claims as of the Effective Date, plus (y) any commitment fees paid pursuant to the Second Lien Exit Facility Commitment Letter in the form of Second Lien Exit Term Loans.

269.    "**Second Lien Exit Facility Commitment Letter**" means that certain commitment letter by and among certain of the Second Lien Exit Term Lenders and the Debtors pursuant to which such Second Lien Exit Term Lenders have committed to fund to New LightSquared, on the Effective Date, Cash in an amount equal to the Prepetition LP Facility SPSO Claims as of the Effective Date.

270.    "**Second Lien Exit Term Lenders**" means the lenders under the Second Lien Exit Facility that are party to the Second Lien Exit Credit Agreement from time to time.

271.    "**Second Lien Exit Term Loans**" means the term loans to be made under the Second Lien Exit Facility.

272.    "**Secured**" means, when referring to a Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to the Plan as a Secured Claim.

273.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect and hereafter amended, or any similar federal, state, or local law.

274.    "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

275.    "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

276.    "**SIG**" means SIG Holdings, Inc. and/or one or more of its designated affiliates.

277.    "**Special Committee**" means the special committee of the boards of directors of LightSquared Inc. and LightSquared GP Inc.

278.    "**Specific Disclosure Statement**" means the *Second Amended Specific Disclosure Statement for the Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 2035].

279.    "**Spectrum Allocation Petition for Rulemaking**" has the meaning set forth in the Disclosure Statement.

280.    "**SPSO**" means SP Special Opportunities, LLC.

281. "**SPSO Affiliate**" means (a) Charles W. Ergen, Cantey Ergen and L-Band Acquisition, LLC and their successors and any member of a Group (as defined under Regulation 13D under the Securities Exchange Act of 1934, as amended) of which SPSO, Charles W. Ergen, and L-Band Acquisition, LLC or their successors are a member, and (b) any other Entity or Group directly or indirectly controlling, controlled by, or under common control with, SPSO, Charles W. Ergen, and/or L-Band Acquisition, LLC or their successors or any member of any Group of which SPSO, Charles W. Ergen, and/or L-Band Acquisition, LLC or their successors is a member; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise; provided, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any Entity shall also include (u) any Entity that directly or indirectly owns, or in which such Entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such Entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above. For the avoidance of doubt, it is understood that DISH Network Corporation, EchoStar Corporation, and any other Entity directly or indirectly controlling, controlled by, or under common control with, DISH Network Corporation or EchoStar Corporation are currently SPSO Affiliates.

282. "**SPSO Parties**" means SPSO or any SPSO Affiliate.

283. "**Stalking Horse Agreement**" has the meaning set forth in the Bid Procedures Order.

284. "**Standing Motion**" means that certain *Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates* [Docket No. 323].

285. "**Standing Motion Stipulation**" means the *Stipulation and Order Resolving the Motion of the Ad Hoc Secured Group of LightSquared LP Lenders for Entry of an Order Granting Leave, Standing and Authority To Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates [Docket No. 323] Solely with Respect to the Prepetition Inc. Facility Non-Subordinated Claims* [Docket No. 2054].

286. "**Standing Motion Stipulation Order**" means an order of the Bankruptcy Court approving the Standing Motion Stipulation.

287. "**Third Party New Inc. DIP Facility**" means that certain debtor-in-possession credit facility provided either (a) solely by one or more third parties other than the New Investors or (b) by one or more third parties other than the New Investors together with one or more of the New Investors, in connection with the New Inc. DIP Credit Agreement and New DIP Orders in

form and substance satisfactory to the New Investors and the Debtors in an aggregate principal amount not less than the aggregate principal amount of the New Inc. DIP Facility as set forth in the New Investor New Inc. DIP Commitment Letter (after giving effect to the conversion of the Acquired DIP Inc. Claims into New Inc. DIP Loans).

288.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code, or may be amended by mutual agreement of the parties thereto.

289.    "**Unimpaired**" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

290.    "**U.S. Trustee**" means the United States Trustee for the Southern District of New York.

291.    "**U.S. Trustee Fees**" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

292.    "**Voting Record Date**" means the date upon which the Disclosure Statement Order is entered by the Bankruptcy Court.

293.    "**Working Capital Facility**" means that certain first lien credit facility in an original aggregate principal amount of $1,250,000,000 provided in connection with the Working Capital Facility Credit Agreement.

294.    "**Working Capital Facility Credit Agreement**" means that certain credit agreement or equivalent instrument with respect to the Working Capital Facility, to be entered into on the Effective Date among the New LightSquared Obligors and the Working Capital Lenders.

295.    "**Working Capital Facility Loans**" means the working capital term loans or equivalent securities to be made or issued under the Working Capital Facility. The Working Capital Facility Loans shall have market terms and conditions satisfactory to New LightSquared, each of the New Investors, and the Debtors.

296.    "**Working Capital Lenders**" means the lenders party to the Working Capital Facility Credit Agreement from time to time.

B.    *Rules of Interpretation*

The following rules for interpretation and construction shall apply to the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in such form or substantially on such terms and conditions; (3) any reference herein to an

existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit as it may thereafter be amended, modified, or supplemented; (4) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (5) any reference herein to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references herein to "Articles" or "Sections" are references to Articles or Sections hereof or hereto; (7) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) unless otherwise stated, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Approval Rights Over Plan Documents*

Unless otherwise expressly provided in the Plan, all approval rights over the Plan or the Plan Documents for Plan Support Parties other than the New Investors and the Debtors shall be governed by the terms and conditions of the Plan Support Agreement.

G.    *Rights of the Debtors Under the Plan*

Notwithstanding anything to the contrary contained in the Plan, to the extent any term or provision of the Plan provides the Debtors with (1) consent, approval or similar rights, including,

without limitation, with respect to the form of, the substance of or amendments to the Plan, any documents or transactions contemplated by the Plan, or the other Plan Documents or (2) decision making rights, and either (a) the Debtors seek to exercise such rights in a circumstance not consented to by each of the New Investors or (b) the New Investors collectively seek to act or refrain from acting in a certain fashion, or collectively consent to the form of, the substance of, or amendments to the Plan or any documents contemplated by the Plan, and the Debtors fail to consent thereto, then the position of the New Investors shall govern, and the Debtors' sole right shall be to withdraw as a Plan Proponent, in which case all such consent, approval, or similar rights of the Debtors under the Plan shall be void and of no force and effect and shall be automatically deemed deleted from the Plan without further action by any Entity.

*H.      Nonconsolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Equity Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, ACCRUED PROFESSIONAL COMPENSATION CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Equity Interests (except Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III hereof. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Accrued Professional Compensation Claims, DIP Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.

*A.      Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors, each Holder of an Allowed Administrative Claim (other than of an Accrued Professional Compensation Claim, DIP Claim, and KEIP Payment) shall receive in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Administrative Claim, Plan Consideration in the form of Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon thereafter as reasonably practicable, or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable or, if not then due, when such Allowed Administrative Claim is due or as soon thereafter as reasonably practicable; (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the

Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims; (4) at such other time that is agreed to by all of the New Investors (in consultation with the Debtors) or New LightSquared, as applicable, and the Holder of such Allowed Administrative Claim; or (5) at such other time and on such other terms set forth in an order (including, without limitation, the Confirmation Order and the New DIP Order) of the Bankruptcy Court; provided, that, to the extent any Allowed Administrative Claims are due and payable after the Effective Date, such Claims shall be paid by, and be the sole obligation of, New LightSquared and/or its subsidiaries and such Administrative Claims shall not be an obligation of any Reorganized Inc. Entity.

Except for Accrued Professional Compensation Claims, DIP Claims, U.S. Trustee Fees, and KEIP Payments, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on New LightSquared no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the occurrence of the Effective Date. Objections to such requests must be Filed and served on New LightSquared and the requesting party by the later of (1) one hundred and eighty (180) days after the Effective Date and (2) one hundred and eighty (180) days after the Filing of the applicable request for payment of Administrative Claims, if applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

Notwithstanding anything to the contrary herein, (1) a New Investor, the DIP Inc. Lenders, the DIP Inc. Agent, the Holders of Prepetition Inc. Facility Non-Subordinated Claims, and the Prepetition Inc. Agent shall not be required to File any request for payment of any Administrative Claims, including, but not limited to, any New Investor Fee Claims, DIP Claims, DIP Inc. Fee Claims, or Prepetition Inc. Fee Claims, and (2) any New Investor, the DIP Inc. Lenders, the DIP Inc. Agent, the Holders of Prepetition Inc. Facility Non-Subordinated Claims, and the Prepetition Inc. Agent shall be paid in accordance with the terms of the Plan, Confirmation Order, DIP Inc. Order, DIP LP Order, or other applicable governing documents.

Notwithstanding anything to the contrary herein, (1) the New Investor Fee Claims incurred through and including the Confirmation Date shall be paid in full, in Cash following the Inc. Facilities Claims Purchase Closing Date from the proceeds of the New DIP Facilities or Cash on hand, and (2) the New Investor Fee Claims incurred after the Confirmation Date through and including the Effective Date (to the extent not previously paid), shall be paid monthly from the proceeds of the New DIP Facilities or Cash on hand, subject to the New Investors and the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to File a fee application with the Bankruptcy Court. The Confirmation

Order shall provide that the New Investor Fee Claims shall be deemed Allowed Administrative Claims following the Inc. Facilities Claims Purchase Closing Date.

B.      *Accrued Professional Compensation Claims*

1.      Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court and satisfied in accordance with an order of the Bankruptcy Court.

2.      Professional Fee Escrow Account

In accordance with Section II.B.3 hereof, on the Effective Date, New LightSquared shall establish and fund the Professional Fee Escrow Account in the form of Cash in an amount equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors or Reorganized Debtors. The amount of Accrued Professional Compensation Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Allowed Accrued Professional Compensation Claims are paid in full in Cash, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to New LightSquared.

3.      Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Accrued Professional Compensation Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through the Effective Date, and shall deliver such estimate to the Debtors and each of the New Investors no later than five (5) days prior to the anticipated Confirmation Date; provided, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated and agreed to by each of the New Investors and the Debtors as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

4.      Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of, the Bankruptcy Court, and upon five (5) Business Days' advance notice to all of the New Investors, pay in Cash the reasonable legal, Professional, or other fees and expenses related to the Consummation and implementation of the Plan incurred by the Debtors on or after the Confirmation Date through the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or

the Interim Compensation Order in seeking retention or compensation for services rendered from the Confirmation Date through the Effective Date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court, subject to the terms of the New DIP Orders. The payments contemplated by this section shall be included in all final requests for payment of Claims of a Professional as contemplated by Section II.B.1 hereof.

C.    *DIP Inc. Claims*

The DIP Inc. Claims shall be Allowed and deemed to be Allowed Claims in the amount of $122,437,327.70 as of January 15, 2015 (as increased on a per diem basis through and including the Inc. Facilities Claims Purchase Closing Date in accordance with the DIP Inc. Credit Agreement and DIP Inc. Order), plus any additional incremental funding provided by the DIP Inc. Lenders under the DIP Inc. Credit Agreement pursuant to a budget provided by the Debtors that is acceptable to the DIP Inc. Lenders together with related interest, default interest, fees, and expenses. The total amount of the Allowed DIP Inc. Claims shall be increased to include the 2% exit fee owed pursuant to the DIP Inc. Credit Agreement and DIP Inc. Order upon the repayment and/or conversion of all amounts outstanding under the DIP Inc. Facility, which amount of exit fee shall be calculated based upon the aggregate principal and interest outstanding under the DIP Inc. Facility immediately prior to the Inc. Facilities Claims Purchase Closing Date. For the avoidance of doubt, the economics of any incremental funding provided under the DIP Inc. Credit Agreement shall remain consistent with prior amendments thereto, including the accrual of interest at the default rate of 17.5%, payment of a financing fee of 3.5% in connection with each funding to be paid in kind at the time such future amendment(s) are approved by the Bankruptcy Court, the payment of a 2% exit fee upon repayment of the DIP Inc. Claims, and other terms and conditions otherwise acceptable to MAST.

In accordance with, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement, SIG shall purchase in Cash from the DIP Inc. Claims Sellers all rights, title, and interest to the JPM Acquired DIP Inc. Claims on the Inc. Facilities Claims Purchase Closing Date. On, and after giving effect to, the Inc. Facilities Claims Purchase Closing Date, the JPM Acquired DIP Inc. Claims held by SIG shall be converted into New Inc. DIP Loans on a dollar-for-dollar basis.

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP Inc. Claim that is not a JPM Acquired DIP Inc. Claim, each Holder of such Allowed DIP Inc. Claim shall receive, on the Inc. Facilities Claims Purchase Closing Date, and concurrent with SIG's purchase of the JPM Acquired DIP Inc. Claims and the Acquired Inc. Facility Claims, Cash in an amount equal to such Allowed DIP Inc. Claims either (a) from the proceeds of the Third Party New Inc. DIP Facility or (b) as contemplated by the New Investor Commitment Documents.

D.    *DIP LP Claims*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each DIP LP Claim, except to the extent that a Holder of an Allowed DIP LP Claim agrees to less favorable or other treatment, each Holder of an Allowed DIP LP Claim shall receive, on the

New LP DIP Closing Date, Plan Consideration in the form of Cash from the proceeds of the New LP DIP Facility in an amount equal to such Allowed DIP LP Claim.

### E.    New Inc. DIP Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed New Inc. DIP Claim, and except to the extent that a Holder of an Allowed New Inc. DIP Claim agrees to less favorable or other treatment (including with respect to the New Inc. DIP Claims held by SIG), each Holder of an Allowed New Inc. DIP Claim shall receive, on the Effective Date, Plan Consideration in the form of Cash in an amount equal to its Allowed New Inc. DIP Claim; provided that, $41 million of the New Inc. DIP Claims held by SIG shall be satisfied by converting such Claims on the Effective Date into the Reorganized LightSquared Inc. Exit Facility on a dollar-for-dollar basis with the remainder of the New Inc. DIP Claims held by SIG being satisfied with Plan Consideration in the form of Cash.

### F.    New LP DIP Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed New LP DIP Claim, except to the extent that a Holder of an Allowed New LP DIP Claim agrees to a less favorable or other treatment, each Holder of an Allowed New LP DIP Claim shall receive, on the Effective Date, Plan Consideration in the form of Cash in an amount equal to such Allowed New LP DIP Claims.

### G.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable or other treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive on the Effective Date or as soon thereafter as reasonably practicable: (1) Plan Consideration in the form of Cash in an amount equal to such Allowed Priority Tax Claim; (2) Plan Consideration in the form of Cash in an amount agreed to by such Holder and New LightSquared; or (3) at the option of New LightSquared, Plan Consideration in the form of Cash in an aggregate amount equal to such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, the Holder of such Claim shall receive Plan Consideration in the form of Cash in accordance with the terms of any agreement between New LightSquared and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

### H.    Payment of Statutory Fees

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, New LightSquared shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories listed in Section III.B hereof classify Claims against, and Equity Interests in, each of the Debtors for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving Plan Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Classification and Treatment of Claims and Equity Interests*

To the extent a Class contains Allowed Claims or Allowed Equity Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    <u>Class 1 – Inc. Other Priority Claims</u>

(a)    *Classification*: Class 1 consists of all Inc. Other Priority Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Priority Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Priority Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Priority Claim.

(c)    *Voting*: Class 1 is Unimpaired by the Plan. Each Holder of a Class 1 Inc. Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 1 Inc. Other Priority Claim is entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – LP Other Priority Claims</u>

(a)    *Classification*: Class 2 consists of all LP Other Priority Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Priority Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Priority Claim agrees to

any other treatment, each Holder of an Allowed LP Other Priority Claim against an individual LP Debtor shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Priority Claim.

(c)    *Voting*: Class 2 is Unimpaired by the Plan. Each Holder of a Class 2 LP Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 2 LP Other Priority Claim is entitled to vote to accept or reject the Plan.

3.    Class 3 – Inc. Other Secured Claims

(a)    *Classification*: Class 3 consists of all Inc. Other Secured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. Other Secured Claim agrees to any other treatment, each Holder of an Allowed Inc. Other Secured Claim against an individual Inc. Debtor shall receive one of the following treatments, in the sole discretion of the New Investors (upon agreement of all of the New Investors) or the Reorganized Debtors, as applicable: (i) Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. Other Secured Claim; (ii) delivery of the Collateral securing such Allowed Inc. Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed Inc. Other Secured Claim in any other manner such that the Allowed Inc. Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*: Class 3 is Unimpaired by the Plan. Each Holder of a Class 3 Inc. Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 3 Inc. Other Secured Claim is entitled to vote to accept or reject the Plan.

4.    Class 4 – LP Other Secured Claims

(a)    *Classification*: Class 4 consists of all LP Other Secured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP Other Secured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP Other Secured Claim agrees to any other treatment, each Holder of an Allowed LP Other Secured Claim against an individual LP Debtor shall receive one of the following treatments, in the sole discretion of the New Investors (upon agreement of all of the New Investors) or the Reorganized Debtors, as applicable: (i)

Plan Consideration in the form of Cash in an amount equal to such Allowed LP Other Secured Claim; (ii) delivery of the Collateral securing such Allowed LP Other Secured Claim and payment of interest required to be paid under section 506(b) of the Bankruptcy Code, if any; or (iii) treatment of such Allowed LP Other Secured Claim in any other manner such that the Allowed LP Other Secured Claim shall be rendered Unimpaired.

(c)     *Voting*: Class 4 is Unimpaired by the Plan. Each Holder of a Class 4 LP Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 4 LP Other Secured Claim is entitled to vote to accept or reject the Plan.

5.    Class 5 - Prepetition Inc. Facility Non-Subordinated Claims

(a)     *Classification*: Class 5 consists of all Prepetition Inc. Facility Non Subordinated Claims.

(b)     *Allowance*: Prepetition Inc. Facility Non-Subordinated Claims shall be Allowed Claims in the aggregate amount of $337,879,725.54 as of January 15, 2015 (and as increased on a *per diem* basis through and including the Effective Date to account for Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Non-Subordinated Claims accrued from January 16, 2015 through the Effective Date) for all purposes and, for the avoidance of doubt, shall include all principal, Inc. Facility Prepetition Interest, and Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Non-Subordinated Claims through and including the Effective Date, but shall exclude any Prepetition Inc. Facility Repayment Premium allocable to the Prepetition Inc. Facility Non-Subordinated Claims (which amount shall not be Allowed).

(c)     *Treatment*: In accordance with, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement, on the Inc. Facilities Claims Purchase Closing Date, SIG shall purchase in Cash from the Prepetition Inc. Facility Claims Sellers all rights, title, and interest to the Acquired Inc. Facility Claims in exchange for the Acquired Inc. Facility Claims Purchase Price. In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Acquired Inc. Facility Claim and the termination of Liens securing such Claims, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Acquired Inc. Facility Claim agrees to any other treatment, each Acquired Inc. Facility Claim, which shall include all Inc. Facility Postpetition Interest allocable to the Acquired Inc. Facility Claims through and including the Effective Date, shall be converted into the Reorganized LightSquared Inc. Exit Facility on a dollar-for-dollar basis on the Effective Date.

(d)  *Voting*: Class 5 is Impaired by the Plan. Each Holder of a Class 5 Prepetition Inc. Facility Non-Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

6.  <u>Class 6 - Prepetition Inc. Facility Subordinated Claims</u>

(a)  *Classification*: Class 6 consists of all Prepetition Inc. Facility Subordinated Claims.

(b)  *Allowance*: Prepetition Inc. Facility Subordinated Claims shall be Allowed Claims in the aggregate amount of $188,903,095.98 as of December 31, 2014 (and as increased on a *per diem* basis through and including the Effective Date to account for Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Subordinated Claims accrued from January 1, 2015 through the Effective Date) for all purposes and, for the avoidance of doubt, shall include all principal, Inc. Facility Prepetition Interest and Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Subordinated Claims through and including the Effective Date, but shall exclude the Prepetition Inc. Facility Repayment Premium allocable to the Prepetition Inc. Facility Subordinated Claims (which amount shall not be Allowed).

(c)  *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition Inc. Facility Subordinated Claim and the termination of Liens securing such Claims and Harbinger's contribution to New LightSquared of the Harbinger Litigations, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition Inc. Facility Subordinated Claim agrees to any other treatment, each Holder of an Allowed Prepetition Inc. Facility Subordinated Claim shall receive Plan Consideration in the form of such Holder's pro rata share of (i) New LightSquared Series A Preferred Interests having an original liquidation preference equal to the Allowed amount of the principal amount of Prepetition Inc. Facility Subordinated Claims, plus the Inc. Facility Prepetition Interest and the Inc. Facility Postpetition Interest allocable to the Prepetition Inc. Facility Subordinated Claims as of the Effective Date, <u>plus</u> $122,000,000, and (ii) 44.45% of the New LightSquared Common Interests. For the avoidance of doubt, the treatment provided to Class 6 herein shall satisfy in full any and all Claims (including, without limitation, guarantee claims and adequate protection claims) that may be asserted by the Holders of Prepetition Inc. Facility Subordinated Claims against any and all Debtors.

(d)  *Voting*: Class 6 is Impaired by the Plan. Each Holder of a Class 6 Prepetition Inc. Facility Subordinated Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

7.    <u>Class 7A - Prepetition LP Facility Non-SPSO Claims</u>

    (a)    *Classification*: Class 7A consists of all Prepetition LP Facility Non-SPSO Claims.

    (b)    *Allowance*: The Prepetition LP Facility Non-SPSO Claims against the LP Debtors shall be Allowed Claims on the Effective Date for all purposes, and, for the avoidance of doubt, shall include all LP Facility Postpetition Interest, all LP Facility Prepetition Interest, the LP Facility Repayment Premium, and the Prepetition LP Fee Claims.

    (c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Claim agrees to any other treatment, each such Holder of an Allowed Prepetition LP Facility Non-SPSO Claim against the LP Debtors shall receive Second Lien Exit Term Loans in a principal amount equal to such Holder's Allowed Prepetition LP Facility Non-SPSO Claim as of the Effective Date; <u>provided</u>, that any Allowed Prepetition LP Fee Claims of Holders of Prepetition LP Facility Non-SPSO Claims (including any LP Group Fee Claim) shall be payable in Cash or in Second Lien Exit Term Loans, and at such time(s), as determined by the New Investors and either the Debtors or the Reorganized Debtors, as applicable; <u>provided</u>, <u>further</u>, that any determination by the New Investors and either the Debtors or the Reorganized Debtors, as applicable, as to the form and manner of payment of the Prepetition LP Fee Claims of Holders of Prepetition LP Facility Non-SPSO Claims shall apply equally to all such Prepetition LP Fee Claims; <u>provided</u>, <u>further</u>, that the Plan Proponents reserve the right to modify the treatment of Class 7A to provide for the payment of all Allowed Prepetition LP Facility Non-SPSO Claims in full in Cash on or prior to the Effective Date.

    (d)    *Voting*: Class 7A is Impaired by the Plan. Each Holder of a Class 7A Prepetition LP Facility Non-SPSO Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

8.    <u>Class 7B - Prepetition LP Facility SPSO Claims</u>

    (a)    *Classification*: Class 7B consists of all Prepetition LP Facility SPSO Claims.

    (b)    *Allowance*: The Prepetition LP Facility SPSO Claims against the LP Debtors shall include all LP Facility Postpetition Interest, all LP Facility Prepetition Interest, the LP Facility Repayment Premium, and the Prepetition LP Fee Claims. All parties in interest shall have the right to

assert all claims and defenses to the allowance of any and all Prepetition LP Facility SPSO Claims previously sought and currently subject to the Appeal, except for equitable subordination of the Prepetition LP Facility SPSO Claims; provided, however, that in the case of any Prepetition LP Fee Claims requested by SPSO, all parties in interest shall have the right to assert all claims and defenses to the allowance thereof.

(c)    *Treatment*: In full and final satisfaction and discharge of, and in exchange for, each Prepetition LP Facility SPSO Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Prepetition LP Facility SPSO Claim agrees to any other treatment, each such Holder of a Prepetition LP Facility SPSO Claim against the LP Debtors shall receive Plan Consideration in the form of Cash in an amount equal to such Holder's Prepetition LP Facility SPSO Claim as of the Effective Date; provided, that in the case of any Prepetition LP Fee Claims asserted by SPSO, such Cash shall only be distributed to the Holder of such Claim upon the allowance thereof.

The Cash received by the Holders of the Prepetition LP Facility SPSO Claims shall be subject to disgorgement to New LightSquared without the further approval of any Entity, to the extent that the Bankruptcy Court or any other court of competent jurisdiction, at the request of any party in interest, disallows (on the grounds set forth in Section III.B.8(b)) all or any part of the Prepetition LP Facility SPSO Claims.

(d)    *Voting*: Class 7B is Unimpaired by the Plan. Each Holder of a Class 7B Prepetition LP Facility SPSO Claim as of the Voting Record Date is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 7B Prepetition LP Facility SPSO Claim is entitled to vote to accept or reject the Plan.

9.    Class 8A –Prepetition LP Facility Non-SPSO Guaranty Claims

(a)    *Classification*: Inc. Class 8A consists of all Prepetition LP Facility Non SPSO Guaranty Claims.

(b)    *Allowance*: The Prepetition LP Facility Non-SPSO Guaranty Claims shall be Allowed Claims on the Effective Date for all purposes, and for the avoidance of doubt shall include all LP Facility Postpetition Interest, all LP Facility Prepetition Interest, the LP Facility Repayment Premium, and the Prepetition LP Fee Claims.

(c)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Prepetition LP Facility Non-SPSO Guaranty Claim, on the Effective Date, and except to the extent that a Holder of an Allowed Prepetition LP Facility Non-SPSO Guaranty Claim agrees to any other treatment, the Inc. Debtors who are New LightSquared

Obligors shall each provide to the agent under the Second Lien Exit Facility guaranties of New LightSquared's obligations under the Second Lien Exit Facility, which guaranty shall be secured by the assets of such New LightSquared Obligor, and the New LightSquared Obligors will grant liens to the agent under the Second Lien Exit Facility on all other assets received by the New LightSquared Obligors from the Reorganized Inc. Entities pursuant to Section IV.B.2(c)(i) hereof.

(d)     *Voting*: Class 8A is Impaired by the Plan. Each Holder of a Class 8A Prepetition LP Facility Non-SPSO Guaranty Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan. If the Holder of a Class 8A Prepetition LP Facility Non-SPSO Guaranty Claim votes to accept the Plan, such vote also shall be deemed an acceptance of the Plan with respect to Claims held by such Holder in Class 7A.

10.     Class 8B –Prepetition LP Facility SPSO Guaranty Claims

(a)     *Classification*: Class 8B consists of all Prepetition LP Facility SPSO Guaranty Claims.

(b)     *Allowance*: The Prepetition LP Facility SPSO Guaranty Claims shall include all LP Facility Postpetition Interest, all LP Facility Prepetition Interest, the LP Facility Repayment Premium, and the Prepetition LP Fee Claims.  All parties in interest shall have the right to assert all claims and defenses to the allowance of any and all Prepetition LP Facility SPSO Guaranty Claims previously sought and currently subject to the Appeal, except for equitable subordination of the Prepetition LP Facility SPSO Guaranty Claims; provided, however, that in the case of any Prepetition LP Fee Claims requested by SPSO, all parties in interest shall have the right to assert all claims and defenses to the allowance thereof.

(c)     *Treatment*:  The Cash received by the Holders of the Prepetition LP Facility SPSO Claims shall be deemed to be in full and final satisfaction and discharge of, and in exchange for, each Prepetition LP Facility SPSO Guaranty Claim on the Effective Date.

The Cash received by the Holders of the Prepetition LP Facility SPSO Claims shall be subject to disgorgement to New LightSquared without the further approval of any Entity, to the extent that the Bankruptcy Court or any other court of competent jurisdiction, at the request of any party in interest, disallows (on the grounds set forth in Section III.B.8(b)) all or any part of the Prepetition LP Facility SPSO Claims.

(d)     *Voting*: Class 8B is Unimpaired by the Plan. Each Holder of a Class 8B Prepetition LP Facility SPSO Guaranty Claim as of the Voting Record Date is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Class 8B

Prepetition LP Facility SPSO Guaranty Claim is entitled to vote to accept or reject the Plan.

11.    Class 9 – Inc. General Unsecured Claims

(a)    *Classification*: Class 9 consists of all Inc. General Unsecured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Inc. General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Inc. General Unsecured Claim agrees to any other treatment, each Holder of an Allowed Inc. General Unsecured Claim against an individual Inc. Debtor shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed Inc. General Unsecured Claim, including interest from the Petition Date to the Effective Date.

(c)    *Voting*: Class 9 is Unimpaired by the Plan. Each Holder of a Class 9 Inc. General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 9 Inc. General Unsecured Claim is entitled to vote to accept or reject the Plan.

12.    Class 10 – LP General Unsecured Claims

(a)    *Classification*: Class 10 consists of all LP General Unsecured Claims.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed LP General Unsecured Claim, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed LP General Unsecured Claim agrees to any other treatment, each Holder of an Allowed LP General Unsecured Claim against an individual LP Debtor shall receive Plan Consideration in the form of Cash in an amount equal to such Allowed LP General Unsecured Claim, including interest from the Petition Date to the Effective Date.

(c)    *Voting*: Class 10 is Unimpaired by the Plan. Each Holder of a Class 10 LP General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Class 10 LP General Unsecured Claim is entitled to vote to accept or reject the Plan.

13.    Class 11 – Existing LP Preferred Units

(a)    *Classification*: Class 11 consists of all Existing LP Preferred Units.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing LP Preferred Units, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing LP Preferred Units agrees to any other treatment, each Holder of an Allowed Existing LP Preferred Units shall, at the Holder's option, receive Plan Consideration in the form of either (1) New LightSquared Series A-2 Preferred Interests having a liquidation preference equal to such Holder's pro rata share of Existing LP Preferred Units Distribution Amount or (2) New LightSquared Series C Preferred Interests having a liquidation preference equal to such Holder's pro rata share of Existing LP Preferred Units Distribution Amount.  Each Holder must identify their election to receive New LightSquared Series A-2 Preferred Interests or New LightSquared Series C Preferred Interests in writing to the Debtors and each of the New Investors within ten (10) Business Days after entry of the Confirmation Order.  If no election is timely made by a Holder of Allowed Existing LP Preferred Units, then such Holder shall be deemed to have elected to receive New LightSquared Series C Preferred Interests.  For the avoidance of doubt, any New Investor that holds Allowed Existing LP Preferred Units as of the Distribution Record Date shall be deemed, and hereby agrees, to elect to receive New LightSquared Series C Preferred Interests.

(c)     *Voting*: Class 11 is Impaired by the Plan. Each Holder of a Class 11 Existing LP Preferred Units as of the Voting Record Date is entitled to vote to accept or reject the Plan.

14.     Class 12 – Existing Inc. Preferred Stock Equity Interests

(a)     *Classification*: Class 12 consists of all Existing Inc. Preferred Stock Equity Interests.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Existing Inc. Preferred Stock Equity Interest, on the Effective Date or as soon thereafter as reasonably practicable, except to the extent that a Holder of an Allowed Existing Inc. Preferred Stock Equity Interest agrees to any other treatment:

        (i)     each Other Existing Inc. Preferred Equity Holder shall receive on account of its Allowed Existing Inc. Preferred Stock Equity Interest Plan Consideration in the form of such Holder's pro rata share of New LightSquared Series C Preferred Interests having an original liquidation preference equal to the outstanding liquidation preference of the Existing Inc. Preferred Stock held by such Other Existing Inc. Preferred Equity Holder as of the Effective Date (excluding any prepayment or redemption premium) in the manner set forth in Section IV.B.2(d)(iii) below; and

      (ii)     SIG shall receive 100% of the Reorganized LightSquared Inc. Common Shares issued as of the Effective Date.

    (c)    *Voting*: Class 12 is Impaired by the Plan. Each Holder of a Class 12 Existing Inc. Preferred Stock Equity Interest as of the Voting Record Date is entitled to vote to accept or reject the Plan.

15.    <u>Class 13 – Existing LP Common Units Equity Interests</u>

    (a)    *Classification*: Class 13 consists of all Existing LP Common Units Equity Interests.

    (b)    *Treatment*: All Existing LP Common Units Equity Interests shall be cancelled as of the Effective Date, and Holders of Existing LP Common Units Equity Interests shall not receive any distribution under the Plan on account of such Existing LP Common Units Equity Interests.

    (c)    *Voting*: Class 13 is Impaired by the Plan. Each Holder of a Class 13 Existing LP Common Units Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Class 13 Existing LP Common Units Equity Interest is entitled to vote to accept or reject the Plan.

16.    <u>Class 14 – Existing Inc. Common Stock Equity Interests</u>

    (a)    *Classification*: Class 14 consists of all Existing Inc. Common Stock Equity Interests.

    (b)    *Treatment*: All Existing Inc. Common Stock Equity Interests shall be cancelled as of the Effective Date, and Holders of Existing Inc. Common Stock Equity Interests shall not receive any distribution under the Plan on account of such Existing Inc. Common Stock Equity Interests.

    (c)    *Voting*: Class 14 is Impaired by the Plan. Each Holder of a Class 14 Existing Inc. Common Stock Equity Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Class 14 Existing Inc. Common Stock Equity Interest is entitled to vote to accept or reject the Plan.

17.    <u>Class 15A – Inc. Debtor Intercompany Claims</u>

    (a)    *Classification*: Class 15A consists of all Intercompany Claims against the Inc. Debtors.

    (b)    *Treatment*: Holders of Allowed Intercompany Claims against an Inc. Debtor shall not receive any distribution from Plan Consideration on account of such Intercompany Claims.

(c)     *Voting*: Class 15A is Impaired by the Plan. Each Holder of a Class 15A
Inc. Debtor Intercompany Claim is conclusively presumed to have rejected
the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder
of a Class 15A – Inc. Debtor Intercompany Claim is entitled to vote to
accept or reject the Plan.

18.    Class 15B – LP Debtor Intercompany Claims

(a)     *Classification*: Class 15B consists of all Intercompany Claims against the
LP Debtors.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge
of, and in exchange for, each Allowed Intercompany Claim against an LP
Debtor, on the Effective Date or as soon thereafter as reasonably
practicable, except to the extent that a Holder of an Allowed Intercompany
Claim against an LP Debtor agrees to any other treatment, each Allowed
Intercompany Claim against an LP Debtor shall be Reinstated for the
benefit of the Holder thereof; provided, that the Inc. Debtors agree that
they shall not receive any recovery on account of, and shall discharge, any
and all of the Intercompany Claims that they can assert against each of the
LP Debtors. After the Effective Date, the Reorganized LP Debtors, in their
sole discretion, shall have the right to resolve or compromise Allowed
Intercompany Claims against an LP Debtor without further notice to or
action, order, or approval of the Bankruptcy Court.

(c)     *Voting*: Class 15B is Unimpaired by the Plan. Each Holder of a Class 15B
LP Debtor Intercompany Claim is conclusively presumed to have accepted
the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of
a Class 15B LP Debtor Intercompany Claim is entitled to vote to accept or
reject the Plan.

19.    Class 16A – LP Debtor Intercompany Interests

(a)     *Classification*: Class 16A consists of all Intercompany Interests in an LP
Debtor.

(b)     *Treatment*: In full and final satisfaction, settlement, release, and discharge
of, and in exchange for, each Allowed Intercompany Interest in an LP
Debtor, other than Allowed Existing LP Common Units, on the Effective
Date or as soon thereafter as reasonably practicable, except to the extent
that a Holder of an Allowed Intercompany Interest in an LP Debtor agrees
to any other treatment, each Allowed Intercompany Interest in an LP
Debtor, other than Allowed Existing LP Common Units, shall be
Reinstated for the benefit of the Holder thereof and treated in accordance
with the Plan, as applicable.

(c)    *Voting*: Class 16A is Unimpaired by the Plan. Each Holder of a LP Debtor Class 16A Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a LP Debtor Class 16A Intercompany Interest is entitled to vote to accept or reject the Plan.

20.    Class 16B – Inc. Debtor Intercompany Interests

(a)    *Classification*: Class 16B consists of all Intercompany Interests in an Inc. Debtor.

(b)    *Treatment*: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Intercompany Interest in an Inc. Debtor, on the Effective Date or as soon thereafter as reasonably practicable, and except to the extent an Intercompany Interest in an Inc. Debtor is assigned or otherwise transferred pursuant to Section IV.B.2(c) hereof, each Allowed Intercompany Interest in an Inc. Debtor shall be Reinstated for the benefit of the Holder thereof and treated in accordance with the Plan, as applicable.

(c)    *Voting*: Class 16B is Unimpaired by the Plan. Each Holder of an Inc. Debtor Class 16B Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of an Inc. Debtor Class 16B Intercompany Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Equity Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Equity Interests.

D.    *Acceptance or Rejection of Plan*

1.    Voting Classes Under Plan

Under the Plan, Classes 5, 6, 7A, 8A, 11, and 12 are Impaired, and each Holder of a Claim or Equity Interest as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance Under Plan

Under the Plan, (a) Classes 1, 2, 3, 4, 7B, 8B, 9, 10, 15B, 16A, and 16B are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan.

3.     Acceptance by Impaired Classes of Claims or Equity Interests

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Pursuant to section 1126(d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Equity Interests has accepted the Plan if the Holders of at least two-thirds (2/3) in amount of the Allowed Equity Interests in such Class actually voting have voted to accept the Plan.

4.     Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Equity Interests eligible to vote and no Holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

5.     Deemed Rejection of the Plan

Under the Plan, Classes 13, 14, and 15A are Impaired, and the Holders of Claims and Equity Interests in such Classes (a) shall receive no distributions under the Plan on account of their Claims or Equity Interests, (b) are deemed to have rejected the Plan, and (c) are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

E.     *Elimination of Vacant Classes*

Any Class of Claims or Equity Interests that does not contain a Holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.     *Confirmation Pursuant to Section 1129(b) of Bankruptcy Code*

The Plan Proponents will request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that is deemed to reject the Plan or votes to reject the Plan. The Plan Proponents reserve the right, with the consent of the JPM Investment Parties and, solely with respect to the Plan, the JPM Inc. Facilities Claims Purchase Agreement, the New Investor Commitment Documents, and the Second Lien Exit Credit Agreement, MAST, to revoke or withdraw the Plan or any document in the Plan Supplement, subject to and in accordance with the Plan Support Agreement and the terms of the Plan. The Plan Proponents, with the consent of MAST (to the extent provided herein and in the Plan Support Agreement), also reserve the right to alter, amend, or modify the Plan or any document in the Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to and in accordance with the Plan Support Agreement or, in the case of the Debtors, the terms of the Plan, as applicable. Any

alternative treatment to be provided to a Holder of Claims or Equity Interests instead of the treatment expressly provided in this Article III shall require the prior consent of each New Investor and the Debtors and, prior to the Inc. Facilities Claims Purchase Closing Date and solely with respect to the treatment of the Prepetition Inc. Facility Non-Subordinated Claims, MAST.

G.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF PLAN

A.      *Sources of Consideration for Plan Distributions*

All consideration necessary for the Disbursing Agent to make Plan Distributions shall be derived from Cash on hand and proceeds from the New DIP Facilities, the JPM Inc. Facilities Claims Purchase Agreement, the New Investor Commitment Documents (as applicable), the Working Capital Facility, the Second Lien Exit Facility, the Reorganized LightSquared Inc. Exit Facility as well as the New LightSquared Entities Shares.

B.      *Plan Transactions*

The Confirmation Order shall be deemed to authorize, among other things, the Plan Transactions. On and after the Confirmation Date or the Effective Date, as applicable, the Plan Proponents, with the consent of each New Investor, or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and this Article IV, including: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, reorganization, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, certificates of partnership, merger, amalgamation, consolidation, conversion, reconstitution, or dissolution with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that each of the New Investors or the Reorganized Debtors, as applicable, determine are necessary or appropriate.

1.      <u>Confirmation Date Plan Transactions</u>. Certain Plan Transactions occurring prior to, on, or as soon as practicable after the Confirmation Date shall include, without limitation, the following:

(a)      On the Inc. Facilities Claims Purchase Closing Date, the New Inc. DIP Obligors, the New Inc. DIP Lenders, and other relevant Entities shall enter into the New Inc. DIP Credit Agreement and, subject to the terms of the New Inc. DIP Credit Agreement, the New Inc. DIP Lenders shall fund the

New Inc. DIP Facility (including by converting Acquired DIP Inc. Claims into New Inc. DIP Loans to the extent applicable) and the proceeds thereof shall be used (i) to indefeasibly repay the Allowed DIP Inc. Claims (other than the Acquired DIP Inc. Claims to the extent applicable) in full in Cash, and (ii) for general corporate purposes and to fund the working capital needs of the Inc. Debtors through the Effective Date. The New Inc. DIP Facility may be combined with the New LP DIP Facility, but only to the extent that the Inc. Facilities Claims Purchase Closing Date has occurred (or will occur concurrently therewith) and the Allowed DIP Inc. Claims that are not JPM Acquired DIP Inc. Claims have been indefeasibly paid in full in Cash either (i) from the proceeds of the Third Party New Inc. DIP Facility or (ii) as contemplated by the New Investor Commitment Documents.

(b)      On the New LP DIP Closing Date, the New LP DIP Obligors, New LP DIP Lenders, and other relevant Entities shall enter into the New LP DIP Credit Agreement. The New LP DIP Facility may be combined with the New Inc. DIP Facility. On the New LP DIP Closing Date, subject to the terms of the New LP DIP Credit Agreement, the New LP DIP Lenders shall fund the New LP DIP Facility, and the proceeds thereof shall be used to indefeasibly repay in full in Cash the Allowed DIP LP Claims and for general corporate purposes and to fund the working capital needs of the LP Debtors through the Effective Date.

(c)      Pursuant to, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement, SIG shall purchase from the DIP Inc. Claims Sellers in Cash all right, title, and interest to the JPM Acquired DIP Inc. Claims upon the Inc. Facilities Claims Purchase Closing Date. On the New Inc. DIP Closing Date, the JPM Acquired DIP Inc. Claims purchased by SIG shall be converted into New Inc. DIP Loans on a dollar-for-dollar basis, of which on the Effective Date, $41,000,000 shall be converted into the Reorganized LightSquared Inc. Exit Facility as set forth in Section IV.B.2(d)(i) and the remainder of New Inc. DIP Claims held by SIG (including any accrued and unpaid interest thereon) shall be paid in Cash.

(d)      To the extent applicable, pursuant to, and subject to the terms and conditions of, the New Investor Commitment Documents, Fortress and Centerbridge shall purchase from the DIP Inc. Claims Sellers in Cash all right, title, and interest to the Fortress/Centerbridge Acquired DIP Inc. Claims upon the Inc. Facilities Claims Purchase Closing Date. On the New Inc. DIP Closing Date, the Fortress/Centerbridge Acquired DIP Inc. Claims purchased by Fortress and Centerbridge shall be converted into New Inc. DIP Loans on a dollar-for-dollar basis.

(e)      Pursuant to, and subject to the terms and conditions of, the JPM Inc. Facilities Claims Purchase Agreement, SIG shall purchase from the

Prepetition Inc. Facility Claim Sellers in Cash all right, title, and interest to the Acquired Inc. Facility Claims upon the Inc. Facilities Claims Purchase Closing Date. For the avoidance of doubt, the Inc. Facility Postpetition Interest shall continue to accrue on the Acquired Inc. Facility Claims after the Inc. Facilities Claims Purchase Closing Date through the Effective Date. On the Effective Date, the Acquired Inc. Facility Claims shall be converted into the Reorganized LightSquared Inc. Exit Facility as set forth in Section IV.B.2(d)(i) below. For the avoidance of doubt, the Inc. Facilities Claims Purchase Closing Date shall coincide with the payment in full in Cash of the DIP Inc. Claims that are not Acquired DIP Inc. Claims as set forth in Section IV.B.1(a).

2.  <u>Effective Date Plan Transactions</u>. Plan Transactions occurring on the Effective Date shall include, without limitation, the following:

(a)  LightSquared LP shall be converted to a Delaware limited liability company pursuant to applicable law.

(b)  Fortress and Centerbridge shall fund to New LightSquared their Effective Date Investments. As consideration for such Effective Date Investments, New LightSquared shall issue: (i) to Fortress, 26.20% of New LightSquared Common Interests and New LightSquared Series B Preferred Interests having an original liquidation preference of $68,391,643.16; and (ii) to Centerbridge, 8.10% of New LightSquared Common Interests and New LightSquared Series B Preferred Interests having an original liquidation preference of $21,108,531.85.

(c)  <u>Certain Transactions Between New LightSquared and Reorganized Inc. Entities</u>.

(i)  On the Effective Date, each Reorganized Inc. Entity shall assign, contribute or otherwise transfer to New LightSquared substantially all of its assets, including all legal, equitable, and beneficial right, title, and interest thereto and therein, including, without limitation, all of its equity interests, if any, in any Reorganized Debtor (except as provided below), intellectual property, contractual rights, Retained Causes of Action, and the right to prosecute such Retained Causes of Action and receive the benefits therefrom; but excluding each Reorganized Inc. Entity's tax attributes and direct or indirect equity interests in One Dot Four Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, TMI Communications Delaware, Limited Partnership, LightSquared Investors Holdings Inc. and SkyTerra Investors LLC; and

(ii)  As consideration for the Reorganized Inc. Entities assigning, contributing or otherwise transferring their assets to New LightSquared as described in clause (i) above, on the Effective

Date, New LightSquared shall (A) issue to the Reorganized Inc. Entities (1) 21.25% of the New LightSquared Common Interests, (2) New LightSquared Series C Preferred Interests having an original liquidation preference equal to (y) the outstanding liquidation preference of the Existing Inc. Preferred Stock held by the Other Existing Inc. Preferred Equity Holders as of the Effective Date (excluding any prepayment or redemption premium) <u>plus</u> (z) $73,000,000 (subject to the distribution obligations set forth in Section IV.B.2(d)(iii)), (3) New LightSquared Series B Preferred Interests having an original liquidation preference of $41,000,000 and (4) New LightSquared Series A Preferred Interests having an original liquidation preference equal to the Allowed Prepetition Inc. Facility Non-Subordinated Claims held by SIG as of the Effective Date; and (B) assume all obligations with respect to, and make the Plan Distributions required to be made under the Plan with respect to Allowed Inc. Other Priority Claims, Allowed Inc. Other Secured Claims, Allowed Prepetition Inc. Facility Subordinated Claims, and Allowed Inc. General Unsecured Claims.

(d)     <u>Certain Transactions Regarding Claims Against and Equity Interests in the Inc. Debtors</u>.

(i)     The Acquired Inc. Facility Claims (including all Inc. Facility Postpetition Interest) and $41,000,000 of the New Inc. DIP Loans held by SIG (as a result of the conversion of its JPM Acquired DIP Inc. Claims into such New Inc. DIP Loans in accordance with Section II.C.), will be converted into the Reorganized LightSquared Inc. Exit Facility on a dollar-for-dollar basis (with the remainder of the New Inc. DIP Loans held by SIG to be repaid in full in Cash);

(ii)     Reorganized LightSquared Inc. shall issue 100% of the Reorganized LightSquared Inc. Common Shares to SIG in satisfaction of its Existing Inc. Preferred Equity Interests as set forth in Section III.B.14(b)(ii) hereof;

(iii)     The Reorganized Inc. Entities shall distribute to Other Existing Inc. Preferred Equity Holders in satisfaction of their Existing Inc. Preferred Equity Interests as set forth in Section III.B.14(b)(i) hereof, New LightSquared Series C Preferred Interests having an original liquidation preference equal to the outstanding liquidation preference of the Existing Inc. Preferred Stock held by the Other Existing Inc. Preferred Equity Holders as of the Effective Date (excluding any prepayment or redemption premium); and

(iv)    After giving effect to the transfer of assets contemplated by Section IV.B.2(c) above, and to the distributions of New LightSquared Series C Preferred Interests contemplated by Section IV.B.2(d)(iii) above, Reorganized Inc. Entities will, collectively, hold 21.25% of New LightSquared Common Interests, New LightSquared Series C Preferred Interests having an original liquidation preference of $73,000,000, New LightSquared Series B Preferred Interests having an original liquidation preference of $41,000,000 and New LightSquared Series A Preferred Interests having an original liquidation preference equal to the Prepetition Inc. Facility Non-Subordinated Claims held by SIG as of the Effective Date, and will retain their tax attributes and Reorganized LightSquared Inc. will retain 100% of the equity interests in One Dot Four Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, TMI Communications Delaware, Limited Partnership, LightSquared Investors Holdings Inc. and SkyTerra Investors LLC; provided that, on the Effective Date the Reorganized Inc. Entities shall have the option to exchange on a dollar-for-dollar basis all or a portion of their New LightSquared Series A-1 Preferred Interests into New LightSquared Series A-2 Preferred Interests and/or additional New LightSquared Series C Preferred Interests.

3.    New LightSquared Loan Facilities.

(a)    New LightSquared and the other relevant Entities shall enter into the Working Capital Facility and the Second Lien Exit Facility. Confirmation of the Plan shall constitute (i) approval of the Working Capital Facility, Second Lien Exit Facility, and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by the New LightSquared Obligors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and (ii) authorization for the New LightSquared Obligors to enter into and execute the Working Capital Facility Credit Agreement, the Second Lien Exit Credit Agreement and such other documents as may be required or appropriate. On the Effective Date, the Working Capital Facility and the Second Lien Exit Facility, together with any new promissory notes evidencing the obligations of the New LightSquared Obligors, and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by the New LightSquared Obligors pursuant to the Working Capital Facility and the Second Lien Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Working Capital Facility Credit

Agreement, the Second Lien Exit Credit Agreement and related documents.

(i)     Working Capital Facility. The New LightSquared Obligors, Working Capital Lenders, and other relevant Entities shall enter into the Working Capital Facility. The Working Capital Lenders shall fund the Working Capital Facility through the provision of new financing, in accordance with the Plan, Confirmation Order, and Working Capital Facility Credit Agreement, and shall provide for loans in the aggregate principal amount of up to $1,250,000,000.

The Working Capital Facility Loans shall be secured by senior liens on all assets of the New LightSquared Obligors, and shall have market terms and conditions satisfactory to New LightSquared, each of the New Investors, and the Debtors.

New LightSquared shall use the proceeds from the Working Capital Facility for the purposes specified in the Plan, including to satisfy Allowed Administrative Claims, repay the New DIP Facilities (other than $41 million of the New Inc. DIP Loans held by SIG on account of the JPM Acquired DIP Inc. Claims), for general corporate purposes and working capital needs, and to make Plan Distributions.

The Working Capital Facility Loans may not be made by or assigned or otherwise transferred (including by participation) to any Prohibited Transferee and any assignment or other transfer (including by participation) to a Prohibited Transferee shall be *void ab initio*.

(ii)    Second Lien Exit Facility. The New LightSquared Obligors and the other relevant Entities shall enter into the Second Lien Exit Facility. The Second Lien Exit Facility shall be funded through (a) the provision of new financing in Cash by certain of the Second Lien Exit Term Lenders in an amount equal to the Prepetition LP Facility SPSO Claims as of the Effective Date and (b) the conversion of the Prepetition LP Facility Non-SPSO Claims as of the Effective Date into loans under the Second Lien Exit Facility in accordance with the Plan, Confirmation Order, and Second Lien Exit Credit Agreement.  The Second Lien Exit Facility shall provide for loans in the aggregate principal amount of the Prepetition LP Facility Claims as of the Effective Date plus the amount of the commitment fee under the Second Lien Exit Facility Commitment Letter. Second Lien Exit Term Loans shall be secured by second liens on all assets of the New LightSquared Obligors, have a five (5) year term, bear interest at the rate of the

higher of (a) 12% and (b) 300 basis points greater than the interest rate of the Working Capital Facility per annum, payable in kind, and not be callable for the first two (2) years after the Effective Date, subject in each case to the terms of the Second Lien Exit Facility Credit Agreement.

The Second Lien Exit Term Loans made pursuant to the Second Lien Exit Facility shall be made by the Holders of Prepetition LP Facility Non-SPSO Claims and certain third parties. In connection with the Second Lien Exit Facility, certain of the Second Lien Exit Term Lenders have entered into the Second Lien Exit Facility Commitment Letter, pursuant to which the Debtors have agreed to pay to the Second Lien Exit Term Lenders party thereto a commitment fee in an amount of Second Lien Exit Term Loans in accordance with the terms of such commitment letter.

No Prohibited Transferee (including SPSO Parties) shall be permitted to hold (either by assignment, participation or otherwise) any Second Lien Exit Term Loans and any assignment or other transfer (including by participation) thereof to a Prohibited Transferee (including SPSO Parties) shall be void *ab initio*.

The Second Lien Exit Credit Agreement shall also provide that, prior to a vote or other consent solicitation on any matter requiring a vote or consent by Second Lien Exit Term Lenders (or any portion thereof), the administrative agent under the Second Lien Exit Facility must receive prior to each such vote or consent solicitation a written certification from each Second Lien Exit Term Lender that no Prohibited Transferee has any direct or indirect interest (including, without limitation, pursuant to any participation or voting agreement) in such Second Lien Exit Term Lender's Second Lien Exit Term Loans (and if no such certificate is delivered by a particular Second Lien Exit Term Lender, such Second Lien Exit Term Lender's Second Lien Exit Term Loans shall be excluded from such vote or consent solicitation).

4. <u>Reorganized LightSquared Inc. Exit Facility</u>.

(a) Reorganized LightSquared Inc. and SIG shall enter into the Reorganized LightSquared Inc. Exit Facility, which shall provide for loans in the aggregate principal amount equal to $41 million of the New Inc. DIP Loans held by SIG on account of the JPM Acquired DIP Inc. Claims as of the Effective Date and the Acquired Inc. Facility Claims as of the Effective Date, and which shall be secured by liens on all assets of Reorganized LightSquared Inc. The Reorganized LightSquared Inc. Exit Facility shall be funded through the conversion of the Acquired Inc. Facility Claims and $41 million of the New Inc. DIP Loans held by SIG

into loans under the Reorganized LightSquared Inc. Exit Facility in accordance with the Plan.

(b)     Confirmation of the Plan shall constitute (i) approval of the Reorganized LightSquared Inc. Exit Facility and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized LightSquared Inc. in connection therewith, and (ii) authorization for Reorganized LightSquared Inc. to enter into and execute the Reorganized LightSquared Inc. Credit Agreement and such other documents as may be required or appropriate.

(c)     On the Effective Date, the Reorganized LightSquared Inc. Exit Facility, together with any new promissory notes evidencing the obligations of Reorganized LightSquared Inc. and all other documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by Reorganized LightSquared Inc. pursuant to the Reorganized LightSquared Inc. Exit Facility and related documents shall be secured and paid or otherwise satisfied pursuant to, and as set forth in, the Reorganized LightSquared Inc. Credit Agreement and related documents.

C.     *Issuance of New LightSquared Entities Shares; Reinstatement of Reinstated Intercompany Interests*

On the Effective Date or as soon thereafter as reasonably practicable, except as otherwise provided herein, (1) New LightSquared or Reorganized LightSquared Inc., as applicable, shall (a) issue the New LightSquared Entities Shares required to be issued in accordance with the Plan and all related instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan, and (2) all Intercompany Interests shall be Reinstated for the benefit of the Holders thereof and treated in accordance with the Plan, as applicable. The issuance of the New LightSquared Entities Shares and the Reinstatement of the Reinstated Intercompany Interests are authorized without the need for any further corporate action or without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity. All of the New LightSquared Entities Shares issued (or Reinstated) pursuant to the Plan shall be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.

The applicable Reorganized Debtors Governance Documents shall contain provisions necessary to (1) except as consented to by the initial holder thereof, prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable Reorganized Debtors Governance Documents as permitted by applicable law, and (2) effectuate the provisions of the Plan, in each case without any further action by the holders of New LightSquared Entities Shares or directors of the Debtors or the Reorganized Debtors.

On the Effective Date, New LightSquared shall issue the New LightSquared Series A Preferred Interests, the New LightSquared Series B Preferred Interests and the New LightSquared Series C Preferred Interests, the respective terms and rights of which shall be set forth in the New LightSquared Interest Holders Agreement.

D.    *Section 1145 and Other Exemptions*

The offering, issuance, and distribution of the securities contemplated by the Plan and any and all agreements incorporated herein, including the New LightSquared Entities Shares, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code or pursuant to another applicable exemption from registration requirements of the Securities Act. In addition, any securities contemplated by the Plan and any and all agreements incorporated therein, including the New LightSquared Entities Shares, shall be subject to (1) if issued pursuant to section 1145 of the Bankruptcy Code, the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, (3) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the Reorganized Debtors Governance Documents, and (4) applicable regulatory approval, if any.

E.    *Listing of New LightSquared Entities Shares; Reporting Obligations*

Except as may be determined in accordance with the Reorganized Debtors Governance Documents, the Reorganized Debtors shall not be (1) obligated to list the New LightSquared Entities Shares on a national securities exchange, (2) reporting companies under the Securities Exchange Act, (3) required to file reports with the Securities and Exchange Commission or any other Entity or party, or (4) required to file monthly operating reports, or any other type of report, with the Bankruptcy Court after the Effective Date. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Reorganized Debtors Governance Documents may impose certain trading restrictions, and the New LightSquared Entities Shares shall be subject to certain transfer and other restrictions pursuant to the Reorganized Debtors Governance Documents.

F.    *New LightSquared Interest Holders Agreement*

On the Effective Date, New LightSquared shall enter into and deliver the New LightSquared Interest Holders Agreement.

Confirmation of the Plan shall constitute (1) approval of the New LightSquared Interest Holders Agreement and all transactions contemplated thereby, including any and all actions to be taken, undertakings to be made, and obligations to be incurred by New LightSquared, and (2) authorization for New LightSquared to enter into and execute the New LightSquared Interest Holders Agreement and such other documents as may be required or appropriate. On the Effective Date, the New LightSquared Interest Holders Agreement, together with all other

documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder, shall become effective, valid, binding, and enforceable in accordance with their terms, and each party thereto shall be bound thereby. The obligations incurred by New LightSquared pursuant to the New LightSquared Interest Holders Agreement and related documents shall be satisfied pursuant to, and as set forth in, the New LightSquared Interest Holders Agreement and related documents.

The New LightSquared Interest Holders Agreement shall provide that, among other things, Harbinger shall have, in accordance with the terms set forth in the Plan Support Agreement, a call option to purchase from Reorganized LightSquared Inc. three percent (3%) of the New LightSquared Common Interests. The New LightSquared Interest Holders Agreement shall also provide that after redemption in full of all New LightSquared Preferred Interests but prior to any distributions on account of the New LightSquared Common Interests, Harbinger shall receive an additional allocation on account of (1) the issuance of additional New LightSquared Preferred Interests as compared with the amount contemplated in the Plan Support Agreement, (2) the addition of the two (2) year no call provision with respect to the Second Lien Exit Term Loans, and (3) the commitment fee on the first $400,000,000 of the new financing referenced in Section IV.B.3(a)(ii) of the Plan all as provided in greater detail in the New LightSquared Interest Holders Agreement.

If each of the New Investors and the Debtors determine, on a Holder by Holder basis, that it is necessary or advisable from a regulatory approval standpoint, certain potential holders of New LightSquared Interests shall be issued warrants to acquire such New LightSquared Interests in lieu of direct ownership of New LightSquared Interests.

The New LightSquared Board shall be comprised of seven (7) members, which shall include: two (2) members appointed by Fortress; one (1) member appointed by Reorganized LightSquared Inc.; one (1) member appointed by Centerbridge; one (1) independent member; the Chief Executive Officer of New LightSquared; and the Chairman of the New LightSquared Board. The New LightSquared Board shall not include any Harbinger employees, affiliates or representatives. If agreed to by each of the New Investors, the New LightSquared Board can be expanded in size. In addition, New LightSquared shall have a separate advisory committee of the New LightSquared Board, with five (5) members, one (1) of which shall be appointed by Reorganized LightSquared Inc., two (2) of which shall be appointed by Fortress, one (1) of which shall be appointed by Centerbridge, and one (1) of which shall be appointed as provided in the New LightSquared Interest Holders Agreement.

G.    *Indemnification Provisions in Reorganized Debtors Governance Documents*

Except as provided in the Plan Supplement and except as may be agreed to by SIG with respect to the Reorganized Debtors Governance Documents of the Reorganized Inc. Entities, as of the Effective Date, the Reorganized Debtors Governance Documents shall provide for the indemnification, defense, reimbursement, exculpation, and limitation of liability of, and advancement of fees and expenses to, the Reorganized Debtors' then current directors, officers, employees, or agents (and such directors, officers, employees, or agents that held such positions as of the Confirmation Date) at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether

direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, or asserted or unasserted, and none of the Reorganized Debtors, other than the Reorganized Inc. Entities, shall amend or restate the Reorganized Debtors Governance Documents before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

H.    *Management Incentive Plan*

On or as soon as practicable following the Consummation of the Plan, the New LightSquared Board shall adopt a Management Incentive Plan in accordance with the terms of the New LightSquared Interest Holders Agreement and subject to the approval of each of the New Investors.

I.    *Corporate Governance*

As shall be set forth in the Reorganized Debtors Governance Documents, the Reorganized Debtors Boards shall consist of a number of members and be appointed in a manner, subject to applicable law, to be agreed upon by each of the New Investors (including as specified in Section IV.F) or otherwise provided in the Reorganized Debtors Governance Documents. In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the following at, or prior to, the Confirmation Hearing: (1) the identities and affiliations of any Person proposed to serve as a member of the Reorganized Debtors Boards or officer of the Reorganized Debtors and (2) the nature of compensation for any officer employed or retained by the Reorganized Debtors who is an "**insider**" under section 101(31) of the Bankruptcy Code.

J.    *Vesting of Assets in Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, all property in each Estate, all Retained Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for (1) any Liens granted to secure the Working Capital Facility and any rights of any of the parties under the Working Capital Facility Credit Agreement or any related documents, (2) any Liens granted to secure the Second Lien Exit Facility and any rights of any of the parties under the Second Lien Exit Credit Agreement or any related documents, (3) any Liens granted to secure the Reorganized LightSquared Inc. Exit Facility and any rights of any of the parties under the Reorganized LightSquared Inc. Credit Agreement or any related documents, and (4) any rights of any of the parties under any of Reorganized Debtors Governance Documents) without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and

compromise or settle any Claims, Equity Interests, or Retained Causes of Action without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, AFTER THE EFFECTIVE DATE, NO REORGANIZED DEBTOR AND NO AFFILIATE OF ANY SUCH REORGANIZED DEBTOR SHALL HAVE, OR BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM, OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO LIGHTSQUARED INC., LIGHTSQUARED LP, OR ANY OTHER DEBTOR) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO ANY OF THE REORGANIZED DEBTORS OR ANY OF THEIR AFFILIATES.**

K.    *Cancellation of Securities and Agreements*

On the Effective Date (or the New DIP Closing Date with respect to the DIP Inc. Facility and the DIP LP Facility), except as otherwise specifically provided for in the Plan, including with respect to the Acquired Inc. Facility Claims and JPM Acquired DIP Inc. Claims: (1) the obligations of the Debtors under the DIP Facilities, the Prepetition Loan Documents, the Existing Shares, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Equity Interest (except such Certificates, Equity Interests, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that may be Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for the purposes of allowing such Holders to receive Plan Distributions under the Plan; provided, further, that (1) the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order, the Confirmation Recognition Order, or the Plan or result in any expense or liability to the Reorganized Debtors and (2) the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.

On the Confirmation Date, but subject to the Effective Date, (1) the obligations of the Debtors Stalking Horse Agreement and the Bid Procedures Order shall be cancelled as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and

(2) the obligations of the Debtors pursuant, relating, or pertaining to the Stalking Horse Agreement or the Bid Procedures Order to pay any LBAC Break-Up Fee or Expense Reimbursement, to the extent payable in accordance with the terms thereof, shall be released and discharged. For the avoidance of doubt, no party shall be entitled to, or receive (nor shall any reserve be required on account of), any LBAC Break-Up Fee or Expense Reimbursement.

L.      Corporate Existence

Except as otherwise provided in the Plan or as contemplated by the Plan Transactions, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, unlimited liability company, partnership, or other form, as applicable, with all the powers of a corporation, limited liability company, unlimited liability company, partnership, or other form, as applicable, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court (to the extent permitted by Canadian law), or any other Entity.

M.      Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity or Person, including, without limitation, the following: (1) execution of, and entry into, the Working Capital Facility Credit Agreement, the Second Lien Exit Credit Agreement, the Reorganized LightSquared Inc. Credit Agreement, the Exit Intercreditor Agreement, the Reorganized Debtors Governance Documents, the Management Incentive Plan, and commitment letters and such other documents as may be required or appropriate with respect to the foregoing; (2) consummation of the reorganization and restructuring transactions contemplated by the Plan and performance of all actions and transactions contemplated thereby; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) selection of the managers and officers for the Reorganized Debtors; (5) the issuance, reinstatement, and distribution of the New LightSquared Entities Shares; and (6) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters specifically provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or, as applicable, prior to the Effective Date, the appropriate officers, managers, or authorized person of the Debtors (including, any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and

directed to issue, enter, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name, and on behalf, of the Debtors, including, as appropriate: (1) the Working Capital Facility Credit Agreement (2) the Second Lien Exit Credit Agreement; (3) the Reorganized LightSquared Inc. Credit Agreement; (4) the Exit Intercreditor Agreement; (5) the Reorganized Debtors Governance Documents; (6) the Management Incentive Plan; and (7) any and all other agreements, documents, securities, and instruments related to the foregoing. The authorizations and approvals contemplated by this Section IV.M shall be effective notwithstanding any requirements under non-bankruptcy law.

N.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors or managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity.

O.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, Industry Canada filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.    *Preservation, Transfer, and Waiver of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date,

including any Retained Causes of Actions that may be described in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against them. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in New LightSquared.

The Cash received by the Holders of the Prepetition LP Facility SPSO Claims shall be subject to disgorgement to New LightSquared without the further approval of any Entity, to the extent that the Bankruptcy Court or any other court of competent jurisdiction, at the request of any party in interest, disallows (on the grounds set forth in Section III.B.8(b)) all or any part of the Prepetition LP Facility SPSO Claims.  For the avoidance of doubt, the Prepetition LP Facility SPSO Claims and any Cash received on account thereof shall be subject to any equitable or legal remedy previously sought and currently subject to the Appeal, other than equitable subordination of the Prepetition LP Facility SPSO Claims.

Upon the Effective Date of the Plan, Harbinger shall irrevocably assign to New LightSquared all Harbinger Litigations and the New Investors shall irrevocably assign to New LightSquared any and all of their rights to commence any New Actions.  New LightSquared will receive all Retained Causes of Action Proceeds, which, for the avoidance of doubt, shall include any and all proceeds from any of the Harbinger Litigations and New Actions.

Q.      *Assumption of D&O Liability Insurance Policies*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date; provided that, all D&O Liability Insurance Policies to which a Reorganized Inc. Entity would be a counterparty or obligor shall be assigned to New LightSquared on the Effective Date and no Reorganized Inc. Entity shall have any liability or obligations with respect to any D&O Liability Insurance Policies. Entry of the Confirmation Order shall constitute, subject to the occurrence of the Effective Date, the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, but without limiting the proviso in the first sentence of this paragraph, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance

Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, but subject to the proviso in the first sentence of the first paragraph in this Section IV.Q, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date. As of the Effective Date, New LightSquared shall purchase and maintain continuing director and officer insurance coverage for a tail period of six (6) years.

R.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, New LightSquared shall assume and continue to perform the Debtors' obligations to: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case, to the extent disclosed in the Disclosure Statement or the First Day Pleadings, for, among other things, compensation and wages (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance or termination benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and current and former employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of current and former employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement shall not entitle any Person or Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. In addition, as of the Effective Date, (1) Equity Interests granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors, and any such applicable equity plan, shall be (a) fully vested and (b) cancelled and terminated and (2) Holders of such Equity Interests shall be treated in accordance with Class 12 in Section III.B.14 hereof; provided, that the applicable Reorganized Debtors Boards shall maintain the discretion to execute and implement agreements or plans that grant current and former employees of the applicable Reorganized Debtors awards of stock options, equity appreciation rights, restricted equity, phantom equity, or any other Cash or performance-based awards as the Reorganized Debtors Boards deem appropriate.

Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid to the extent required by applicable law.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.     Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.     Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein (including Section IV.R hereof), each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease (a) is listed on the Schedule of Assumed Agreements in the Plan Supplement, (b) has been previously assumed, assumed and assigned, or rejected by the Debtors by Final Order of the Bankruptcy Court or has been assumed, assumed and assigned, or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date, (c) is the subject of a motion to assume, assume and assign, or reject pending as of the Effective Date, (d) is an Intercompany Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms herein.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor parties to Executory Contracts or Unexpired Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code; provided, however, that the non-Debtor parties must comply with Section V.B hereof.

    2.     Assumption of Executory Contracts and Unexpired Leases

In connection with the Confirmation and Consummation of the Plan, the New Investors (upon agreement of all of the New Investors) and the Debtors shall designate the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, pursuant to, and in accordance with, the Plan, which designated Executory Contracts and Unexpired Leases will be listed on the Schedule of Assumed Agreements in the Plan Supplement. On the Effective Date, the Debtors shall assume, or assume and assign, all of the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Agreements in the Plan Supplement; provided, that all assumed Executory Contracts and Unexpired Leases to which a Reorganized Inc. Entity would be a counterparty or obligor shall be assigned to New LightSquared on the Effective Date and no Reorganized Inc. Entity shall have any liability or obligations with respect to any such Executory Contracts and Unexpired Leases.

With respect to each Executory Contract and Unexpired Lease listed on the Schedule of Assumed Agreements in the Plan Supplement, the Debtors shall have designated a proposed amount of the Cure Costs, and the assumption, or assumption and assignment, of such Executory Contract and Unexpired Lease may be conditioned upon the disposition of all issues with respect to such Cure Costs. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions, or assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed, or assumed and assigned, in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cure Costs pursuant to the order approving such assumption, or assumption and assignment, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to, or action, order, or approval of, the Bankruptcy Court.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Notwithstanding anything in the Claims Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease, including pursuant hereto, gives rise to a Claim by the non-Debtor party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, their respective successors, or their respective property unless a Proof of Claim is Filed and served on the Reorganized Debtors no later than thirty (30) days after the Effective Date. All Allowed Claims arising from the rejection of the Inc. Debtors' Executory Contracts and Unexpired Leases shall be classified as Inc. General Unsecured Claims and shall be treated in accordance with Class 9 in Section III.B.11 hereof, and all Allowed Claims arising from the rejection of the LP Debtors' Executory Contracts and Unexpired Leases shall be classified as LP General Unsecured Claims and shall be treated in accordance with Class 10 in Section III.B.12 hereof.

C.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan*

With respect to any Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, pursuant hereto, all Cure Costs shall be satisfied as Administrative Claims of the applicable Debtors' Estates at the option of the New Investors (upon agreement of all of the New Investors) and the Debtors or the Reorganized Debtors (as applicable) (1) by payment of the Cure Costs with Plan Consideration in the form of Cash on the Effective Date or as soon thereafter as reasonably practicable or (2) on such other terms as the parties to each such Executory Contract or Unexpired Lease may otherwise agree without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity, provided that no Reorganized Inc. Entity shall have any obligation with respect to such Cure Costs.

In accordance with the Bid Procedures Order, on November 22, 2013, the Debtors Filed with the Bankruptcy Court and served upon all counterparties to such Executory Contracts and Unexpired Leases, a notice regarding any potential assumption, or assumption and assignment, of their Executory Contracts and Unexpired Leases and the proposed Cure Costs in connection therewith, which notice (1) listed the applicable Cure Costs, if any, (2) described the procedures for filing objections to the proposed assumption, assumption and assignment, or Cure Costs, and (3) explained the process by which related disputes shall be resolved by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to any potential assumption, assumption and assignment, or related Cure Costs must have been Filed, served, and actually received by (1) Milbank, Tweed, Hadley & McCloy LLP, One Chase Manhattan Plaza, New York, NY 10005 (Attn: Matthew S. Barr, Esq., Steven Z. Szanzer, Esq., and Karen Gartenberg, Esq.), counsel to the Debtors, and (2) any other notice parties identified on the notice no later than 4:00 p.m. (prevailing Eastern time) on November 29, 2013; <u>provided</u>,

however, that any objection by a counterparty to an Executory Contract or Unexpired Lease solely to the Reorganized Debtors' financial wherewithal must be Filed, served, and actually received by the appropriate notice parties no later than February 25, 2015 at 11:59 p.m. (prevailing Eastern time). Any counterparty to an Executory Contract or Unexpired Lease that failed to timely object to the proposed assumption, assumption and assignment, or Cure Costs shall be deemed to have assented to such assumption, assumption and assignment, or Cure Costs, as applicable. For the avoidance of doubt, if there is any discrepancy between the Schedule of Assumed Agreements and the notice referenced above in this paragraph, the Schedule of Assumed Agreements shall govern and any objection on account of such discrepancy shall also be filed by no later than February 25, 2015 at 11:59 p.m. (prevailing Eastern time).

In the event of a dispute regarding (1) the amount of any Cure Costs, (2) the ability of the Reorganized Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under such Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (3) any other matter pertaining to assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease, the payment of any Cure Costs shall be made following the entry of a Final Order resolving the dispute and approving the assumption, or assumption and assignment, of such Executory Contract or Unexpired Lease; provided, however, that the New Investors (upon agreement of all of the New Investors) and the Debtors or New LightSquared, as applicable, may settle any dispute regarding the amount of any Cure Costs without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors (with the consent of each of the New Investors) reserve the right to reject any Executory Contract or Unexpired Lease; provided, further, that the Bankruptcy Court shall adjudicate and decide any unresolved disputes relating to the assumption of Executory Contracts and Unexpired Leases, including, without limitation, disputed issues relating to Cure Costs, financial wherewithal, or adequate assurance of future performance, at a hearing scheduled for a date and time set forth in the Confirmation Order.

Assumption, or assumption and assignment, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, or assumption and assignment.

D.      *Pre-existing Obligations to Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, each of the New Investors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors or New LightSquared, as applicable, contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Intercompany Contracts, Contracts, and Leases Entered into After Petition Date, Assumed Executory Contracts, and Unexpired Leases*

Any (1) Intercompany Contracts, (2) contracts and leases entered into after the Petition Date by any Debtor to the extent not rejected prior to the Effective Date, and (3) any Executory Contracts and Unexpired Leases assumed, or assumed and assigned, by any Debtor and not rejected prior to the Effective Date, may be performed by the applicable Reorganized Debtor in the ordinary course of business. Any such contracts and leases described in the foregoing clauses (1) through (3) to which a Reorganized Inc. Entity or any of its subsidiaries is a counterparty or obligor shall be assigned to New LightSquared and, upon such assignment, no Reorganized Inc. Entity shall retain any obligations or liabilities thereunder.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed, or assumed and assigned, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Postpetition Contracts and Leases*

Each Reorganized Debtor shall perform its obligations under each contract and lease entered into by the respective Debtor or applicable Reorganized Debtor after the Petition Date to the extent not rejected prior to the Effective Date, including any Executory Contract and Unexpired Lease assumed by such Debtor or Reorganized Debtor, in each case, in accordance with, and subject to, the then applicable terms; provided that each Reorganized Inc. Entity shall assign such obligations to New LightSquared on the Effective Date. Accordingly, such contracts and leases to the extent not rejected prior to the Effective Date (including any assumed Executory Contracts or Unexpired Leases) shall survive, and remain unaffected by, entry of the Confirmation Order.

H.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the New Investors on any exhibit to the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by any of the New Investors that any such contract or lease is or is not, in fact, an Executory Contract or Unexpired Lease or that the Debtors, or their respective Affiliates, have any liability thereunder.

The Debtors and New LightSquared, with the consent of each New Investor, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Agreements until and including the Effective Date or as otherwise provided by Bankruptcy Court order; provided, however, that if there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, assumption and assignment, or with respect to asserted Cure Costs, then the New Investors and the Reorganized Debtors shall have thirty (30) days following the entry of a Final Order resolving such dispute to amend the decision to assume, or assume and assign, such Executory Contract or Unexpired Lease.

I.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming, assuming and assigning, or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors, the DIP Inc. Lenders, the DIP LP Lenders, and the New DIP Lenders, the Prepetition Lenders, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. Except as otherwise provided in the Plan (including with respect to the Acquired Inc. Facility Claims and the Acquired DIP Inc. Claims), the Debtors and the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Distribution Record Date. Except as otherwise provided in the Plan (including with respect to the Acquired Inc. Facility Claims and the Acquired DIP Inc. Claims), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

B.    Timing and Calculation of Amounts To Be Distributed

Unless otherwise provided in the Plan, including with respect to distributions contemplated hereunder to Holders of DIP Inc. Claims and DIP LP Claims on the New DIP Closing Date and/or the Inc. Facilities Claims Purchase Closing Date, as applicable, on the Effective Date or as soon thereafter as reasonably practicable (or if a Claim or an Equity Interest is not Allowed on the Effective Date, on the date that such a Claim or an Equity Interest is Allowed, or as soon thereafter as reasonably practicable), each Holder of an Allowed Claim or an Allowed Equity Interest shall receive the full amount of the Plan Distribution that such Holder is entitled to pursuant to the Plan; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, or assumed by the Debtors on or prior to the Effective Date, shall be paid or

performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice.

Upon the Consummation of the Plan, the New LightSquared Entities Shares shall be deemed to be issued to (and the Reinstated Intercompany Interests shall be deemed to be Reinstated for the benefit of), as of the Effective Date, the eligible Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable, without the need for further action by any Debtor, Disbursing Agent, Reorganized Debtor, or any other Entity, including, without limitation, the issuance or delivery of any certificate evidencing any such debts, securities, shares, units, or interests, as applicable. Except as otherwise provided herein, the eligible Holders of Allowed Claims and Allowed Equity Interests, and the other eligible Entities hereunder entitled to receive Plan Distributions pursuant to the terms of the Plan shall not be entitled to interest, dividends, or accruals on such Plan Distributions, regardless of whether such Plan Distributions are delivered on or at any time after the Effective Date.

The Disbursing Agent is authorized to make periodic Plan Distributions on account of Allowed Claims and Allowed Equity Interests and, if such periodic Plan Distributions are made, the Disbursing Agent shall reserve any applicable Plan Consideration from Plan Distributions to applicable Holders equal to the Plan Distributions to which Holders of Disputed Claims or Disputed Equity Interests would be entitled if such Disputed Claims or Disputed Equity Interests become Allowed.

C.    *Disbursing Agent*

All Plan Distributions shall be made by New LightSquared as Disbursing Agent, or such other Entity designated by the New Investors (upon agreement of all of the New Investors) or New LightSquared, as applicable, as Disbursing Agent, including Reorganized LightSquared Inc. to the extent set forth in Section IV.B.2(d). A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be as agreed by and between all of the New Investors or the Reorganized Debtors, as applicable, and such Disbursing Agent.

Except as otherwise provided herein, Plan Distributions of Plan Consideration under the Plan shall be made by the Debtors or the Reorganized Debtors, as applicable, to the Disbursing Agent for the benefit of the Holders of Allowed Claims or Allowed Equity Interests, and the other eligible Entities hereunder, as applicable. All Plan Distributions by the Disbursing Agent shall be at the discretion of the Debtors or the Reorganized Debtors, as applicable, and the Disbursing Agent shall not have any liability to any Entity for Plan Distributions made by them under the Plan.

D.    *Rights and Powers of Disbursing Agent*

1.    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b)

make all Plan Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

     2.     <u>Expenses Incurred On or After Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorneys' fees and expenses) made by the Disbursing Agent, shall be paid in Cash by New LightSquared.

E.     *Plan Distributions on Account of Claims and Equity Interests Allowed After Effective Date*

     1.     <u>Payments and Plan Distributions on Disputed Claims and Disputed Equity Interests</u>

Plan Distributions made after the Effective Date to Holders of Claims or Equity Interests that are not Allowed as of the Effective Date, but which later become Allowed Claims or Allowed Equity Interests, shall be deemed to have been made on the Effective Date.

     2.     <u>Special Rules for Plan Distributions to Holders of Disputed Claims and Disputed Equity Interests</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties and all of the New Investors, (a) no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim or Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order, and (b) any Entity that holds both (i) an Allowed Claim or an Allowed Equity Interest and (ii) a Disputed Claim or a Disputed Equity Interest shall not receive any Plan Distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or Disputed Equity Interest, respectively, have been resolved by settlement or Final Order; <u>provided</u>, <u>however</u>, that, for all purposes, the foregoing shall not apply to the Prepetition LP Facility SPSO Claims or the Prepetition LP Facility SPSO Guaranty Claims, which Claims shall not be treated as Disputed Claims and shall, on the Effective Date, receive their distributions in accordance with, and subject to, the terms and conditions of Sections III.B.8 and 10 hereof.

F.     *Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions*

     1.     <u>Delivery of Plan Distributions in General</u>

Except as otherwise provided herein, the Disbursing Agent shall make Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder

as indicated on the Debtors' or the Reorganized Debtors' records as of the date of any such Plan Distribution; provided, however, that the manner of such Plan Distributions shall be determined at the discretion of the New Investors (upon agreement of all of the New Investors) or New LightSquared; provided, further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Disbursing Agent by check or by wire transfer.

Each Plan Distribution referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such Plan Distribution and by the terms and conditions of the instruments evidencing or relating to such Plan Distribution, if any, which terms and conditions shall bind each Entity receiving such Plan Distribution.

2.    Delivery of Plan Distributions to Holders of Allowed DIP Inc. Claims

The Plan Distributions provided for Allowed DIP Inc. Claims (other than the Acquired DIP Inc. Claims) pursuant to Section II.C hereof shall be made to the DIP Inc. Agent or MAST, as directed by MAST, by the Debtors or the New Inc. DIP Lenders, on behalf of the Debtors, or the New Investors pursuant to the New Investor Commitment Documents, as applicable, on the Inc. Facilities Claims Purchase Closing Date.

3.    Delivery of Plan Distributions to Holders of Allowed DIP LP Claims

The Plan Distributions provided for Allowed DIP LP Claims pursuant to Section II.D hereof shall be made to the DIP LP Lenders by the Debtors or the New LP DIP Lenders, on behalf of the Debtors, on the New LP DIP Closing Date.

4.    Delivery of Plan Distributions to Holders of Allowed New DIP Claims

The Plan Distributions provided for Allowed New DIP Claims pursuant to Sections II.E and F hereof shall be made to the New Inc. DIP Agent and New LP DIP Agent, as applicable. To the extent possible, the Reorganized Debtors and the Disbursing Agent shall provide that the applicable Plan Consideration is eligible to be distributed to the New DIP Lenders at the direction of the New Inc. DIP Agent and New LP DIP Agent, as applicable.

5.    Delivery of Plan Distributions to Holders of Allowed Prepetition LP Facility Claims or Allowed Prepetition Inc. Facility Claims

Other than as provided by the JPM Inc. Facilities Claims Purchase Agreement, the Plan Distributions provided for Allowed Prepetition Inc. Facility Claims and Allowed Prepetition LP Facility Claims in Sections III.B.5, III.B.6, III.B.7, III.B.8, III.B.9, and III.B.10 hereof shall be made to applicable Holders of Allowed Prepetition Inc. Facility Claims and Allowed Prepetition LP Facility Claims by the Debtors or the Disbursing Agent, as applicable.

6.    Minimum Plan Distributions

Notwithstanding anything herein to the contrary, the Disbursing Agent shall not be required to make Plan Distributions or payments of Cash of less than the amount of $100 and

shall not be required to make partial Plan Distributions or payments of fractions of dollars. Whenever any payment or Plan Distributions of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or Plan Distribution shall reflect a rounding of such fraction to the nearest whole dollar, with half dollars or less being rounded down. The Disbursing Agent shall not be required to make partial or fractional Plan Distributions of New LightSquared Entities Shares and such fractions shall be deemed to be zero.

7.    Undeliverable Plan Distributions and Unclaimed Property

In the event that any Plan Distribution to any Holder is returned as undeliverable, no Plan Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Plan Distribution shall be made to such Holder without interest; provided, however, that such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to New LightSquared (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in such property shall be discharged and forever barred.

G.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Plan Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Plan Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all Plan Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent that the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

H.    Setoffs

Each Debtor, or such Entity's designee as instructed by such Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Claim, an Allowed DIP LP Claim, or an Allowed DIP Inc. Claim) or any Allowed Equity Interest (other than an Allowed Existing Inc. Preferred Stock or Allowed Existing LP Preferred Units), and the Plan Distributions on account of such Allowed Claim or

Allowed Equity Interest, any and all claims, rights, and Causes of Action that a Debtor or its successors may hold against the Holder of such Allowed Claim or Allowed Equity Interest after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim or Equity Interest (other than an Allowed Prepetition LP Facility Non-SPSO Claim, an Allowed Prepetition Inc. Facility Claim, an Allowed DIP LP Claim, an Allowed DIP Inc. Claim, Allowed Existing Inc. Preferred Stock, or Allowed Existing LP Preferred Units) hereunder shall constitute a waiver or release by a Debtor or its successor of any and all claims, rights, and Causes of Action that a Debtor or its successor may possess against such Holder.

I.      Recoupment

In no event shall any Holder of Claims against, or Equity Interests in, the Debtors be entitled to recoup any such Claim or Equity Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      Claims Paid or Payable by Third Parties

1.      Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor or the Disbursing Agent; provided, that the foregoing shall not apply with respect to Claims purchased pursuant to the JPM Inc. Facilities Claims Purchase Agreement or the Fortress/Centerbridge DIP Inc. Claims Purchase Agreement, to the extent applicable, which Claims so purchased shall be deemed satisfied upon Consummation of the Plan. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from an Entity that is not a Debtor or a Reorganized Debtor or the Disbursing Agent on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Plan Distribution to the applicable Reorganized Debtor or the Disbursing Agent, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution under the Plan. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the two (2)-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

3.      Preservation of Insurance Rights

Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any insurer from any obligations to any Person under applicable law or any policy of insurance under which any of the Debtors is an insured or a beneficiary, nor shall anything contained herein constitute or be deemed a waiver by any of the Debtors' insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

*A.      Allowance of Claims and Equity Interests*

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest immediately prior to the Effective Date, including the Causes of Action referenced in Section IV.P hereof. Except as expressly provided herein, no Claim or Equity Interest shall become Allowed unless and until such Claim or Equity Interest is deemed Allowed under Section I.A.8 hereof or the Bankruptcy Code.

In accordance with Sections III.B.8 and 10 hereof, the Prepetition LP Facility SPSO Claims and the Prepetition LP Facility SPSO Guaranty Claims in such Classes shall remain subject to all claims that may be brought by any party in interest against, and all and any defenses to the allowance of, such Claims, as previously sought and currently subject to the Appeal, except for equitable subordination of the Prepetition LP Facility SPSO Claims and Prepetition LP Facility SPSO Guaranty Claims; provided, however, that in the case of any Prepetition LP Fee Claims requested by SPSO, all parties in interest shall have the right to assert all claims and defenses to the allowance thereof.  In no event shall the Prepetition LP Facility SPSO Claims or the Prepetition LP Facility SPSO Guaranty Claims be deemed to be Disputed Claims or subject to those procedures applicable to Disputed Claims as set forth in this Article VII.

*B.      Claims and Equity Interests Administration Responsibilities*

Except as otherwise provided in the Plan, after the Effective Date, New LightSquared shall have the sole and exclusive authority to (1) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests, (2) settle or compromise any Disputed Claim or

Disputed Equity Interest without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

New LightSquared shall maintain the Disputed Claims and Equity Interests Reserve on account of the Disputed Claims. The Disputed Claims and Equity Interests Reserve may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims or Disputed Equity Interests that have subsequently become disallowed Claims or disallowed Equity Interests shall be released from such reserve and used to fund the other reserves and Plan Distributions, or for general corporate purposes and working capital needs.

C.      *Estimation of Claims or Equity Interests*

Before the Effective Date, the Plan Proponents, and after the Effective Date, New LightSquared, may at any time request that the Bankruptcy Court estimate (1) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and (2) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, for any reason, regardless of whether any Entity previously has objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim or Equity Interest, any group of Claims or Equity Interests, or any Class of Claims or Equity Interests, at any time during litigation concerning any objection, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim or Disputed Equity Interest, that estimated amount shall constitute either (1) the Allowed amount of such Disputed Claim or Disputed Equity Interest, (2) a maximum limitation on such Disputed Claim or Disputed Equity Interest, or (3) in the event such Disputed Claim or Disputed Equity Interest is estimated in connection with the estimation of other Claims or Equity Interests within the same Class, a maximum limitation on the aggregate amount of Allowed Claims or Equity Interests on account of such Disputed Claims or Disputed Equity Interests so estimated, in each case, for all purposes under the Plan (including for purposes of Plan Distributions); provided, however, that the Plan Proponents or New LightSquared, as applicable, may elect to pursue supplemental proceedings to object to any ultimate allowance of any Disputed Claim or Disputed Equity Interest and any ultimate Plan Distributions on such Claim or Equity Interest. Notwithstanding any provision in the Plan to the contrary, a Claim or Equity Interest that has been disallowed or expunged from the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Equity Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim or Equity Interest is estimated.

All of the aforementioned Claims or Equity Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      Expungement or Adjustment to Claims or Equity Interests Without Objection

Any Claim or Equity Interest that has been paid, satisfied, superseded, or compromised in full by a particular Debtor may be expunged on the Claims Register or stock transfer ledger or similar register of such Debtor, as applicable, by the Reorganized Debtors, and any Claim or Equity Interest that has been amended may be adjusted on the Claims Register by the Reorganized Debtors, in both cases without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity. Additionally, any Claim or Equity Interest that is duplicative or redundant with another Claim or Equity Interest against the same Debtor may be adjusted or expunged on the Claims Register or stock transfer ledger or similar register of the applicable Debtor, as applicable, by the Reorganized Debtors without a Claims or Equity Interests objection having to be Filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

E.      No Interest

Unless otherwise (1) specifically provided for in the Plan or the Confirmation Order, (2) agreed to by the New Investors (upon agreement of all of the New Investors) or the Reorganized Debtors, as applicable, (3) provided for in a postpetition agreement in writing between all of the New Investors or the Reorganized Debtors, as applicable, and a Holder of a Claim, or (4) allowed under applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, and except as otherwise set forth in the Plan, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Plan Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

F.      Deadline To File Objections to Claims or Equity Interests

Any objections to Claims or Equity Interests shall be Filed no later than the Claims and Equity Interests Objection Bar Date, as may be extended from time to time upon the consent of the Debtors and each of the New Investors.

G.      Disallowance of Claims or Equity Interests

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are transferees of transfers avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code or otherwise, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Equity Interests may not receive any Plan Distributions on

account of such Claims or Equity Interests until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums or property due, if any, to the Debtors from that Entity have been turned over or paid.

EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF, THE BANKRUPTCY COURT, THE CANADIAN COURT, OR ANY OTHER ENTITY, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY PLAN DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

H.      *Amendments to Claims*

On or after the later of the Effective Date or the applicable deadline set by the Bankruptcy Court, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or New LightSquared, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Plan Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors in accordance with Section III.B.17 and Section III.B.18 hereof), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Equity Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, whether or not (1) a Proof of Claim or proof of Equity Interest based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Equity Interest based upon such debt, right, or Equity Interest is Allowed pursuant

to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Equity Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Effective Date.

B.      Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective Plan Distributions and treatments under the Plan shall give effect to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Proponents, with the consent of each of the New Investors, reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, the Prepetition Inc. Facility Lender Subordination Agreement shall be enforceable as a subordination agreement under section 510(a) of the Bankruptcy Code.

C.      Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, Causes of Action, and controversies resolved pursuant to the Plan and relating to any contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any Plan Distributions to be made on account of such an Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims or Equity Interests and is fair, equitable, and reasonable. Plan Distributions made to Holders of Allowed Claims or Equity Interests are intended to be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, the Canadian Court, or any other Entity, after the Effective Date, New LightSquared may compromise and settle Claims against, or Equity Interests in, the Debtors, and Causes of Action against other Entities; provided that, any settlement with respect to Claims against, or Equity Interests in, or any Causes of Action against any Reorganized Inc. Entity shall require the prior approval of Reorganized LightSquared Inc. In addition, and for the avoidance of doubt, entry of the Confirmation Order shall also operate to settle all claims and causes of action alleged in the Standing Motion against the Prepetition Inc. Agent and the Prepetition Inc. Lenders in respect of the Prepetition Inc. Facility Subordinated Claims, and the Standing Motion, to the extent not previously withdrawn with prejudice, shall be deemed withdrawn with prejudice upon the occurrence of the Inc. Facilities Claims Purchase Closing Date.

D.    *Releases by Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the CCAA Proceeding, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors, the Prepetition Facilities, the DIP Facilities, the Working Capital Facility, the Second Lien Exit Facility, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Exit Facility, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter 11 Cases and/or the CCAA Proceeding, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements (including the Plan Support Agreement), instruments, or other documents, any of the Debtors' regulatory efforts (including, without limitation, change of control applications) upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Working Capital Facility Credit Agreement, Second Lien Exit Credit Agreement, Reorganized LightSquared Inc. Credit Agreement, Exit Intercreditor Agreement, Reorganized Debtors Governance Documents, and the Plan Supplement) executed to implement the Plan.**

E.    *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, Cause of Action, or liability for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Plan Documents, or any contract, instrument, release, or other agreement, or document created or entered into in connection with the**

Plan (including the Plan Support Agreement), any act taken or omitted to be taken in connection with, or related to, any of the Debtors' regulatory efforts (including, without limitation change of control applications), the negotiation of Cure Costs, the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases, or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the approval of the Disclosure Statement, or Confirmation or Consummation of the Plan, except for (1) willful misconduct (including fraud) or gross negligence and/or (2) the rights of any Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under, or in connection with, the Plan, or assumed pursuant to the Plan, or assumed pursuant to a Final Order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Third-Party Releases by Holders of Claims or Equity Interests*

Except as otherwise specifically provided in the Plan, on and after the Effective Date, to the fullest extent permissible under applicable law, (1) each Released Party, (2) each present and former Holder of a Claim or Equity Interest, and (3) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, members (including ex-officio members), officers, directors, principals, managers, trustees, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, consultants, agents, and representatives (in each case, in his, her, or its capacity as such) (each of the foregoing parties in (1), (2), and (3), a "Releasing Party") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Claims, Equity Interests, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the CCAA Proceeding, the prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors, the Prepetition Facilities, the DIP Facilities, the Working Capital Facility, the Second Lien Exit Facility, the Exit Intercreditor Agreement, the New LightSquared Entities Shares, the Reorganized LightSquared Inc. Exit Facility, as applicable, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Equity Interests prior to or in the Chapter

11 Cases and/or the CCAA Proceeding, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, any act taken or omitted to be taken in connection with, or related to, any of the Debtors' regulatory efforts (including, without limitation change of control applications), the negotiation of Cure Costs, the amendment, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence; **provided**, **however**, that each present and former Holder of a Claim or Equity Interest voting to reject the Plan may reject the third-party release provided in this Section VIII.F by checking the box on the applicable Ballot indicating that such Holder opts not to grant such third-party release.

Notwithstanding anything contained herein to the contrary, the third-party release herein does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Working Capital Facility Credit Agreement, Second Lien Exit Credit Agreement, Reorganized LightSquared Inc. Credit Agreement, Exit Intercreditor Agreement, Reorganized Debtors Governance Documents, and the Plan Supplement) executed to implement the Plan.

G.    *Injunctions*

Except as otherwise expressly provided in the Plan, or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released pursuant to Section VIII.D hereof or Section VIII.F hereof, discharged pursuant to Section VIII.A hereof, or are subject to exculpation pursuant to Section VIII.E hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Debtors or the Reorganized Debtors: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of, in connection with, or with respect to any such Claims or Equity Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or proof of Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the

**Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity shall (1) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.      *Release of Liens*

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, (1) on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and (2) in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledge, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. The Reorganized Debtors shall be authorized to file any necessary or desirable documents to evidence such release in the name of such Holder of a Secured Claim.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION DATE AND EFFECTIVE DATE OF PLAN

A.      *Conditions Precedent to Confirmation Date*

It shall be a condition to the Confirmation Date of the Plan that the following conditions shall have been satisfied (prior to, or in conjunction with, entry of the Confirmation Order) or waived pursuant to the provisions of Section IX.C hereof:

1.      Except as otherwise agreed by each of the New Investors, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of satisfying any FCC Objective.

2.      The Bankruptcy Court shall have entered the Confirmation Order.

3.      The Bankruptcy Court shall have entered the Disclosure Statement Order and the Canadian Court shall have entered the Disclosure Statement Recognition Order.

4.      The Plan Support Agreement shall be in full force and effect.

5.      The New DIP Orders shall have been entered contemporaneously with the Confirmation Order.

6. The Standing Motion Stipulation Order shall have been entered by the Bankruptcy Court.

7. The JPM Inc. Facilities Claims Purchase Agreement shall have been executed and be in full force and effect.

8. The New Investor Commitment Documents shall have been executed and be in full force and effect.

9. The Prepetition Inc. Fee Claims and DIP Inc. Fee Claims shall have been paid in full in Cash

10. The Debtors shall have received (a) binding commitments with respect to the Effective Date Investments, (b) a highly confident letter with respect to the Working Capital Facility, in each case, on terms and conditions satisfactory to each of the New Investors and the Debtors, and (c) binding commitments with respect to the Cash portion of the Second Lien Exit Facility.

11. The New Investor Break-Up Fee and the commitment fee under the Second Lien Exit Facility Commitment Letter shall each have been approved by the Bankruptcy Court.

B.    *Conditions Precedent to Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived (upon agreement of each of the New Investors and the Debtors) pursuant to the provisions of Section IX.C hereof:

1. The Confirmation Order shall have become a Final Order.

2. The transactions contemplated by the JPM Inc. Facilities Claims Purchase Agreement shall have been consummated.

3. The New DIP Orders (a) shall have been entered and (b) shall have become Final Orders.

4. The New DIP Recognition Order shall have become a Final Order.

5. The New DIP Facilities shall have been funded, and there shall not be any default under the New DIP Credit Agreements or the New DIP Orders with respect to which the New DIP Agents or New DIP Lenders are exercising any rights and remedies against the collateral under such New DIP Facilities.

6. The Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith, including, but not limited to:

(a)     the Working Capital Facility Credit Agreement and any related documents, in forms and substance satisfactory to New LightSquared, each of the New Investors, and the Debtors, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, and the incurrence of obligations pursuant to the Working Capital Facility Credit Agreement shall have occurred;

(b)     the Second Lien Exit Credit Agreement and any related documents, in forms and substance satisfactory to each of the New Investors and the Debtors, shall have been executed and delivered by all of the Entities that are parties thereto, all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof, the incurrence of obligations pursuant to the Second Lien Exit Credit Agreement, and the funding of all New Money Lender Commitments (as such term is defined in the Second Lien Exit Credit Agreement) shall have occurred;

(c)     the Reorganized LightSquared Inc. Exit Facility and any related documents, in forms and substance satisfactory to each of the New Investors and the Debtors, shall have been executed and delivered by all of the Entities that are parties thereto, and the incurrence of obligations pursuant to the Reorganized LightSquared Inc. Exit Facility shall have occurred;

(d)     the New LightSquared Interest Holders Agreement, in form and substance satisfactory to each of the New Investors and the Debtors, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof; and

(e)     the Debtors shall have sufficient Cash on hand to fund the Professional Fee Reserve and the Disputed Claims and Equity Interests Reserve.

7.     The Canadian Court shall have entered the Confirmation Recognition Order and such order shall have become a Final Order.

8.     All necessary actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

9.     Except as otherwise agreed by each of the New Investors, the FCC shall not have: (a) denied any Material Regulatory Request in writing on material substantive grounds; (b) denied any Material Regulatory Request in writing on any other grounds without affording the applicant or petitioner an opportunity to submit a

substantively similar request without prejudice; or (c) otherwise taken action so as to preclude a reasonable prospect of satisfying any FCC Objective.

10.    The FCC, Industry Canada, and other applicable governmental authorities shall have granted any necessary consents and approvals required for the Debtors to emerge from chapter 11 pursuant to the Plan (including, without limitation and to the extent applicable, consents to the assignment of the Debtors' licenses and/or the transfer of control of the Debtors, as well as customary approvals and authorizations related thereto) and any statutory waiting periods shall have expired (including under the *Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the Competition Act* (Canada)).

11.    The Plan Support Agreement shall be in full force and effect.

12.    The Debtors shall have paid in full in Cash all New Investor Fee Claims.

13.    The Harbinger Litigations shall have been assigned to New LightSquared.

14.    The identity of the Chairman of the New LightSquared Board shall be reasonably acceptable to each of the New Investors.

*C.    Waiver of Conditions*

The conditions to the Confirmation Date and/or the Effective Date of the Plan set forth in this Article IX may be waived by the agreement of each of the New Investors and the Debtors, without notice to, or action, order, or approval of, the Bankruptcy Court, the Canadian Court, or any other Entity; <u>provided</u>, that if the Inc. Facilities Claims Purchase Closing Date and payment in full in Cash of the DIP Inc. Claims has not yet occurred, the conditions to Confirmation set forth in Section IX.A may not be waived without the consent of MAST, other than Sections IX.A.1, IX.A.10, and IX.A.11.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

*A.    Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Plan Proponents (in accordance with the Plan Support Agreement, as applicable, and the terms of this Article X), reserve the right with the written consent of each Plan Proponent to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Plan may not be modified or amended with respect to (1) a MAST Term or (2) Articles I, II, II.A, II.C, III, IV.A, IV.B.1, VI (solely as to such terms that pertain to MAST or the Prepetition Inc. Agent), VIII, IX.A, IX.C, X, XI (solely as to such terms that pertain to MAST or the Prepetition Inc. Agent), and XII hereof, without the prior written consent of MAST and the Prepetition Inc. Agent, which consent, in the case of clause (2), immediately above and when unrelated to a MAST Term, shall not be unreasonably withheld or delayed. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan and in the Plan Support Agreement, the

Plan Proponents other than the Debtors (in accordance with the Plan Support Agreement or the terms of this Section X.A), expressly reserve the right to alter, amend, or modify materially the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court or Canadian Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Confirmation Order, or the Confirmation Recognition Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Section X.A.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order or Confirmation Recognition Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Plan Proponents, with the consent of each Plan Proponent, MAST, and the Prepetition Inc. Agent, in accordance with the Plan Support Agreement (or, in the case of the Debtors, the terms of this Section X.C), reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans. The Debtors reserve their right to withdraw support for the Plan at any time if it is determined that pursuing the Plan would be inconsistent with the exercise of their fiduciary duties; provided, however, that such withdrawal is without prejudice to the right of the other Plan Proponents to continue to seek confirmation and consummation of the Plan. If the Plan Proponents collectively revoke or withdraw the Plan, or if the Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claims or Equity Interests or Class of Claims or Equity Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void in all respects (provided, however, that the foregoing shall not apply to (x) the Standing Motion Stipulation and the withdrawal of the Standing Motion as to the Prepetition Inc. Facility Non-Subordinated Claims or (y) the JPM Inc. Facilities Claims Purchase Agreement or the New Investor Commitment Documents to the extent that the Inc. Facilities Claims Purchase Closing Date has occurred); and (3) nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims or Equity Interests in any respect, (b) prejudice in any manner the rights of the Debtors or any other Entity in any respect, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity in any respect.

D.      *Validity of Certain Plan Transactions If Effective Date Does Not Occur*

If, for any reason, the Plan is Confirmed, but the Effective Date does not occur, any and all post-Confirmation Date and pre-Effective Date Plan Transactions that were authorized by the Bankruptcy Court, whether as part of the New DIP Facilities, the purchases pursuant to the JPM

Inc. Facilities Claims Purchase Agreement, the New Investor Commitment Documents, the Plan, or otherwise, and any distributions made from proceeds of the New DIP Facilities, shall be deemed valid, in full force and effect, and not subject to revocation or reversal.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, of any request for the payment or Plan Distribution on account of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, and of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

2.  Decide and resolve all matters relating to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  Resolve any matters relating to the following: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned; and (d) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.  Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve all matters related to the Standing Motion Stipulation and Standing Motion Stipulation Order;

8.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10.     To hear and determine any matters relating to, arising out of, or in connection with the implementation of the Working Capital Facility, the Second Lien Exit Facility, the Reorganized LightSquared Inc. Exit Facility, the Exit Intercreditor Agreement, the Reorganized Debtors Governance Documents, the Second Lien Exit Facility Commitment Letter, or any ancillary or related agreements thereto;

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Consummation or enforcement of the Plan, including the releases set forth therein;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

15.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Equity Interest for amounts not timely repaid pursuant to Section VI.J hereof;

16.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

17.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract,

instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

18.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

19.     Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan or any transactions contemplated therein;

20.     Adjudicate any and all disputes arising from or relating to the JPM Inc. Facilities Claims Purchase Agreement.

21.     Adjudicate any and all disputes arising from, or relating to, the New Investor Commitment Documents.

22.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

23.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

24.     Enforce all orders previously entered by the Bankruptcy Court; and

25.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*    *Immediate Binding Effect*

Subject to Section IX.B hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, the Confirmation Order, and the Confirmation Recognition Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties, or are subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring or receiving property under the Plan, and any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan. For the avoidance of doubt, upon entry of the Confirmation Order the JPM Inc. Facilities Claims Purchase Agreement, and the New Investor Commitment Documents shall remain binding, subject to the terms thereof, regardless of whether the Effective Date occurs.

B.      *Additional Documents*

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the New Investors or the Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or appropriate to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall have entered the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor, any Plan Proponent, or any Plan Support Party with respect to the Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

D.      *Successors and Assigns*

Except as expressly set forth in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to:

the Debtors or the Reorganized Debtors, shall be served on:

LightSquared Inc.                          Milbank, Tweed, Hadley & McCloy LLP
Attn: General Counsel                      Matthew S. Barr
10802 Parkridge Boulevard                  Steven Z. Szanzer
Reston, VA 20191                           Karen Gartenberg
                                           One Chase Manhattan Plaza
                                           New York, NY 10005

the Special Committee, shall be served on:

Kirkland & Ellis LLP
Paul M. Basta
Joshua A. Sussberg
601 Lexington Avenue
New York, NY 10022

Fortress, shall be served on:

| | |
|---|---|
| Fortress Credit Opportunities Advisors LLC<br>1345 Avenue of the Americas<br>New York, NY 10105<br>Kristopher M. Hansen | Stroock & Stroock & Lavan LLP<br>Frank A. Merola<br>Jayme T. Goldstein<br>180 Maiden Lane<br>New York, NY 10038 |

JPM Investment Parties, shall be served on:

| | |
|---|---|
| JPMorgan Chase & Co.<br>Patrick Daniello<br>383 Madison Ave.<br>New York, NY 10179 | Simpson Thacher & Bartlett LLP<br>Sandeep Qusba<br>Elisha D. Graff<br>425 Lexington Avenue<br>New York, NY 10017 |

Harbinger, shall be served on:

Kasowitz, Benson, Torres & Friedman LLP
David M. Friedman
Adam L. Shiff
1633 Broadway
New York, NY 10019

Centerbridge, shall be served on:

| | |
|---|---|
| Centerbridge Partners, L.P.<br>Vivek Melwani<br>Jared Hendricks<br>375 Park Avenue, 12th Floor<br>New York, NY 10152 | Fried, Frank, Harris, Shriver & Jacobson LLP<br>Brad Eric Scheler<br>Peter B. Siroka<br>Aaron S. Rothman<br>One New York Plaza<br>New York, NY 10004 |

MAST, the Prepetition Inc. Agent and/or the DIP Inc. Agent shall be served on:

| | |
|---|---|
| MAST Capital Management, LLC<br>Peter Reed<br>Adam Kleinman<br>The John Hancock Tower<br>200 Clarendon Street, Floor 51<br>Boston, MA 02116 | Akin Gump Strauss Hauer & Feld LLP<br>Philip C. Dublin<br>Meredith A. Lahaie<br>One Bryant Park<br>New York, NY 10036 |

After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, or the Confirmation Recognition Order shall remain in full force and effect in accordance with their terms.

G.    *Plan Supplement*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan, and any reference to the Plan shall mean the Plan and the Plan Supplement. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Claims and Solicitation Agent at http://www.kccllc.net/lightsquared. The documents contained in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement (which, for the avoidance of doubt, shall not include the New DIP Order) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Non-severability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall be deemed to provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the New Investors and, to the extent otherwise set forth herein or in the Plan Support Agreement, MAST, and (3) non-severable and mutually dependent.

J.       *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Plan Proponents shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, subsidiaries, members, principals, shareholders, officers, directors, employees, representatives, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

K.       *Waiver or Estoppel*

**Each Holder of a Claim or an Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

L.       *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall govern and control.

New York, New York
Dated: March __, 2015

**LIGHTSQUARED INC., LIGHTSQUARED
LP, AND THE OTHER DEBTORS IN THE
CHAPTER 11 CASES**

_____

Douglas Smith
Chief Executive Officer, President, and
Chairman of the Board of LightSquared Inc.

New York, New York
Dated: March ___, 2015

**CENTERBRIDGE PARTNERS, L.P., ON BEHALF OF CERTAIN OF ITS AFFILIATED FUNDS**


By: _____
Name:    Jared S. Hendricks
Title:    Authorized Signatory

CHI-181960186v1

New York, New York
Dated: March __, 2015

**FORTRESS CREDIT OPPORTUNITIES ADVISORS LLC**, by and on behalf of its and its affiliates' managed funds and/or accounts

By: _____
Name:    Marc K. Furstein
Title:    Chief Operating Officer

New York, New York
Dated: March __, 2015

**HARBINGER CAPITAL PARTNERS LLC**


By:      /
Name:    Philip A. Falcone
Title:   Chief Executive Officer


**HGW HOLDING COMPANY, L.P.**


By:
Name:    Philip A. Falcone
Title:   Chief Executive Officer


**BLUE LINE DZM CORP.**


By:      /
Name:    Keith M. Hladek
Title:   Authorized Signatory


**HCP SP INC.**


By:
Name:    Philip A. Falcone
Title:   President

CHI-181960186v1

EXHIBIT B – FORM OF SECOND LIEN CREDIT AGREEMENT

NYI-524645449v7

**$[            ]**

**JUNIOR LIEN LOAN AGREEMENT[1]**

**dated as of [          ], 2015,**

**among**

**[NEWCO],**

**as the Borrower,**

**and**

**THE GUARANTORS PARTY HERETO,**

**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**and**

**[            ],**

**as Administrative Agent**

---

[1] Terms are subject to change based on syndication of Working Capital Facility.

# TABLE OF CONTENTS

**Page**

ARTICLE 1

DEFINITIONS                                                                    2

Section 1.01.    Defined Terms ................................................................2
Section 1.02.    Terms Generally ............................................................34
Section 1.03.    Accounting Terms; GAAP ............................................35
Section 1.04.    Resolution of Drafting Ambiguities ..............................35
Section 1.05.    Permitted Liens .............................................................35

ARTICLE 2

THE LOANS                                                                     35

Section 2.01.    Commitments .................................................................35
Section 2.02.    Loans .............................................................................36
Section 2.03.    Borrowing Procedure ....................................................36
Section 2.04.    Evidence of Debt; Repayment of Loans ........................37
Section 2.05.    Fees ...............................................................................37
Section 2.06.    Interest on Loans ..........................................................38
Section 2.07.    Termination of Commitments .......................................40
Section 2.08.    [Reserved] .....................................................................40
Section 2.09.    Repayment of Loans .....................................................40
Section 2.10.    Optional and Mandatory Prepayments of Loans ...........40
Section 2.11.    [Reserved] .....................................................................43
Section 2.12.    Yield Protection .............................................................43
Section 2.13.    [Reserved] .....................................................................44
Section 2.14.    Payments Generally; Pro Rata Treatment; Sharing of Setoffs ....................44
Section 2.15.    Taxes .............................................................................45
Section 2.16.    Mitigation Obligations; Replacement of Lenders .........49
Section 2.17.    Currency Indemnity ......................................................51

ARTICLE 3

REPRESENTATIONS AND WARRANTIES                                                 51

Section 3.01.    Organization; Powers ....................................................51
Section 3.02.    Authorization; Enforceability ........................................52
Section 3.03.    No Conflicts ..................................................................52
Section 3.04.    Financial Statements; Projections ..................................52
Section 3.05.    Properties .......................................................................53
Section 3.06.    Intellectual Property ......................................................54
Section 3.07.    Equity Interests and Subsidiaries ..................................55
Section 3.08.    Litigation; Compliance with Laws ................................55
Section 3.09.    Agreements ....................................................................56
Section 3.10.    Federal Reserve Regulations .........................................56

Section 3.11.    Investment Company Act ...................................................................56
Section 3.12.    Use of Proceeds .................................................................................56
Section 3.13.    Taxes ..................................................................................................57
Section 3.14.    No Material Misstatements ................................................................57
Section 3.15.    Labor Matters .....................................................................................57
Section 3.16.    Solvency ............................................................................................58
Section 3.17.    Employee Benefit Plans .....................................................................58
Section 3.18.    Environmental Matters .......................................................................59
Section 3.19.    Insurance ............................................................................................61
Section 3.20.    Security Documents ...........................................................................61
Section 3.21.    Intercompany Indebtedness; Affiliate Indebtedness .......................62
Section 3.22.    Anti-Terrorism Laws; Anti-Corruption Laws .................................63
Section 3.23.    Communications Licenses and Regulatory Matters ........................63
Section 3.24.    License Subsidiaries; Other Subsidiaries ........................................64

## ARTICLE 4

CONDITIONS                                                                                                    65

Section 4.01.    Conditions ..........................................................................................65

## ARTICLE 5

AFFIRMATIVE COVENANTS                                                                     68

Section 5.01.    Financial Statements, Reports, etc .....................................................68
Section 5.02.    Litigation and Other Notices ..............................................................70
Section 5.03.    Existence; Businesses and Properties .................................................71
Section 5.04.    Insurance ............................................................................................72
Section 5.05.    Obligations and Taxes ........................................................................73
Section 5.06.    Employee Benefits .............................................................................73
Section 5.07.    Maintaining Records; Access to Properties and Inspections; Annual
                        Meetings ............................................................................................74
Section 5.08.    [Reserved] ..........................................................................................75
Section 5.09.    Compliance with Laws; Compliance with Environmental Laws;
                        Environmental Reports .......................................................................75
Section 5.10.    Compliance with Communications Laws and ITU Rules and
                        Regulations ........................................................................................75
Section 5.11.    Additional Collateral; Additional Guarantors ..................................75
Section 5.12.    Security Interests; Further Assurances ..............................................77
Section 5.13.    Information Regarding Collateral .......................................................77
Section 5.14.    Post-Closing Collateral Matters .........................................................78
Section 5.15.    License Subsidiaries; Other Subsidiaries ..........................................78

## ARTICLE 6

NEGATIVE COVENANTS                                                                         78

Section 6.01.    Indebtedness ......................................................................................78
Section 6.02.    Liens ..................................................................................................80

Section 6.03.   Sale and Leaseback Transactions ................................................................82
Section 6.04.   Investments, Loan, Advances and Acquisition ............................................82
Section 6.05.   Mergers and Consolidations .......................................................................84
Section 6.06.   Asset Sales..................................................................................................85
Section 6.07.   Dividends....................................................................................................86
Section 6.08.   Transactions with Affiliates........................................................................87
Section 6.09.   Prepayments of Other Indebtedness; Modifications of Organizational
                Documents and Other Documents, etc ........................................................88
Section 6.10.   Limitation on Certain Restrictions on Subsidiaries.....................................89
Section 6.11.   Limitation on Issuance of Capital Stock .....................................................89
Section 6.12.   Limitation on Creation of Subsidiaries.......................................................90
Section 6.13.   Business ......................................................................................................90
Section 6.14.   Fiscal Year..................................................................................................90
Section 6.15.   No Further Negative Pledge ........................................................................90
Section 6.16.   Compliance with Anti-Terrorism Laws.......................................................91
Section 6.17.   Canadian Pension Plans..............................................................................91
Section 6.18.   Permitted Activities of License Subsidiaries and Other Subsidiaries ..........92
Section 6.19.   Communications Licenses...........................................................................93

## ARTICLE 7

GUARANTEE                                                                                      93

Section 7.01.   The Guarantee .............................................................................................93
Section 7.02.   Obligations Unconditional...........................................................................93
Section 7.03.   Reinstatement ..............................................................................................95
Section 7.04.   Subrogation; Subordination .........................................................................95
Section 7.05.   Remedies .....................................................................................................95
Section 7.06.   Instrument for the Payment of Money..........................................................95
Section 7.07.   Continuing Guarantee..................................................................................95
Section 7.08.   General Limitation on Guarantee Obligations ..............................................96
Section 7.09.   Release of Guarantors..................................................................................96
Section 7.10.   Right of Contribution ..................................................................................96

## ARTICLE 8

EVENTS OF DEFAULT                                                                             96

Section 8.01.   Events of Default.........................................................................................96
Section 8.02.   Application of Proceeds ...............................................................................99
Section 8.03.   Government Approval ................................................................................100

## ARTICLE 9

THE ADMINISTRATIVE AGENT                                                                     101

## ARTICLE 10

MISCELLANEOUS                                                                                103

Section 10.01.   Notices....................................................................................................103

Section 10.02.    Waivers; Amendment ......................................................................105
Section 10.03.    Expenses; Indemnity; Damage Waiver .......................................108
Section 10.04.    Successors and Assigns ..................................................................110
Section 10.05.    Survival of Agreement ...................................................................114
Section 10.06.    Counterparts; Integration; Effectiveness ...................................115
Section 10.07.    Severability. .....................................................................................115
Section 10.08.    Right of Setoff ................................................................................116
Section 10.09.    Governing Law; Jurisdiction; Consent to Service of Process ....116
Section 10.10.    Waiver of Jury Trial .......................................................................117
Section 10.11.    Headings ...........................................................................................117
Section 10.12.    Treatment of Certain Information; Confidentiality. ....................117
Section 10.13.    Material Non-Public Information. ................................................118
Section 10.14.    Authorization to Distribute Certain Materials to Public-Siders ................118
Section 10.15.    USA PATRIOT Act Notice and Customer Verification ............119
Section 10.16.    Interest Rate Limitation .................................................................119
Section 10.17.    Obligations Absolute ......................................................................119
Section 10.18.    AML Legislation ..............................................................................120

SCHEDULES

Schedule 1.01(a)        Disqualified Companies
Schedule 1.01(b)        Subsidiary Guarantors
Schedule 2.01             Commitments
Schedule 3.03             Governmental Approvals; Compliance with Laws
Schedule 3.06(c)         Violations or Proceedings
Schedule 3.07(c)         Organizational Chart
Schedule 3.08             Litigation and Government Proceedings
Schedule 3.09             Material Agreements
Schedule 3.18             Environmental Matters
Schedule 3.19             Insurance
Schedule 3.23(a)         Communications Licenses
Schedule 3.24             Assets and Liabilities of Reorganized One Dot Six and Reorganized
                                  LightSquared Inc. of Virginia
Schedule 4.01(e)         Local Counsel
Schedule 5.14             Post-Closing Matters
Schedule 6.01(b)         Existing Indebtedness
Schedule 6.02(c)         Existing Liens
Schedule 6.04(b)         Existing Investments
Schedule 6.04(l)          Permitted Investments
Schedule 6.06(g)         Asset Sales
Schedule 6.06(j)          Existing Agreements Pursuant to Which Assets May Be Sold

<u>EXHIBITS</u>

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B-1 | Form of Assignment and Assumption |
| Exhibit B-2 | Form of Assignment and Assumption for Affiliate Lenders |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Joinder Agreement |
| Exhibit E | Form of Note |
| Exhibit F-1 | Form of Perfection Certificate |
| Exhibit F-2 | Form of Perfection Certificate Supplement |
| Exhibit G-1 | Form of Security Agreement |
| Exhibit G-2 | Form of Pledge Agreement |
| Exhibit H | Form of Intercreditor Agreement |
| Exhibit I | Form of Solvency Certificate |
| Exhibit J | Form of Intercompany Note |
| Exhibit K-1 | Form of Tax Compliance Certificate |
| Exhibit K-2 | Form of Tax Compliance Certificate |
| Exhibit K-3 | Form of Tax Compliance Certificate |
| Exhibit K-4 | Form of Tax Compliance Certificate |
| Exhibit L | Form of Borrowing Request |

## JUNIOR LIEN LOAN AGREEMENT

This JUNIOR LIEN LOAN AGREEMENT (this "**Agreement**") dated as of [          ], 2015, among [NewCo], a Delaware limited liability company (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article I), the Lenders and [        ],            as administrative agent and collateral agent for the Lenders (in such capacities, the "**Administrative Agent**").

## WITNESSETH:

WHEREAS, certain Subsidiaries (such term and each other capitalized term used but not otherwise defined in this introductory statement having the meaning specified in Section 1.01) of the Borrower have been debtors in reorganization proceedings (the "**Bankruptcy Proceedings**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

WHEREAS, the Debtors filed the Modified Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code, which was confirmed by the Bankruptcy Court on [          ], 2015 pursuant to the Plan Confirmation Order (such plan, as so confirmed, the "**Plan of Reorganization**"), pursuant to which the Borrower shall be capitalized in accordance thereunder. The Plan of Reorganization is described in, and included as an exhibit to, the Debtors' Second Amended Specific Disclosure Statement for Second Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code (the "**Disclosure Statement**"), the final version of which was filed with and approved by the Bankruptcy Court on January 20, 2015.

WHEREAS, the Converting Lenders are parties to that certain Credit Agreement, dated as of October 1, 2010 (as amended by that certain First Amendment to Credit Agreement, dated December 30, 2010 and as further amended by that certain Second Amendment to Credit Agreement, dated June 1, 2011) (the "**Prepetition LP Credit Agreement**"), among LightSquared LP, as borrower, LightSquared Inc., as guarantor, the other guarantors party thereto, the lenders party thereto, UBS AG, Stamford Branch, as administrative agent, and the other financial institutions party thereto from time to time.

WHEREAS, pursuant the Plan of Reorganization, on the Plan Effective Date, all Allowed Prepetition LP Facility Non-SPSO Claims in respect of the Prepetition LP Credit Agreement shall be converted into Loans hereunder in the amounts and manner set forth herein and in the Plan of Reorganization.

WHEREAS, the New Money Lenders are willing to extend credit to the Borrower in an aggregate principal amount equal to the New Money Lender Commitments, the proceeds of which will be used to repay all Prepetition LP SPSO Facility Claims outstanding as of the Plan Effective Date pursuant to the Plan of Reorganization.

WHEREAS, on the Closing Date, the Borrower will also obtain loans from the lenders under the Senior Lien Credit Agreement (the loans thereunder, the "**Senior Lien Loans**") in aggregate principal amount of $1,250,000,000.

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

ARTICLE 1<br>DEFINITIONS

Section 1.01.  *Defined Terms*.

As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Adjusted LIBO Rate**" shall mean, with respect to any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; *provided* that the Adjusted LIBO Rate shall not be less than 1.00%.

"**Administrative Agent**" shall have the meaning assigned to such term in the recitals hereto and includes each other person appointed as a successor pursuant to Article 10.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of Exhibit A.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided*, *however*, that, for purposes of Section 6.08, the term "Affiliate" shall also include (x) any person that is or has the right to appoint an executive officer or director of the person specified and (y) the Equity Investors, except for any Equity Investor that ceases to own directly or indirectly more than 5% of any class of Equity Interests in the Borrower and does not otherwise constitute an Affiliate pursuant to this definition.

"**Affiliate Debt Fund**" shall mean any Affiliate of Centerbridge that is a bona fide debt fund or an investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course, is not organized for the purpose of making equity investments, and with respect to which (i) its managers have fiduciary duties to the investors thereof independent of and in addition to their duties to Centerbridge and (ii) Centerbridge and investment vehicles managed or advised by Centerbridge do not, either directly or indirectly, make investment decisions for such Affiliate.

"**Affiliate Debt Fund Voting Cap**" shall mean, as of any date, an amount equal to the aggregate principal amount of Loans held by Affiliate Debt Funds as of such date; *provided* that such amount shall not exceed $300,000,000 plus all PIK Interest and any fees and other accruals that have been added to the principal amount thereof.

2

"**Affiliate Lender**" shall mean each Lender that is an Affiliate of the Borrower; *provided* that no Equity Investor or Affiliate thereof shall be an Affiliate Lender for any purpose under this Agreement.

"**Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**Allowed**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, *provided* that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.

"**AML Legislation**" shall have the meaning assigned to such term in Section 10.18.

"**Anti-Terrorism Laws**" shall mean any Requirement of Law related to terrorism financing or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes the following Canadian requirements: Part II.1 of the Criminal Code, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act ("**PCTFA**"), the Special Economic Measures Act (Canada), the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" shall mean, for any day, (i) with respect to any ABR Loan, [    ]% and (ii) with respect to any Eurodollar Loan, [    ]%.[2]

"**Applicable Percentage**" shall mean, with respect to any Lender at any time, the percentage represented by the ratio of the amount of such Lender's Loans to the aggregate Loans of all Lenders outstanding at such time.

"**Assets**" shall mean all rights, titles, and interests of the Debtors of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

---

[2] The interest rate for Eurodollar Loans to be the higher of (i) the Adjusted LIBO Rate plus 11% and (ii) the Adjusted LIBO Rate plus an Applicable Margin such that the all-in interest rate for Eurodollar Loans is 3.0% higher than the all-in interest rate on the Senior Lien Loans.  Applicable Margin for ABR Loans to be 1.0% less than the implied Applicable Margin for Eurodollar Loans.

"**Asset Sale**" shall mean any conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible including rights under the Inmarsat Agreement), but excluding leases (and subleases) of capacity on any satellite in the ordinary course of business and dispositions of cash and Cash Equivalents in the ordinary course of business, by the Borrower or any of its Subsidiaries and excluding any disposition, or series of related dispositions, for fair market value less than $[      ] (as reasonably determined in good faith by the Borrower).

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B-1 (or in the case of an assignment to an Affiliate Lender, Exhibit B-2), or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligations".

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Proceedings**" shall have the meaning assigned to such term in the recitals hereto.

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers of such person, (iii) in the case of any partnership, the Board of Directors of the general partner of such person, (iv) in any other case, the functional equivalent of the foregoing and (v) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" shall mean Boeing Satellite Systems, Inc.

"**Borrower**" shall have the meaning assigned to such term in the recitals hereto.

"**Borrowing**" shall mean Loans of the same Type, deemed made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit L, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close; *provided* that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"**Canadian Court**" shall mean the Ontario Superior Court of Justice (Commercial List) having jurisdiction over the proceedings commenced in respect of the Debtors pursuant to Part IV of the CCAA.

"**Canadian GAAP**" shall mean such generally accepted accounting principles in Canada as are used by the Canadian Subsidiaries, applied on a consistent basis.

"**Canadian Income Tax Act**" shall mean the *Income Tax Act* (Canada), and the regulations thereunder, as amended from time to time.

"**Canadian Pension Plan**" shall mean a "**registered pension plan**", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Plan Even**t" shall mean any event prohibited by Section 6.17 hereof which would reasonably be expected to result in liability for any Company.

"**Canadian Radiocommunication Act**" shall mean the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" shall mean the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capital Asset**s" shall mean, with respect to any person, any equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for Capital Assets (in each case, whether paid in cash or other consideration, financed by the incurrence of

Indebtedness or accrued as a liability); *provided* that payments (x) to Inmarsat under the Inmarsat Agreement, (y) under the One Dot Six Lease and (z) to NOAA, in each case in accordance with the business plan as described to the Lenders prior to the entry of the Plan Confirmation Order will not constitute "Capital Expenditures".

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; and (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries, in each case other than any such loss, damage, destruction, condemnation or taking the Net Cash Proceeds of which are less than $[          ].    "**Casualty Event**" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" shall mean the *Companies' Creditors Arrangement Act* (Canada), as amended from time to time.

"**Centerbridge**" shall mean Centerbridge Partners, L.P., on behalf of certain of its affiliated funds that hold Equity Interests of the Borrower as of the Closing Date.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

      (a)     at any time a change of control occurs under any Material Indebtedness;

      (b)     a plan relating to the liquidation or dissolution of the Borrower is adopted;

      (c)     any "person" or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) other than (x) any Permitted Holders or (y) group consisting of Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Voting Stock of the Borrower representing a majority of the voting power of the total outstanding Voting Stock of the Borrower; or

      (d)     a "change of control" or any comparable term under, and as defined in the Senior Lien Credit Agreement (or any documentation governing any Permitted Refinancing in respect thereof), occurs.

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in Section 10.16.

"**CIPO**" shall mean the Canadian Intellectual Property Office.

"**Closing Date**" shall have the meaning assigned to such term in Section 2.07.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral, the Pledge Agreement Collateral, the Mortgaged Property and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document; *provided* that Collateral: (i) shall not include (A) the One Dot Six License (which is not held by a Loan Party), (B) more than 65% of the Voting Stock in any Excluded Subsidiary and (C) assets of any Excluded Subsidiary and (ii) shall include Communications Licenses other than the One Dot Six License only to the maximum extent permitted by law but shall include the proceeds and right to receive proceeds from any Communications Licenses other than the One Dot Six License.

"**Commitments**" shall mean, as the context shall require, the Converting Lender Commitments and the New Money Lender Commitments. The aggregate amount of the Commitments as of the Closing Date is $[          ].

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Communications Act**" shall mean the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations, orders and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" shall mean the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications Licenses**" shall mean (i) the One Dot Six License and (ii) all other authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, Industry Canada and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" shall mean the Borrower and its Subsidiaries; and "Company" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit C.

"**Connection Income Taxes**" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any

Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto. Without limiting the generality of the foregoing, for purposes of Section 6.08, a person shall be deemed to be Controlled by another person if such other person possesses, directly or indirectly, power to vote 10% or more of the Voting Stock of such other person.

"**Control Agreement**" shall have the meaning assigned to such term in the Security Agreement.

"**Converting Lender Commitments**" shall have the meaning assigned to such term in Section 2.01. The aggregate amount of the Converting Lender Commitments as of the Closing Date is $[          ].

"**Converting Lenders**" shall have the meaning assigned to such term in Section 2.01.

"**Cooperation Agreement Order**" shall mean the final order of the Bankruptcy Court dated [__], 2015 [Docket No. ___] authorizing the applicable Debtors' assumption of the Inmarsat Agreement, as amended, supplemented or otherwise modified from time to time to the extent permitted under this Agreement.

"**CRTC**" shall mean the Canadian Radio-television and Telecommunications Commission, or any successor agency administering, among other things, the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Currency Due**" shall have the meaning assigned to such term in Section 2.17.

"**Custodian Affiliate**" shall mean an Affiliate of Reorganized LightSquared Inc. that is a Lender and is engaged in providing private banking or investment management services and is acting in the ordinary course on behalf of third-party customers; provided that such third-party customer is the beneficial owner of such Loans and such Affiliate has a fiduciary duty to such third-party customer.

"**Debt Issuance**" shall mean the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtors**" shall mean, collectively, LightSquared Inc., One Dot Four Corp., One Dot Six Corp., SkyTerra Rollup LLC, SkyTerra Rollup Sub LLC, SkyTerra Investors LLC, One Dot Six TVCC Corp, LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Finance Co., LightSquared Network LLC, LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, SkyTerra Holdings (Canada) Inc., SkyTerra (Canada) Inc., LightSquared Bermuda Ltd., LightSquared Investors Holdings Inc., TMI Communications Delaware, Limited Partnership, and LightSquared GP Inc., each as a debtor and debtor-in-possession in the Bankruptcy Proceeding.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(b).

"**Disclosure Statement**" shall have the meaning assigned to such term in the recitals hereto.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Loan Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is 180 days after the Loan Maturity Date or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided, however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Loan Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Disqualified Company**" shall mean any of (x) any SPSO Entity, (y) any person that is identified as a Prohibited Transferee under the Plan of Reorganization and (z) (i) any person that

is a competitor of the Borrower identified to the Administrative Agent in writing prior to the Closing Date and set forth on Schedule 1.01(a) and Affiliates of such person and (ii) thereafter, such additional persons that are competitors of the Borrower and the Affiliates of such persons, in each case as may be identified to the Administrative Agent from time to time and notified to the Lenders; *provided*, *further* that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests). Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Electronic Signature**" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" shall mean any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Affiliates or any other person, providing for access to data protected by passcodes or other security system.

"**Eligible Assignee**" shall mean (a) any Lender, any Affiliate of a Lender and any Participant or (b) any commercial bank, insurance company, investment or mutual fund or other entity that extends credit or buys loans as its primary business; *provided* that "Eligible Assignee" shall not include (i) any natural person, (ii) any Disqualified Company or (iii) the Borrower or any of its Subsidiaries.

"**Embargoed Person**" shall mean any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (ii) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and in the case of each of (i) and (ii) shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of any Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the Security Agreement.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Investor Entities**" shall mean Equity Investors and Affiliates thereof, in each case, that are Lenders hereunder (other than (x) any Affiliate Debt Fund and (y) any Custodian Affiliate).

"**Equity Investor Entity Voting Cap**" shall mean, with respect to any Equity Investor Entity as of any date, an amount not to exceed (i) (x) 30% of the aggregate principal amount of outstanding Loans as of such date, *less* (y) the Affiliate Debt Fund Voting Cap as of such date *multiplied by* (ii) a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggregate principal amount of Loans held by such Equity Investor Entity as of such date and the denominator of which is the aggregate principal amount of Loans held by Equity Investor Entities as of such date.

"**Equity Investors**" shall mean each of (a) LSQ, (b) Centerbridge, (c) Harbinger, and (d) Reorganized LightSquared Inc.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code. For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any person who was, as to the time of such past event or period of time, an "ERISA Affiliate" within the meaning of the preceding sentence.

"**ERISA Event**" shall mean the occurrence of any one or more of the following: (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than any required contributions to any Plans and non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA); (e) the receipt by the Borrower, any Company or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by the Borrower, any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (k) the cessation of operations at a facility of the Companies or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; or (l) any other event or condition with respect to a Single Employer Plan or Multiemployer Plan that would result in liability of the Companies.

"**Eurodollar**", when used in reference to any Loan or Borrowing, shall refer to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Subsidiary**" shall mean (i) a Foreign Subsidiary that is a "controlled foreign corporation" as defined in Section 957 of the Code, (ii) a Subsidiary substantially all of whose assets consist, directly or indirectly, of Equity Interests in one or more "controlled foreign corporations" as defined in Section 957 of the Code or (iii) a Subsidiary of an entity described in clauses (i) or (ii).

"**Excluded Swap Obligations**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes unlawful under the Commodity Exchange Act or any rule or regulation promulgated thereunder or order of the Commodity Futures Trading Commission (or the application or official interpretation of any provision thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor or the grant of such security interest by such Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Subsidiary Guarantor hereunder, (a) Taxes imposed on or measured by its net income or profits (however denominated), franchise taxes imposed on it (in lieu of net income taxes), and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of the recipient being organized under the laws of or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on payments pursuant to any Requirements of Law that are in effect on the date on which (i) such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender acquired pursuant to Section 2.16(b), or (ii) such Lender designates a new lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15, (c) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.15(e) or (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any applicable intergovernmental agreements between a non-U.S. jurisdiction and the United States with respect thereto and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" shall mean the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Final Order**" shall mean a final order of a court of competent jurisdiction which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari or leave to appeal has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari or leave to appeal was sought.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financial Statements**" shall mean the financial statements to be furnished pursuant to Section 5.01(a) or (b).

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Flood Insurance Requirements**" shall mean, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System) ("**Flood Laws**"), the following documents: (A) a completed standard "life of loan" flood hazard determination form (a "**Flood Determination Form**"), (B) if any improvements to the applicable real property are located in a special flood hazard area, a notification to the Borrower (the "**Borrower Notice**") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("**NFIP**") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice, and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in

which the property is located, a copy of one of the following: the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Administrative Agent (any of the foregoing being "**Evidence of Flood Insurance**").

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. Persons have the authority to control all substantial decisions of such trust. In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes (for the avoidance of doubt, excluding for purposes of Section 2.15(e)(ii)(C)), a Foreign Lender shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof  but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof ) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding Tax on payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) maintained or contributed to by any Company with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy or arrangement maintained or contributed to by any Company with respect to employees employed in Canada, other than a Canadian Pension Plan).

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Fortress**" shall mean Fortress Credit Opportunities Advisors LLC on behalf of its and its affiliates' managed funds and/or accounts.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**" shall mean the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, Industry Canada and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government

(including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, from, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article 7 by the Subsidiary Guarantors.

"**Guarantors**" shall mean the Subsidiary Guarantors.

"**Harbinger**" shall mean Harbinger Capital Partners, LLC.

"**Harbinger Entity**" shall mean Harbinger and any Affiliate thereof.

"**Harbinger Proxy**" shall have the meaning assigned thereto in the New LightSquared Interest Holders Agreement.

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or hazardous or toxic chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" shall mean the orbital performance incentives and liquidated damages that may become due and payable under the Amendment, Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing, as in effect on the date hereof or as amended, supplemented or otherwise modified from time to

time so long as such amendment, supplement or other modification makes such contract more favorable to the Loan Parties compared to such contract as in effect on the date hereof.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such person; (h) all Attributable Indebtedness of such person; (i) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (j) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.  For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03.

"**Independent Third Party**" shall mean any person that is not an Affiliate of a Lender and that otherwise satisfies the definition of Eligible Assignee.

"**Industry Canada**" shall mean the Canadian federal government Department of Industry or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Inmarsat Agreement**" shall mean the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among Reorganized LightSquared LP, SkyTerra (Canada) Inc., Reorganized LightSquared Inc. and Inmarsat Global Limited, as in effect on the date hereof, as amended, supplemented or otherwise modified from time to time prior to the date hereof, and as further amended, supplemented or otherwise modified from time to time to the extent permitted herein.

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit J.

"**Intercreditor Agreement**" shall mean the Intercreditor Agreement in substantially the form of Exhibit H dated as of the Closing Date, among the Senior Lien Administrative Agent, as First Lien Representative for the First Lien Credit Agreement Secured Parties (each as defined therein) and the Administrative Agent, as Second Lien Representative for the Junior Lien Credit Agreement Secured Parties (each as defined therein), and each additional representative party thereto from time to time, as amended, supplemented or otherwise modified from time to time as permitted thereunder.

"**Interest Election Request**" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with .2.06Section

"**Interest Payment Date**" shall mean (a) the last Business Day of each March, June, September and December to occur during any period in which such Loan is outstanding and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter (or, if each affected Lender so agrees, twelve months thereafter), as the Borrower may elect.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**ITU**" shall mean the International Telecommunication Union, or any successor agency of the United Nations that develops standards and procedures concerning radiocommunication.

"**Joinder Agreement**" shall mean a joinder agreement substantially in the form of Exhibit D.

"**Judgment Currency**" shall have the meaning assigned to such term in Section 2.17.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements

and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lenders**" shall mean (i) the Converting Lenders, (ii) the New Money Lenders and (iii) any financial institution that has become a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page) on such screen at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits in the London interbank market with a maturity comparable to such Interest Period.  In the event that such rate does not appear on such page (or on any successor or substitute page on such screen or otherwise on such screen), the "LIBO Rate" shall be determined by reference to such other comparable publicly available service for displaying interest rates for dollar deposits in the London interbank market as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of a leading commercial bank reasonably selected by the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"**License Subsidiary**" shall mean each single purpose Subsidiary of the Borrower created solely to hold or lease Communications Licenses issued by the FCC for one or more of its businesses (for the avoidance of doubt, License Subsidiary shall not include One Dot Six Corp. or LightSquared Inc. of Virginia).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or PPSA or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Documents, the Intercreditor Agreement and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"**Loan Maturity Date**" shall mean the date that is five (5) years after the Closing Date or, if such date is not a Business Day, the immediately preceding Business Day.

"**Loan Parties**" shall mean the Borrower and the Guarantors.

"**Loans**" shall mean the term loans made or deemed to be made (as applicable) by the Lenders to the Borrower pursuant to Section 2.02.

"**LSQ**" shall mean LSQ Acquisition Co LLC.

"**Make-Whole Amount**" shall mean, with respect to any Loans as of any date (such date, the "**Prepayment Date**"), the present value, as determined by the Borrower in good faith or on behalf of the Borrower by such Person as the Borrower shall designate, of (x) all required interest payments due on such Loans from the Prepayment Date through and including the second anniversary of the Closing Date (excluding accrued but unpaid interest as of the Prepayment Date), assuming that all such interest accrues at (i) the Adjusted LIBO Rate for a one-month Interest Period as in effect on the first Business Day prior to the Prepayment Date *plus* (ii) the Applicable Margin for Eurodollar Loans *plus* (y) 3.0%, in each case, computed using a discount rate equal to the Treasury Rate as of such Prepayment Date plus 0.50%.

"**Mandatory Prepayment**" shall have the meaning assigned to such term in Section 2.10(h)(i).

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, assets, property, operations or condition, financial or otherwise of the Borrower and its Subsidiaries, taken as a whole; and (b) the validity or enforceability of this Agreement or any of the other Loan Documents or on the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans) or Hedging Obligations of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $[        ]. For purposes of determining Material Indebtedness, the "**principal amount**" in respect of any Hedging Obligations of the Borrower or any Subsidiary at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material License**" shall mean, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies.

"**Material Regulatory Request**" shall mean any or all of the following: (a) the License Modification Application (as defined in the General Disclosure Statement to the Plan); (b) the Spectrum Allocation Petition for Rulemaking (as defined in the General Disclosure Statement to the Plan); and (c) the pending petition for rulemaking in RM-11683.

"**Maturity Date**" shall mean the earlier of (a) the Loan Maturity Date and (b) the date upon which the Loans shall become due and payable pursuant to Article 8.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.16.

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be in a form reasonably satisfactory to the Administrative Agent, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean (a) each Real Property identified as a Mortgaged Property on Schedule 7(a) to the Perfection Certificate dated the Closing Date and (b) each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(c).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA to which any of the Companies or any of their respective ERISA Affiliates has, or at any time has ever had, an obligation to contribute.

"**Net Cash Proceeds**" shall mean:

(a)     with respect to any Asset Sale (including any issuance or sale of Equity Interests in subsidiaries of the Borrower), the cash proceeds received (including lease payments or license fees) by the Borrower or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by the Borrower or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Borrower or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties sold in such Asset Sale (including the Lien securing the Senior Lien Loans) or any remaining amounts payable to the manufacturer of the assets sold in such Asset Sale and, in each case, (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)    with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of (i) all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event and (ii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by a Lien on the properties (including the Lien securing the Senior Lien Loans) that are the subject of such Casualty Event (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such Casualty Event) or any remaining amounts payable to the manufacturer of the assets subject to such Casualty Event and, in each case, which is repaid with such proceeds; and

(c)    with respect to any Debt Issuance by any Company, the aggregate cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith.

"**Network**" shall mean the Terrestrial wireless broadband network being developed by the Companies as of the Closing Date, which network is intended to provide 4G broadband services in the contiguous United States.

"**New Investors**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**New LightSquared Interest Holders Agreement**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**New Money Lender Commitments**" shall have the meaning assigned to such term in Section 2.01.  The aggregate amount of the New Money Lender Commitments as of the Closing Date is $[            ].

"**New Money Lenders**" shall have the meaning assigned to such term in Section 2.01.

"**NOAA**" shall mean the National Oceanic and Atmospheric Administration, or any successor agency.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit E.

"**Obligations**" shall mean (a) obligations of the Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium (including the applicable Payment Premium) and interest (including PIK Interest, interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of

the Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning assigned to such term in the definition of "**Embargoed Person.**"

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, one of the Financial Officers, or, in the case of a Canadian Subsidiary, the secretary, each in his or her official (and not individual) capacity.

"**One Dot Six Lease**" shall mean the Lease Purchase Agreement dated as of April 13, 2010, among One Dot Six Corp., as purchaser, TVCC One Six Holdings LLC, as seller, and TVCC Holding Company, LLC (and all rights conveyed thereby to One Dot Six Corp. in that certain (a) Long-Term De Facto Transfer Lease Agreement dated as of July 23, 2007, between OP LLC, as lessor, and TVCC One Six Holdings, LLC, as lessee and (b) the Long-Term De Facto Transfer Sublease Agreement dated as of August 13, 2008, between OP LLC, as lessee, and TVCC One Six Holdings, LLC, as lessor), as renewed by One Dot Six Corp. on April 2, 2013 and as in effect on the date hereof or as amended, supplemented or otherwise modified from time to time to the extent permitted hereunder.

"**One Dot Six Lease Authorization**" shall mean the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000007295, or another FCC consent substantially replicating that initial consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" shall mean the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**One Dot Six TVCC Corp.**" shall mean One Dot Six TVCC Corp., a Delaware corporation and wholly owned Subsidiary of One Dot Six Corp.

"**Organizational Documents**" shall mean, with respect to any person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) of such person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such person, (e) in the case of the Borrower, the New LightSquared Interest Holders Agreement and (f) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of

24

Borrower or any Subsidiary Guarantor hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean all present or future stamp or documentary Taxes or any other excise, property, filing or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16(b)).

"**Participant**" shall have the meaning assigned to such term in Section 10.04(c).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Payment Premium**" shall have the meaning assigned thereto in Section 2.10(h)(ii).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**PCTFA**" shall have the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**."

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit F-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit F-2 or any other form approved by the Administrative Agent.

"**Permitted Collateral Liens**" shall mean (a) in the case of Collateral other than Mortgaged Property, Permitted Liens and (b) in the case of Mortgaged Property, "Permitted Collateral Liens" shall mean the Liens described in clauses (a), (b), (d), (e), (f), (g), (h), (i), (k), (o) and (s) of Section 6.02; *provided*, *however*, on the Closing Date or upon the date of delivery of each Mortgage under Section 5.11 or 5.12, Permitted Collateral Liens shall mean only those Liens set forth in Schedule B to the applicable Mortgage.

"**Permitted Holders**" shall mean LSQ, Centerbridge, Harbinger (so long as all Equity Interests in the Borrower that are held by Harbinger and/or any Affiliate thereof are subject to the Harbinger Proxy pursuant to the terms of the New LightSquared Interest Holders Agreement as in effect on the date hereof), Reorganized LightSquared Inc. (so long as the owners of Reorganized LightSquared Inc. as of the date hereof continue to hold at least a majority of the voting equity of Reorganized LightSquared Inc.) and any person that is an equityholder of Reorganized LightSquared Inc. as of the date hereof, any Affiliates of any of the foregoing (other than the Borrower and its Subsidiaries and subject to the other limitations described herein) and

any other institutional investors that are approved in advance to become "Permitted Holders" for purposes of this Agreement by the then existing Permitted Holders and, for the avoidance of doubt, no Disqualified Company shall be a Permitted Holder.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Refinancing**" shall mean, with respect to any Indebtedness, any modification, refinancing, refunding, renewal or extension of such Indebtedness; *provided*, that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder; (b) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a weighted average life to maturity equal to or greater than the weighted average life to maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended (except by virtue of amortization of or prepayment of Indebtedness prior to such date of determination); (c) at the time thereof, no Default or Event of Default shall have occurred and be continuing; (d) the original obligors in respect of such Indebtedness being modified, refinanced, refunded, renewed or extended remain the only obligors thereon; (e) the terms of such modification, refinancing, refunding, renewal or extension shall be, in the aggregate, no less favorable to the Borrower, taken as a whole, than those contained in the Indebtedness being renewed or refinanced or shall be consistent with terms available for similar debt then available; and (f) if such modification, refinancing, refunding, renewal or extension is secured then it may be secured only by liens on assets that secure such debt being refinanced.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.06(a).

"**Plan**" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any Company or with respect to which, the Borrower or any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Plan Confirmation Order**" shall mean the order of the Bankruptcy Court dated [__], 2015 [Docket No. ___] confirming the Plan of Reorganization, as amended, supplemented or otherwise modified from time to time to the extent permitted under this Agreement.

"**Plan Effective Date**" shall mean the "Effective Date" of (and as defined in) the Plan of Reorganization

"**Plan of Reorganization**" shall have the meaning assigned to such term in the recitals hereto.

"**Pledge Agreement**" shall mean the Pledge Agreement substantially in the form of Exhibit G-2 among the Loan Parties and Administrative Agent for the benefit of the Secured Parties.

"**Pledge Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Pledge Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**PPSA**" shall mean the Personal Property Security Act (Ontario), as amended from time to time, together with all regulations made thereunder; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or (ii) the Civil Code of Quebec, "**PPSA**" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prepayment Date**" shall have the meaning assigned to such term in the definition of "Make-Whole Amount".

"**Prepetition LP Facility Claim**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Prepetition LP Facility Non-SPSO Claim**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Prepetition LP Facility SPSO Claims**" shall have the meaning assigned to such term in the Plan of Reorganization.

"**Prime Rate**" shall mean the rate of interest per annum publicly announced from time to time by [___] as its prime rate in effect at its office located at [___]; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"**Pro Rata Share**" shall mean, with respect to any New Money Lender, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggregate principal amount of Loans funded by such New Money Lender on the Closing Date and the denominator of which is the aggregate principal amount of Loans funded by all New Money Lenders on the Closing Date.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Public-Sider**" shall mean any representative of a Lender that does not want to receive material non-public information with the meaning of the federal and state securities laws.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Networks; *provided*, *however*, that (i) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Recognition Order**" shall mean the order of the Canadian Court dated [__], 2015 recognizing, among other things, the entry of the Plan Confirmation Order and the Cooperation Agreement Order and vesting in the Reorganized Debtors all of the Debtors' rights, titles, and interests in and to the Assets that are owned, controlled, regulated, or situated in Canada, free and clear of all Liens, claims, charges, interests, or other encumbrances other than Permitted Liens, in accordance with applicable law, as amended, supplemented or otherwise modified from time to time to the extent permitted under this Agreement.

"**Register**" shall have the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Reorganized Debtors**" shall mean the Debtors as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc.**" shall mean LightSquared Inc., as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared Inc. Loan Agreement**" shall mean that certain $[   ] million senior secured term loan agreement dated as of the Closing Date among Reorganized LightSquared Inc., the lenders from time to time party thereto, and [_____] as administrative agent.

"**Reorganized LightSquared Inc. of Virginia**" shall mean LightSquared Inc. of Virginia, as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized LightSquared LP**" shall mean LightSquared LP, as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Reorganized One Dot Six**" shall mean One Dot Six Corp. as reorganized under, and pursuant to, the Plan of Reorganization, or any successor thereto, by merger, consolidation, or otherwise, on or after the Plan Effective Date in connection with the Plan of Reorganization.

"**Required Lenders**" shall mean, at any time, Lenders holding more than 50% of the outstanding principal amount of Loans then outstanding; *provided* that (x) (i) the aggregate principal amount of Loans held by Affiliate Debt Funds that may be voted in any determination of Required Lenders at such time shall be subject to the Affiliate Debt Fund Voting Cap and (ii) the aggregate principal amount of Loans held by Affiliate Debt Funds in excess of the Affiliate Debt Fund Voting Cap at such time shall be deemed to have been voted by Affiliate Debt Funds in the same proportion as Lenders that are not Affiliate Debt Funds or Equity Investor Entities in connection with any consent, waiver, approval or other similar action that is submitted by the Borrower to Lenders for consideration and (y) with respect to each Equity Investor Entity, (i) the aggregate principal amount of Loans held by such Equity Investor Entity that may be voted in any determination of Required Lenders at such time shall be subject to the Equity Investor Entity Voting Cap and (ii) the aggregate principal amount of Loans held by such Equity Investor Entity in excess of the Equity Investor Entity Voting Cap at such time shall be deemed to have been voted by such Equity Investor Entity in the same proportion as Lenders that are not Equity

Investor Entities or Affiliate Debt Funds in connection with any consent, waiver, approval or other similar action that is submitted by the Borrower to Lenders for consideration. Notwithstanding anything in this Agreement to the contrary, the Required Lenders shall not unreasonably withhold, condition or delay any consent, waiver, approval or other similar action that is submitted by the Borrower to Lenders for consideration.  For the avoidance of doubt, the foregoing limitations shall not apply to the proviso to Section 10.02(b).

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, treaties, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law (including, for the avoidance of doubt, FATCA).

"**Response**" shall mean (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Second Satellite**" shall mean the Boeing-GEM-F2 (Serial #7984010-103-002) satellite, together with the related ground-based beam formers and related calibration equipment.

"**Secured Parties**" shall mean, collectively, the Administrative Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securities Collateral**" shall have the meaning assigned to such term in the Security Agreement and the Pledge Agreement.

"**Security Agreement**" shall mean the Security Agreement substantially in the form of Exhibit G-1 among the Loan Parties party thereto and Administrative Agent for the benefit of the Secured Parties.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Agreement (a) on the Closing Date or (b) thereafter pursuant to Section 5.11.

"**Security Documents**" shall mean the Security Agreement, the Pledge Agreement, the Mortgages and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property as

collateral for the Obligations, and all UCC, PPSA or other financing statements or instruments of perfection required by this Agreement, the Security Agreement, the Pledge Agreement, the Intercreditor Agreement, any Mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the Security Agreement, the Pledge Agreement, or any Mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Obligations.

"**Senior Lien Credit Agreement**" shall mean the Credit Agreement, dated as of the Closing Date, among the Borrower, the Guarantors, the lenders party thereto and [___], as administrative agent (as may be amended or modified to the extent permitted under Section 6.09).

"**Senior Lien Loan Documents**" shall mean the Loan Documents (as defined in the Senior Lien Credit Agreement).

"**Senior Lien Loans**" shall have the meaning assigned to such term in the recitals hereto.

"**Single Employer Plan**" shall mean any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is covered by Section 4021 of ERISA, and in respect of which the Borrower, any of the Borrower's Subsidiaries or any of their respective ERISA Affiliates is or, if such plan were terminated, would under Section 4069 of ERISA would be, deemed to be an "employer" as defined in Section 3(5) of ERISA.

"**SPSO**" shall mean SP Special Opportunities, LLC.

"**SPSO Affiliate**" shall mean (a) Charles W. Ergen and L-Band Acquisition, LLC and their successors and assigns and any member of a Group (as defined under Regulation 13D under the Securities Exchange Act of 1934) of which SPSO, Charles W. Ergen and L-Band Acquisition, LLC or their successors or assigns are a member, (b) any other entity or Group directly or indirectly controlling, controlled by, or under common control with, SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors or assigns or any member of any Group of which SPSO, Charles W. Ergen and/or L-Band Acquisition, LLC or their successors or assigns is a member; *provided*, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by agreement or otherwise; *provided*, further, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") as used with respect to any entity shall also include (u) any entity that directly or indirectly owns, or in which such entity directly or indirectly owns more than ten percent (10%) of any class of capital stock or other equity interest of such entity, (v) in the case of a corporation, any officer or director of such corporation, (w) in the case of a partnership, any general partner of such partnership, (x) in the case of a trust, any trustee or beneficiary of such trust, (y) any spouse, parent, sibling, or child or lineal descendant of any individual described in clauses (u) through (x) above, and (z) any trust for the benefit of any individual described in clauses (u) through (y) above. For the avoidance of doubt, it is understood that DISH Network

Corporation, EchoStar Corporation, and any other entity directly or indirectly controlling, controlled by, or under common control with, DISH Network Corporation or EchoStar Corporation are currently SPSO Affiliates.

"**SPSO Entity**" shall mean SPSO and the SPSO Affiliates.

"**Statutory Reserve Rate**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentage shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent and (ii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11; *provided* that no Excluded Subsidiary shall be a Subsidiary Guarantor.

"**Survey**" shall mean a survey of any Mortgaged Property (and all improvements thereon) which is (i) prepared by a surveyor or engineer licensed to perform surveys in the jurisdiction where such Mortgaged Property is located, (ii) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property or any easement, right of way or other interest in the Mortgaged Property has been granted or become effective through operation of law or otherwise with respect to such Mortgaged Property which, in either case, can be depicted on a survey, in which events, as applicable, such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, or after the grant or effectiveness of any such easement, right of way or other interest in the Mortgaged Property, (iii) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent and the Title Company, (iv) complying in all

respects with the minimum detail requirements of the American Land Title Association or local equivalent in respect of Real Property not located within the United States as such requirements are in effect on the date of preparation of such survey and (v) sufficient for the Title Company to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue endorsements acceptable to the Administrative Agent.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under or in respect of any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" shall mean any title insurance company as shall be retained by the Borrower and reasonably acceptable to the Administrative Agent.

"**Transaction Documents**" shall mean the Loan Documents, the Plan of Reorganization and any ancillary agreements governing the transactions contemplated by the Plan of Reorganization and the Plan Confirmation Order and the Recognition Order.

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to the Transaction Documents, including (a) the execution, delivery and performance of the Loan Documents and the Borrowings hereunder and the use of proceeds therefrom, (b) the execution, delivery and performance of the Senior Lien Loan Documents and the borrowings thereunder and the use of proceeds therefrom; (c) the execution, delivery and performance of the Loan Documents (as defined in the Reorganized LightSquared Inc. Loan Agreement) and the deemed borrowings thereunder; and (d) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with each of the foregoing.

"**Transfer**" of, or with respect to, Loans, shall mean, (i) any change in the direct or indirect beneficial ownership of Loans, whether or not for value and whether voluntary, involuntary, by operation of law or otherwise and (ii) any direct or indirect sale, assignment, transfer, exchange, issuing of participation rights, or other disposition of voting or economic rights in such Loans. For the avoidance of doubt, all Transfers of Loans (and rights therein) must be made in accordance with, and subject to the limitations of, Section 10.04.

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Treasury Rate**" means, as of any Prepayment Date, the yield to maturity as of such Prepayment Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such Prepayment Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Prepayment Date to the second anniversary of the

Closing Date; *provided*, *however*, that if the period from the Prepayment Date to the second anniversary of the Closing Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"**Type**", when used in reference to any Loan or Borrowing, shall refer to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**U.S. Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" shall have the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**."

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  *Terms Generally.*

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein

to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights (and for the avoidance of doubt any reference solely to "real property" shall not include Communications Licenses) and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

Section 1.03.   *Accounting Terms; GAAP*.

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Required Lenders.

Section 1.04.   *Resolution of Drafting Ambiguities*.

Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.05.   *Permitted Liens*.

Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

ARTICLE 2
THE LOANS

Section 2.01.   *Commitments*.

Subject to the terms and conditions and relying upon the representations and warranties herein set forth, and subject to the terms and conditions in the Plan of Reorganization, each lender identified on Schedule 2.01 as (i) a "Converting Lender" (each, a "**Converting Lender**" and, collectively, the "**Converting Lenders**") shall be deemed to convert, pursuant to the Plan of Reorganization, such Converting Lender's Allowed Prepetition LP Facility Claims into term loans to the Borrower on the Closing Date in the principal amount set forth opposite such Converting Lender's name on Schedule 2.01 (each, a "**Converting Lender Commitment**" and, collectively, the "**Converting Lender Commitments**") and (ii) a "New Money Lender" (each, a "**New Money Lender**" and, collectively, the "**New Money Lenders**") agrees to extend credit to the Borrower on the Closing Date in the form of term loans in the principal amount set forth

opposite such New Money Lender's name on Schedule 2.01 (each, a "**New Money Lender Commitment**" and, collectively, the "**New Money Lender Commitments**"). Amounts paid or prepaid in respect of Loans may not be reborrowed.

Section 2.02.  *Loans*.

(a)    Each Converting Lender as of the Plan Effective Date shall be deemed to have made a Loan to the Borrower on the Closing Date in the amount of its Converting Lender Commitment in exchange for, and, substantially concurrently with the application of the proceeds of the Loans from the New Money Lenders pursuant to the terms hereof, in full and final satisfaction, settlement, release and discharge of, the amount of all of such Converting Lender's Allowed Prepetition LP Facility Claims as of the Plan Effective Date.

(b)    The Loan made by each New Money Lender on the Closing Date to the Borrower shall be made by such New Money Lender in an amount equal to its New Money Lender Commitment; *provided* that the failure of any New Money Lender to make its Loan shall not relieve any other New Money Lender of its obligation to lend an amount equal to its New Money Lender Commitment.  Each New Money Lender shall be responsible solely to the extent of its New Money Lender Commitment and no New Money Lender shall be responsible for the failure of any other New Money Lender to make any Loan required to be made hereunder by such other New Money Lender.

(c)    Each New Money Lender shall make the Loan to be made by it hereunder on the Closing Date by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate by not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by Borrower in the Borrowing Request maintained with the Administrative Agent or, if a borrowing of the Loan shall not occur on the Closing Date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective New Money Lenders.

Section 2.03.  *Borrowing Procedure*.

To request Loans from the New Money Lenders, the Borrower shall deliver, by hand delivery or electronic transmission, a duly completed and executed Borrowing Request to the Administrative Agent not later than 1:00 p.m., New York City time, one Business Day before the Closing Date. The Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    the aggregate amount of such Borrowing;

(b)    the date of such Borrowing, which shall be a Business Day;

(c)    the Interest Period to be applicable to such Borrowing, which shall be a period contemplated by the definition of the term "Interest Period"; and

(d)    the location and number of Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each New Money Lender of the details thereof and of the amount of such New Money Lender's Loan to be made as part of the requested borrowing.

Section 2.04.  *Evidence of Debt; Repayment of Loans.*

(a)    *Promise to Repay.* The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

(b)    *Lender and Administrative Agent Records.* Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)    *Promissory Notes.* Any Lender by written notice to the Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit E. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to such payee and its registered assigns.

Section 2.05.  *Fees.*

(a)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)    The Borrower agrees to pay a commitment fee to each New Money Lender in an amount equal to its Pro Rata Share of $174.225 million, which amount (i) shall be fully earned and payable on the Closing Date and (ii) shall be paid in the form of additional Loans in the amount set forth opposite such New Money Lender's name on Schedule 2.01 under "Commitment Fee". Such additional amounts shall be Loans for all purposes of this Agreement and the other Loan Documents, including by accruing PIK Interest pursuant to Section 2.06.

Section 2.06.    *Interest on Loans*.

(a)    *Interest*. Subject to the provisions of Section 2.06(b), the Loans shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect from time to time plus the Applicable Margin, payable in kind (the "**PIK Interest**") by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06). All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes.

(b)    *Default Rate*. Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the overdue amount shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to 2% plus the rate otherwise applicable to such Loan as provided in Section 2.06(a) (the "**Default Rate**").

(c)    *Interest Payment Dates*. Accrued interest on each Loan shall be payable in kind in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    *Interest Calculation*. All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)    *[Reserved]*.

(f)    *[Reserved]*.

(g)    The initial Interest Period commencing on the Closing Date for the Loans made by the Converting Lenders shall end on the numerically corresponding day in the calendar month that is three months thereafter.  Thereafter, the Borrower may elect Interest Periods therefor, all as provided in this Section 2.06; *provided* that except as otherwise provided herein, a Loan may be continued or converted only on the last day of an Interest Period for such Loan.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(h)    To make an election pursuant to this Section 2.06, the Borrower shall notify the Administrative Agent of such election by telephone no later than three (3) Business Days prior to the last day of the then current Interest Period.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the

Administrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and signed by the Borrower.

(i)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.06(i):

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

(iii)     the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

(j)     If any such Interest Election Request is not timely delivered prior to the last day of the Interest Period applicable to such Borrowing or if any such Interest Election Request does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(k)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(l)     *Break Funding Payments*.  In the event of (a) the payment of any principal of any Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the failure to convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance therewith), or (c) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to the Borrower shall compensate each Lender for ,in any such event ,then ,2.16Section the reasonable and documented loss, cost and expense attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this nt shall be delivered to the Borrower and shall be conclusive abse (l)2.06Section

The Borrower shall pay such Lender the amount shown as due on any   .manifest error such certificate withinten (10) Business Days after receipt thereof, absent a good faith dispute.

(m)      *Alternate Interest Rate*.  If, prior to the commencement of any Interest Period for a Eurodollar Borrowing, the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period, then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, payable in kind by adding accrued and unpaid interest to the unpaid principal amount of the Loans on the applicable Interest Payment Date (whereupon from and after such date such additional amounts shall also accrue interest pursuant to this Section 2.06). All such PIK Interest so added shall be treated as principal of the Loans for all purposes of this Agreement. The obligation of Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement, and, if applicable, any applicable Notes.  Interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Section 2.07.   *Termination of Commitments*.

The Commitments shall automatically terminate on the date, subject to satisfaction of the conditions precedent set forth in Article IV, that the Loans are made or deemed made (as applicable) hereunder (such date, the "**Closing Date**").

Section 2.08.   *[Reserved]*.

Section 2.09.   *Repayment of Loans*.

The Borrower shall pay to the Administrative Agent, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans, together with accrued and unpaid interest thereon plus the Payment Premium.

Section 2.10.   *Optional and Mandatory Prepayments of Loans*.

(a)      *Optional Prepayments*. The Borrower shall have the right at any time (and from time to time) to prepay the Loans, in whole or in part, subject to the requirements of this Section 2.10, including but not limited to payment of any applicable Payment Premium; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans.

(b)    *Debt Issuance*. Immediately following any Debt Issuance by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(c)    *Asset Sales*. Not later than five (5) Business Days following the receipt of any Net Cash Proceeds in excess of $[        ] of any Asset Sale by the Borrower or any of its Subsidiaries pursuant to Section 6.06(b), the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that such Net Cash Proceeds shall not be required to be so applied on such date to the extent that the Borrower shall have delivered a certificate of a Responsible Officer to the Administrative Agent on or prior to such date stating that such Net Cash Proceeds are reasonably expected to be reinvested in assets useful in the business of the Loan Parties within 365 days following the date of receipt of such Net Cash Proceeds.

(d)    *Casualty Events*. Not later than three (3) Business Days following the receipt of any Net Cash Proceeds in excess of $[        ] from a Casualty Event by the Borrower or any of its Subsidiaries, the Borrower shall make prepayments in accordance with Section 2.10(f) in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided* that so long as no Event of Default shall then exist or arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that the Borrower on or prior to such date requests such proceeds to be used to repair, replace or restore the assets subject to such Casualty Event and does apply such proceeds to such repair or replacement or restoration, as applicable, no later than 12 months (or such longer period as the Required Lenders shall reasonably agree to) following the date of receipt of such proceeds (or, if the Borrower or any of its Subsidiaries, as applicable, has contractually committed within 12 months following the date of receipt of such proceeds to repair, replace or restore the assets subject to such Casualty Event, 24 months following the date of receipt of such proceeds (or such longer period as the Required Lenders shall reasonably agree to)).

(e)    *[Reserved]*.

(f)    *Notice of Prepayment*. The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment. Each such notice shall be irrevocable; *provided* that a notice of prepayment so delivered, if delivered with respect to the entire outstanding principal amount of the Obligations, may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified prepayment date) if such condition is not satisfied. Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

(g)    *Limitations under Senior Lien Credit Agreement.* Notwithstanding anything in this Section 2.10 to the contrary, the Borrower shall be required to actually make any mandatory prepayment required pursuant to Section 2.10(b), (c) or (d) only to the extent the actual payment

of such mandatory prepayment is not then prohibited by the terms of the Senior Lien Credit Agreement and the Intercreditor Agreement. To the extent the terms of the Senior Lien Credit Agreement or the Intercreditor Agreement prohibit the Borrower from actually making any portion of a mandatory prepayment required pursuant to Section 2.10(b), (c) or (d), the Borrower's obligation to pay such portion of such mandatory prepayment shall accrue until such time as the Senior Lien Credit Agreement and the Intercreditor Agreement no longer prohibit such payment, at which point the Borrower shall be required to make such payment pursuant to this Section 2.10.

(h)     *Payment Premiums; Application of Payments.*

(i)     If the Borrower prepays any or all of the Loans pursuant to Section 2.10(b), (c) or (d) (each, a "**Mandatory Prepayment**"), the Borrower shall pay a premium to the Administrative Agent (in addition to the principal amount of the Loans prepaid at such time, *plus* any accrued and unpaid interest that has not yet been added to the principal amount of the Loans in accordance with Section 2.06(a)) for the benefit of the Lenders in connection therewith as follows: (i) 3.0% of the principal amount of Loans prepaid at any time on or prior to the first anniversary of the Closing Date, (ii) 2.0% of the principal amount of Loans prepaid at any time after the first anniversary of the Closing Date, but on or before the second anniversary of the Closing Date, (iii) 1.0% of the principal amount of Loans prepaid at any time after the second anniversary of the Closing Date, but on or before the third anniversary of the Closing Date and (iv) 0.0% of the principal amount of Loans prepaid at any time thereafter.

(ii)     If (x) the Borrower prepays or repays, or is required to prepay or repay, for any reason other than a Mandatory Prepayment (including maturity, a voluntary prepayment pursuant to Section 2.10(a), as a result of an acceleration following an Event of Default, as a result of an acceleration by operation of law or otherwise) all or any part of the principal balance of any Loan or (y) the Obligations are accelerated following an Event of Default, by operation of law or otherwise, in each case of clauses (x) and (y), the Borrower shall pay a premium (the "**Payment Premium**") to the Administrative Agent (in addition to the principal amount of Loans required to be repaid or prepaid at such time, *plus* any accrued and unpaid interest that has not yet been added to the principal amount of the Loans in accordance with Section 2.06(a), but without regard as to whether any Loans are actually prepaid), for the benefit of the Lenders entitled to such payment as follows: (i) the Make-Whole Amount in respect of the principal amount of Loans being prepaid or repaid, or required to be prepaid or repaid, at any time on or prior to the second anniversary of the Closing Date, (ii) 3.0% of the principal amount of Loans being prepaid or repaid, or required to be prepaid or repaid, at any time after the second anniversary of the Closing Date, but on or before the third anniversary of the Closing Date, (iii) 1.5% of the principal amount of Loans being prepaid or repaid, or required to be prepaid or repaid, at any time after the third anniversary of the Closing Date, but on or before the fourth anniversary of the Closing Date and (iv) 0.0% of the principal amount of Loans being prepaid or repaid, or required to be prepaid or repaid, at any time thereafter.

(iii)    Subject to Section 2.10(i), each prepayment of Loans pursuant to this Section 2.10 shall be applied ratably among the Loans, and otherwise in accordance with this Section 2.10. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

Section 2.11.    *[Reserved]*.

Section 2.12.    *Yield Protection*.

(a)    *Increased Costs Generally*. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender; or

(ii)    subject any Lender to any Taxes of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (in each case, except for (i) Indemnified Taxes indemnifiable under Section 2.15, (ii) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes payable by such Lender and (iii) Connection Income Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting into, continuing or maintaining any Loans or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*. If any Lender reasonably determines in good faith that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)    *Delay in Requests*. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13.    *[Reserved]*.

Section 2.14.    *Payments Generally; Pro Rata Treatment; Sharing of Setoffs*.

(a)    *Payments Generally*. The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, premium or fees, or of amounts payable under Sections 2.12, 2.15 or 10.03, or otherwise), including the applicable Payment Premium, on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices, except that payments pursuant to Sections 2.12, 2.15 or 10.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)    *Pro Rata Treatment*.

(i)    Except as provided in Section 2.12(b), each payment by the Borrower of interest, fees and premiums (including Prepayment Premiums) in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders; *provided* that the fees set forth in Section 2.05(b) shall be paid only to the New Money Lenders based on their respective Pro Rata Share.

(ii)    Except as provided in Section 2.12(b), each payment on account of principal of the Loans shall be allocated among the Lenders pro rata based on the principal amount of the Loans held by the Lenders.

(c)     *Insufficient Funds*. Subject to Section 8.02, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premium and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and premium then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and premium then due to such parties.

(d)     *Sharing of Set-Off*. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans (including all PIK Interest that has been added to the principal amount) and accrued interest thereon or other Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make adjustments as shall be equitable with the consent of Required Lenders, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal (including all PIK Interest that has been added to the principal amount) of and accrued interest on their respective Loans and other amounts owing them, *provided* that the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for any Transfer of its Loans to an Eligible Assignee.

If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e)     *The Borrower Default*. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.15.   *Taxes*.

(a)     *Payments Free of Taxes*. Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes, unless required by applicable Requirements of Law. If the applicable withholding agent shall be

required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes, the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    *Payment of Other Taxes by Loan Parties*. Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    *Indemnification by Loan Parties*. The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable by, paid by, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis and computation of such payment or liability, shall be conclusive absent manifest error; *provided* that, upon the Borrower's timely written request, the Administrative Agent or Lender may, in its sole discretion, after consultation with the Borrower, and at the Borrower's expense, contest the validity, applicability or amount of such Taxes by (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, or (iii) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; *provided* that (y) the Administrative Agent or such Lender will not be required to take any action or continue to pursue an action (or inaction) hereunder which, in its sole discretion, could cause the Administrative Agent or such Lender to suffer any disadvantage, and (z) on written demand from the Administrative Agent or the Lender, as the case may be, the Borrower agrees to pay, and shall timely pay, to the Administrative Agent or such Lender all reasonable costs and expenses that the Administrative Agent or such Lender actually incurs in connection with and reasonably allocable to contesting such claim (including reasonable legal and accounting fees, penalties, interest, and additions to Tax) and any Indemnified Taxes that are paid by the Administrative Agent or the Lender.

(d)    *Evidence of Payments*. As soon as practicable after any payment of Indemnified Taxes (or any Taxes otherwise withheld or deducted from any payments to the Administrative Agent, the Lenders, or any other recipient under the Loan Documents) by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     *Status of Lenders.* (i) Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding (including any withholding under FATCA). In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(ii)     Without limiting the generality of the foregoing,

(A)     any Foreign Lender shall, to the extent it may lawfully do so  deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)     duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any applicable successor forms of either), as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(ii)     duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit K-1, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any successor forms), as applicable,

(iv)     to the extent a Foreign Lender is not the beneficial owner executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E (or any successor forms), as applicable, a certificate in substantially the form of Exhibit K-2 or Exhibit K-3, Form W-9 (or any successor form), and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit K-4, on behalf of such direct and indirect partner or

(v)     any other form prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(B)     Each Foreign Lender shall, to the extent it is legally entitled to do so, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in withholding Tax or (2) notify Administrative Agent and the Borrower of its legal inability to deliver any such forms, certificates or other evidence.

(C)     Any Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that it is not subject to U.S. federal backup withholding.

(D)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA

and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    *Treatment of Certain Refunds*. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes giving rise to such refund had never been imposed in the first instance and the indemnification payments or additional amounts with respect to the Indemnified Taxes had never been paid.

(g)    *Payments*. For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from the Borrower on behalf of such Lender shall be treated as a payment from the Borrower to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrower.

(h)    *Survival*. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

Section 2.16.    *Mitigation Obligations; Replacement of Lenders*.

(a)    *Designation of a Different Lending Office*. If any Lender requests compensation under Section 2.12, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment. A certificate setting forth such costs and expenses submitted by such Lender to the Borrower shall be conclusive absent manifest error.

(b)    *Replacement of Lenders*. If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if the Borrower exercises its replacement rights under Section 10.02(d), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)    the Borrower shall have paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans (including all PIK Interest that has been added to the principal amount), accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including the applicable Payment Premium) and under the other Loan Documents, assuming for this purpose (in the case of a Lender being replaced pursuant to Section 2.12, 2.15 or 10.02(d)) that the Loans of such Lender were being prepaid) from the assignee (to the extent of such outstanding principal (including all PIK Interest that has been added to the principal amount) and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Each Lender agrees that, if the Borrower elects to replace such Lender in accordance with this Section 2.16(b), it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence the assignment and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register.

Section 2.17.  *Currency Indemnity.*

If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given. For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office. In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due. If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency. This indemnity shall constitute a secured obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders (with references to the Companies being references thereto after giving effect to the Transactions unless otherwise expressly stated) that:

Section 3.01.  *Organization; Powers.*

Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business

as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

Section 3.02. *Authorization; Enforceability.*

The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03. *No Conflicts.*

Except as set forth on Schedule 3.03, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which would not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

Section 3.04. *Financial Statements; Projections.*

(a)      *Historical Balance Sheets; Forecasted Cash Flows.* The Borrower has heretofore delivered to the Administrative Agent and the Lenders (i) an unaudited consolidated balance sheet for LightSquared Inc. as of and for the fiscal quarter ending immediately prior to the Closing Date, (ii) the unaudited consolidated monthly operating statements for the twelve fiscal months ending immediately prior to the Closing Date, (iii) the Borrower's most recent consolidated forecasted cash flows in form reasonably acceptable to the Lenders for the four-year period beginning on the Plan Effective Date (set forth on a monthly basis for the first year and on an annual basis thereafter), and (iv) a balance sheet of the Borrower on a consolidated basis after giving pro forma effect to the Transactions.  The balance sheets and information referred to in clauses (i) through (iv) of this Section 3.04(a) have not been prepared in accordance with GAAP.  The financial statements delivered pursuant to Sections 5.01(a) and (b)

have been prepared in accordance with GAAP and present fairly and accurately the financial condition and, if applicable, the results of operations and cash flows, of LightSquared Inc. or the Borrower, as applicable, as of the dates and for the periods to which they relate.

(b)    *No Liabilities*. Except as set forth in the financial statements referred to in Section 3.04(a) (or, after the Closing Date, as set forth in the financial statements referred to in Section 5.01(a)), there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which would reasonably be expected to result in such a liability, other than liabilities under the Loan Documents. Since [        ], 2015[3], there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect.

(c)    *Forecasts*. The forecasts of financial performance of the Borrower and its subsidiaries furnished to the Lenders have been prepared in good faith by the Borrower and based on assumptions believed by the Borrower at the time such forecasts were prepared and delivered to be reasonable.

Section 3.05.    *Properties*.

(a)    *Generally*. Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Collateral Liens and, in the case of all other material property, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose. The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)    *Real Property*. Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of each interest in Real Property, other than Canadian Real Property, and each interest in material Canadian Real Property, in each case (i) owned by the Borrower or any of its Subsidiaries as of the date hereof and describes the type of interest therein held and whether such owned Real Property is leased and if leased whether the underlying Lease contains any option to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by the Borrower or any of its Subsidiaries, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)    *No Casualty Event*. No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all

---

[3] To be the date of entry of the Plan Confirmation Order.

or any material portion of its property. No Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04.

(d)    *Collateral.* Each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Loan Party's business as currently conducted. The use by each Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)    *One Dot Six Lease.* Each of the Loan Parties has complied in all material respects with all obligations under the One Dot Six Lease, which is in full force and effect. Reorganized One Dot Six enjoys peaceful and undisturbed possession under the One Dot Six Lease.

Section 3.06.    *Intellectual Property.*

(a)    *Ownership/No Claims.* Each Company owns, or is licensed to use, all patents, trademarks, trade names, service marks, copyrights (and all registrations and applications for registration of any of the foregoing), technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") material to the conduct of its business as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof). No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that any Company is infringing, misappropriating or otherwise violating the Intellectual Property rights of any person, nor does any Company know of any valid basis for any such claim that in each case would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. The conduct of the business of each Company as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any person, except as will not have a Material Adverse Effect.

(b)    *Registrations.* Except pursuant to licenses and other user agreements entered into by the Borrower and its Subsidiaries in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate, on and as of the date hereof (i) the Borrower or its Subsidiaries, as indicated in Schedule 11(a) or 11(b) to the Perfection Certificate, owns and possesses the right to use, and has not licensed any other person to use, any copyright, patent, trademark or service mark (or any application for registration of any of the foregoing listed in Schedule 11(a) or 11(b) to the Perfection Certificate) and (ii) to each Loan Party's knowledge, all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate are valid and in full force and effect.

(c)    *No Violations or Proceedings*. To each Loan Party's knowledge, on and as of the date hereof, there is no material violation by others of any right of the Borrower or its Subsidiaries with respect to any copyright, patent, trademark or service mark listed in Schedule 11(a) or 11(b) to the Perfection Certificate, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

Section 3.07.    *Equity Interests and Subsidiaries*.

(a)    *Equity Interests*. Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) each Subsidiary of the Borrower and its jurisdiction of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through Wholly Owned Subsidiaries. As of the Closing Date (and except as described in the Plan of Reorganization), all of the Equity Interests of the Borrower are owned directly or indirectly by the Equity Investors. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Agreement and the Pledge Agreement, free of any and all Liens, rights or claims of other persons, except the security interest created by the Security Agreement and the Pledge Agreement and the security interest created by the Senior Lien Loan Documents. As of the Closing Date (and except as described in the Plan of Reorganization), there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    *No Consent of Third Parties Required*. No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or second priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Security Agreement or the Pledge Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Security Agreement or the Pledge Agreement or the exercise of remedies in respect thereof, except for such FCC, Industry Canada or CRTC consents as may be required under the Communications Laws and as may be required by the Intercreditor Agreement in connection with the exercise of such remedies.

(c)    *Organizational Chart*. An accurate organizational chart, showing the ownership structure of the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c), which shall only be delivered to the Lenders.

(d)    *Inactive Subsidiaries*. Each of LightSquared Finance, Co. and LightSquared (UK) Limited has no assets and conducts no operations.

Section 3.08.    *Litigation; Compliance with Laws*.

Except as set forth in Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. No Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

Section 3.09.  *Agreements.*

No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or would reasonably be expected to result in a Material Adverse Effect. No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default would reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.09 accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 7(a) or 7(b) to the Perfection Certificate dated the Closing Date) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

Section 3.10.  *Federal Reserve Regulations.*

No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the Security Agreement does not violate such regulations.

Section 3.11.  *Investment Company Act.*

No Company is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12.  *Use of Proceeds.*

The Borrower will borrow (x) the Loans from the Converting Lenders in exchange for, and, substantially concurrently with the application of the proceeds of the New Money Loans

pursuant to the terms hereof, in full satisfaction of, all Allowed Prepetition LP Non-SPSO Facility Claims outstanding as of the Plan Effective Date and (y) the Loans from the New Money Lenders and use the proceeds thereof to repay all Prepetition LP SPSO Facility Claims outstanding as of the Plan Effective Date, each of the foregoing pursuant to the terms of the Plan of Reorganization.

Section 3.13.  *Taxes.*

Each Company has (a) timely filed or caused to be timely filed all material federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP) or (ii) which would not, individually or in the aggregate, have a Material Adverse Effect and (c) satisfied all of its withholding tax obligations except for failures that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Company has made adequate provision (after the Closing Date, in accordance with GAAP) for all material Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that would be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Except as would not reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "**participated**" in a "**listed transaction**" within the meaning of Treasury Regulation Section 1.6011-4.

Section 3.14.  *No Material Misstatements.*

No information, reports, financial statements, certificates, Borrowing Requests, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.15.  *Labor Matters.*

There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, the Canada Labour Code, as amended, or any other applicable Requirements of Law dealing with such matters in any manner which would reasonably be expected to result in a Material Adverse Effect. All payments due from any

Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.16.    *Solvency*.

Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of the Loans and after giving effect to the application of the proceeds of the Loans, (a) the fair value of the properties of the Borrower (on a consolidated basis with its Subsidiaries) will exceed its debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower (on a consolidated basis with its Subsidiaries) will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Borrower (on a consolidated basis with its Subsidiaries) (taking into account reasonably potential asset sales) will not have unreasonably small capital with which to conduct its business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

Section 3.17.    *Employee Benefit Plans*.

With respect to each Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance would not reasonably be expected to result in a Material Adverse Effect. Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Plan, Single Employer Plan or Multiemployer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by any Company or any of its ERISA Affiliates with respect to any Plan, Single Employer Plan or Multiemployer Plan, except where such liability would not reasonably be expected to result in a Material Adverse Effect. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates. The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on those assumptions used to fund such plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefit by a material amount. As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company

and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material. The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under a Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability would not reasonably be expected to result in a Material Adverse Effect.

To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. Except as would not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred which would reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect. The Canadian Pension Plans are in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Companies (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect. All contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all applicable laws, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect. There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans. None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act.

Section 3.18.   *Environmental Matters*.

(a)      Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)    The Companies and their businesses, operations and Real Property have been and are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)    The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)    To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that would result in liability of or by the Companies under any applicable Environmental Law;

(iv)    There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that would reasonably form the basis of such an Environmental Claim; and

(v)    No person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)    Except as set forth in Schedule 3.18:

(i)    No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)    No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)    No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)    The Companies have made available to the Lenders all material records and files in the possession, custody or control of the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.19.  *Insurance*.

Schedule 3.19 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date. All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the Premises, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement. Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.20.  *Security Documents*.

(a)    *Security Agreement*. The Security Agreement is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Security Agreement Collateral and, (i) when financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Administrative Agent of the Security Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by each Security Document), the Liens created by the Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Security Agreement Collateral (other than such Security Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(b)    *[Reserved]*.

(c)    *Pledge Agreement*. The Pledge Agreement is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Pledge Agreement Collateral and, (i) when financing statements

and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate and (ii) upon the taking of possession or control by the Administrative Agent of the Pledge Agreement Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by each Security Document), the Liens created by the Pledge Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Pledge Agreement Collateral (other than such Pledge Agreement Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Collateral Liens.

(d)    *PTO Filing*; Copyright Office Filing. When the Security Agreement or a short form thereof is filed in the United States Patent and Trademark Office and the United States Copyright Office, the Liens created by such Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in all Patents and Trademarks (each as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office and Copyrights (as defined in the Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case subject to no Liens other than Permitted Collateral Liens.

(e)    *[Reserved]*.

(f)    *Valid Liens*. Each Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and (i) when all appropriate filings or recordings are made in the appropriate offices as may be required under applicable law and (ii) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent required by any Security Document), such Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than the applicable Permitted Collateral Liens.

Section 3.21.    *Intercompany Indebtedness; Affiliate Indebtedness.*

(a)    Except for Indebtedness owed by any Canadian Subsidiary to the Borrower the proceeds of which were used to fund operations, no Company has outstanding any Indebtedness owing to an Affiliate of such Loan Party (except Indebtedness that is permitted under Section 6.01).

(b)    Neither the Borrower nor any of its Subsidiaries is party to or otherwise bound by any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon

any of its property or assets (except for Indebtedness permitted under Section 6.01, so long as such Indebtedness does not prohibit Liens on the Collateral in favor of the Administrative Agent and the Lenders), or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary.

Section 3.22. *Anti-Terrorism Laws; Anti-Corruption Laws.*

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**").  No part of the proceeds of the loans will be used, directly or, to the Borrower's knowledge, indirectly for any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(c)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.23. *Communications Licenses and Regulatory Matters.*

(a)    Schedule 3.23(a) accurately and completely lists all Communications Licenses, including a separate designation of Communications Licenses deemed to be Material Licenses as of the date hereof.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies

as presently conducted. All Material Licenses identified on Schedule 3.23(a) are validly held and in full force and effect and, except for the One Dot Six License, are duly issued in the name of, or validly assigned to, the applicable Company.  Reorganized One Dot Six has been validly granted the right to use the spectrum covered by the One Dot Six License pursuant to the One Dot Six Lease and the One Dot Six Lease Authorization.

(b)    The Companies are in compliance in all material respects with all Communications Laws.  No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.23(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect).  Except as described in Schedule 3.23(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, and (to the extent the Communications Laws impose upon any Company a duty to update) remain, true, correct and complete in all material respects.

(d)    Except for any FCC or Industry Canada consents that may be required in connection with any enforcement against any Collateral and additional FCC or Industry Canada consents that may be required under the Plan of Reorganization, no consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)    Except as provided in Schedule 3.23(b), *provided* that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

Section 3.24.   *License Subsidiaries; Other Subsidiaries.*

No License Subsidiary holds any significant assets (other than the Communications Licenses held by it) or has incurred any material liabilities (other than under the Loan Documents, the Senior Lien Loan Documents and the definitive documentation in respect of Indebtedness permitted to be incurred under Section 6.01(k) and 6.01(f), in each case, to which it is a party).  [Neither Reorganized One Dot Six nor Reorganized LightSquared Inc. of Virginia holds any significant assets (other than the Communications Licenses held by it and as described on Schedule 3.24)] or has incurred any material liabilities (other than as permitted under the

Loan Documents, the Senior Lien Loan Documents and the definitive documentation in respect of Indebtedness permitted to be incurred under Section 6.01(k) and Section 6.01(f) and as described on Schedule 3.24).  Other than the License Subsidiaries, Reorganized One Dot Six, and Reorganized LightSquared Inc. of Virginia, none of the Companies holds any U.S. authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.  As of the Closing Date, Reorganized LightSquared Subsidiary LLC is the only License Subsidiary.

ARTICLE 4<br>CONDITIONS

Section 4.01.   *Conditions*.

The effectiveness of this Agreement shall be subject to the satisfaction or waiver of each of the conditions precedent set forth below.

(a)      *Loan Documents*.  There shall have been delivered to the Administrative Agent executed counterparts of the applicable Loan Parties to each of the Loan Documents and the Perfection Certificate and the Administrative Agent shall have received an executed counterpart to this Agreement of each Lender (provided that to the extent the Plan of Reorganization provides for the deemed execution hereof by the Converting Lenders, such counterparts shall not be required from the Converting Lenders), a complete and correct copy of the Senior Lien Loan Documents and the Loan Documents (as defined in the Reorganized LightSquared Inc. Loan Agreement).

(b)      *Corporate Documents*.  The Administrative Agent shall have received:

(i)      a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party organized in the United States) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director (or if there is no such other officer or director of such Loan Party, an officer or director of the general partner or sole member of such Loan Party) as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i)); and

(ii)    a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority).

(c)    *Officers' Certificate*. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions precedent set forth in this Section 4.01.

(d)    *Indebtedness and Minority Interests*. After giving effect to the Transactions and the other transactions contemplated hereby and the consummation of the Plan of Reorganization, no Company shall have outstanding any Indebtedness or preferred stock or Liens, except, in each case, as expressly contemplated by the Plan of Reorganization and expressly permitted under the Loan Documents and the New LightSquared Interest Holders Agreement.

(e)    *Opinions of Counsel*. The Administrative Agent shall have received, on behalf of itself, the Administrative Agent, and the Lenders, a favorable written opinion of (i) Milbank, Tweed, Hadley & McCloy LLP, special counsel for the Loan Parties, (ii) Latham & Watkins LLP, FCC counsel for the Loan Parties, (iii) Dentons Canada LLP, Canadian counsel for SkyTerra (Canada) Inc., SkyTerra Holdings (Canada) Inc. and LightSquared Corp. and Canadian radiocommunication and telecommunications regulatory counsel for the Loan Parties, and (iv) each local and foreign counsel listed on Schedule 4.01(e), in each case (A) dated the Closing Date, (B) addressed to the Administrative Agent and the Lenders, and (C) covering customary matters relating to the Loan Documents and the Transactions and any other matters as the Administrative Agent shall reasonably request.

(f)    *Solvency Certificate*. The Administrative Agent shall have received a solvency certificate in the form of Exhibit I, dated the Closing Date and signed by a Financial Officer of the Borrower.

(g)    *Requirements of Law*. The Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board.

(h)    *Fees*. The Administrative Agent and each Lender shall have received all (i) fees payable pursuant to Section 2.05 that are due and payable on the Closing Date and (ii) reasonable and documented invoiced fees and other amounts due and payable on or prior to the Closing Date as agreed by the Borrower.

(i)    *Personal Property Requirements*. The Administrative Agent shall have received:

(i)    except as specified on Schedule 5.14, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)    subject to the terms of the Intercreditor Agreement, the Intercompany Note executed by and among the Borrower and all of its Subsidiaries, accompanied by appropriate instruments of transfer undated and endorsed in blank;

(iii)    except as specified on Schedule 5.14 and subject to Section 5.03(c), all other certificates, agreements or instruments necessary to perfect the Administrative Agent's security interest in all Chattel Paper, all Instruments and all Investment Property of the Borrower and each Subsidiary Guarantor (as each such term is defined in the Security Agreement and to the extent required thereby);

(iv)    UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable, filings with the United States Patent and Trademark Office, United States Copyright Office and CIPO and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Administrative Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents;

(v)    certified copies of UCC, PPSA, Bank Act (Canada), United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches, execution searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party or Subsidiary as debtor and that are filed in those federal, state, provincial and county jurisdictions in which any Loan Party or Subsidiary is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Permitted Collateral Liens, Liens released on or prior to the Closing Date or any other Liens acceptable to the Administrative Agent), or in the case of PPSA filings, any asset of any Canadian Subsidiary; and

(vi)    evidence acceptable to the Administrative Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

(j)    *Insurance*. The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and, in the case of general liability policies, shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent.

(k)    *USA PATRIOT Act*. The Administrative Agent shall have received the information required under Section 10.15 not less than five (5) Business Days prior to the Closing Date provided and to the extent that such information is requested not less than ten (10) Business Days prior to the Closing Date.

(l)    *Satisfaction of Conditions Precedent*. (i) All conditions precedent to the effectiveness of the Plan of Reorganization shall have been (or shall be concurrently with the effectiveness of this Agreement) satisfied in accordance with the terms thereof, (ii) the Plan

Effective Date shall have occurred on or before the Closing Date and (iii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan of Reorganization shall have occurred on or prior to the Closing Date.

(m)     *License Subsidiaries*.  All Communications Licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries, except that the One Dot Six Lease Authorization and the other Communications Licenses issued by the FCC to the Borrower or its Subsidiaries authorizing the use of the 1670-1675 MHz band may be held in Reorganized One Dot Six.

(n)     *Spectrum Leases*.  All material spectrum leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(o)     *No Default*. The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date.

(p)     *Representations and Warranties*. Each of the representations and warranties made by any Loan Party set forth in Article 3 hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date.

(q)     *No Legal Bar*. No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it. No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(r)     *Other Agreements*.  Each of the One Dot Six Lease, the Material Licenses and the Inmarsat Agreement shall be in full force and effect and shall not have been terminated.

## ARTICLE 5
## AFFIRMATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of its Subsidiaries to:

Section 5.01.  *Financial Statements, Reports, etc*.  Furnish to the Administrative Agent and each Lender:

(a)     *Annual Reports*. As soon as available and in any event within 90 days after the end of each fiscal year, beginning with the fiscal year ending December 31, 2015 (in the case of the fiscal year ended December 31, 2015, within 120 days after the end of the fiscal year unless the Closing Date occurs after September 30, 2015, in which case within 180 days after the end of such fiscal year), the consolidated balance sheet and consolidated income statement of the Borrower as of and for the fiscal year then ended and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in an Annual Report on Form 10-K of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-K or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal year reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such year;

(b)     *Quarterly Reports*. As soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the first full fiscal quarter ending after the Closing Date (but not in any event required to be delivered sooner than 180 days after the Closing Date), the consolidated balance sheet and consolidated income statement of the Borrower as of and for the fiscal quarter then ended and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in a Quarterly Report on Form 10-Q of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-Q or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal quarter reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such quarter;

(c)     *Financial Officer's Certificate*. Concurrently with any delivery of financial statements under Section 5.01(a) above, beginning with the fiscal year ending December 31, 2015, a report of the accounting firm opining on or certifying such financial statements and, so long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, stating that in the course of its regular audit of the financial statements of the Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge that any Default insofar as it relates to financial or accounting matters has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof;

(d)     *Organization*. Concurrently with any delivery of financial statements under Section 5.01(a), an accurate organizational chart as required by Section 3.07(c), or confirmation that there are no changes to Schedule 9(a) to the Perfection Certificate;

(e)     *Management Letters*. Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

(f)     *Budgets*. Within 60 days after the beginning of each fiscal year, a cash-based budget for the Borrower in reasonable detail for (i) each fiscal quarter of such fiscal year and (ii) each fiscal year thereafter, through and including the fiscal year in which the Loan Maturity Date

occurs, prepared in summary form, in each case, with appropriate presentation and discussion of the principal assumptions upon which such budgets are based, accompanied by the statement of a Financial Officer of the Borrower to the effect that the budget of the Borrower is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such budget;

(g)     *Organizational Documents*. Promptly provide copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within 15 days after such Company gives or receives such notice;

(h)     *Other Information*. Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request;

(i)     *Financial Officer's Certificate Regarding Defaults*. Concurrently with any delivery of financial statements to the Lenders under Section 5.01(a) or (b), a Compliance Certificate certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(j)     *Financial Officer's Certificate Regarding Collateral*. Concurrently with any delivery of financial statements to the Lenders under Section 5.01(a), (i) a certificate of a Financial Officer setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement and (ii) a certificate of a Financial Officer and the chief legal officer or other similar officer of the Borrower certifying that all UCC and PPSA financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period); and

(k)     *Public Reports*. Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange.

Section 5.02.    *Litigation and Other Notices*.  Furnish to the Administrative Agent and each Lender written notice of any of the following promptly (and, in any event, within five (5) Business Days of the occurrence thereof):

(a)     the filing or commencement of, or any threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at

law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that would reasonably be expected to be materially adverse to such Company or Affiliate or (ii) with respect to any Loan Document;

(b)      the occurrence of a Casualty Event;

(c)      the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with any Material License, the One Dot Six Lease, and/or the Inmarsat Agreement, (iii) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, Industry Canada, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (iv) any material written correspondence with the FCC or Industry Canada; provided that in relation to the notices required to be delivered under this Section 5.02(i)(c), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.23(b) attached hereto;

(d)      any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(e)      any default under any Indebtedness of a Loan Party in excess of $[      ], specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(f)      any development that has resulted in, or would reasonably be expected to result in a Material Adverse Effect; or

(g)      the occurrence of a Change in Control.

Section 5.03.   *Existence; Businesses and Properties*.

(a)      Do or cause to be done all things reasonably necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Notwithstanding anything to the contrary contained in this Section 5.03, any of the Borrower and the Subsidiary Guarantors may change its partnership, corporate or other existence to another form of existence so long as the perfection and priority of the Liens of the Administrative Agent created by the Security Documents are not adversely affected.

(b)    Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, service marks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent (i) sales of property, consolidations, amalgamations or mergers by or involving any Company in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License), trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable, or (iv) the relinquishment of spectrum rights as contemplated by Schedule 6.06(g).

(c)    Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred upon the Companies thereunder), the One Dot Six Lease and the Inmarsat Agreement; *provided* that the Borrower may take actions required in furtherance of the objective underlying any Material Regulatory Request.

(d)    Upon satisfying the applicable requirements of Section 5.14, the Borrower shall ensure that any deposit or securities accounts maintained by it or any Subsidiary Guarantors shall be subject to account control agreements.

Section 5.04.   *Insurance*.

(a)    *Generally*.  Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to Mortgaged Properties and other properties material to the business of the Companies against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations.

(b)    *Requirements of Insurance*. All such insurance, except for insurance with respect to property subject to a Lien permitted under Section 6.02(i), shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days (or 15 days in the case of satellite insurance) after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as mortgagee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable, and (iii) be reasonably satisfactory in all other respects to the Administrative Agent.

(c)    *Notice to Administrative Agent*. Notify the Administrative Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.04 is taken out by any Company; and promptly deliver to the Administrative Agent a duplicate original copy of such policy or policies.

(d)    *Flood Insurance*. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e)    *Broker's Report*. Deliver to the Administrative Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent may from time to time reasonably request.

Section 5.05.    *Obligations and Taxes*.

(a)    *Payment of Obligations*. Pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)    *Filing of Returns*. Timely and correctly file all material Tax Returns required to be filed by it. Withhold, collect and remit all material Taxes that it is required to collect, withhold or remit.

Section 5.06.    *Employee Benefits*.

Comply in all material respects with the applicable provisions of ERISA and the Code (and any Requirements of Law applicable to any Foreign Plan or Canadian Pension Plan) and (b)

furnish to the Administrative Agent (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know that, (i) any ERISA Event or similar event with respect to a Foreign Plan or Canadian Pension Plan has occurred, (ii) the imposition of a Lien with respect to any Plan, a Single Employer Plan, Canadian Pension Plan or a Multiemployer Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan or Canadian Pension Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan or Canadian Pension Plan if such amendment results in a material increase in benefits or unfunded liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan, Single Employer Plan or Canadian Pension Plan, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event or Canadian Plan Event and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as practicable following any request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Single Employer Plan or each annual information report for any Canadian Pension Plan; (ii) the most recent actuarial valuation report for each Plan, Canadian Pension Plan, Single Employer Plan and Multiemployer Plan; (iii) all notices received by any Company or any of its ERISA Affiliate from a Canadian Pension Plan or Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event or Canadian Pension Plan; (iv) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Plan or Canadian Pension Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent shall reasonably request and (z) as soon as practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; *provided* that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

Section 5.07. *Maintaining Records; Access to Properties and Inspections; Annual Meetings.*

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. The Borrower and each of its Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs,

finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants).

(b)    Within 120 days after the end of each fiscal year of the Companies, at the request of the Administrative Agent or Required Lenders, hold a meeting (at a mutually agreeable time) by conference call (the costs of such call to be paid by the Borrower) with all Lenders who choose to attend such meeting, at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of the Companies and the budgets presented for the current fiscal year of the Companies.

Section 5.08.    *[Reserved]*.

Section 5.09.    *Compliance with Laws; Compliance with Environmental Laws; Environmental Reports*.

(a)    Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    Comply, and undertake all commercially reasonable efforts to cause all of its employees occupying Real Property owned, operated or leased by the Borrower or any of its Subsidiaries to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, undertake, obtain, renew or conduct individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10.    *Compliance with Communications Laws and ITU Rules and Regulations*.

(a)    Comply with all applicable Communications Laws and the terms and conditions of any Communications Licenses and the One Dot Six Lease, including but not limited to requirements applicable to the Companies pursuant to the ITU Radio Regulations, except for instances of non-compliance which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Diligently prosecute all of the Material Regulatory Requests.

(c)    Comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except for instances of non-compliance with applicable Requirements of Law which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.11.    *Additional Collateral; Additional Guarantors*.

(a)        Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Administrative Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent shall deem necessary or advisable to grant the Administrative Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Collateral Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. The Borrower shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall require to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties.

(b)        With respect to any person that is or becomes a Subsidiary after the Closing Date or if any applicable Subsidiary ceases to be an inactive Subsidiary as set forth in Section 3.07(d), promptly (and in any event within 30 days after such person becomes a Subsidiary or ceases to be an inactive Subsidiary) (i) deliver to the Administrative Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to the Borrower or any Subsidiary Guarantor together with instruments of transfer executed and delivered in blank by a duly authorized officer of the Borrower or such Subsidiary Guarantor and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the Security Agreement substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent to cause the Lien created by the Security Agreement to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent. Notwithstanding the foregoing, (1) the Equity Interests required to be delivered to the Administrative Agent pursuant to clause (i) of this Section 5.11(b) shall include Equity Interests of an Excluded Subsidiary created or acquired after the Closing Date only to the extent such Equity Interests are included in the definition of "Collateral" under this Agreement and (2) no Excluded Subsidiary shall be required to take the actions specified in clause (ii) of this Section 5.11(b).

(c)        Promptly grant to the Administrative Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on each Real Property owned in fee by the Borrower or any Subsidiary Guarantor as is acquired by the Borrower or such Subsidiary Guarantor after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $[            ], as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 6.02). Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and shall constitute valid and enforceable perfected Liens subject only to Permitted Collateral Liens or other Liens acceptable to the Administrative Agent.

The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. The Borrower or such Subsidiary Guarantor shall otherwise take such actions and execute and/or deliver to the Administrative Agent such documents as the Administrative Agent shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including a title policy (in an amount not less than 100% of the fair market value of such Real Property, as determined by the Borrower), a Survey, where customary, a local counsel opinion (each in form and substance reasonably satisfactory to the Administrative Agent) and such documentation as is required by the Flood Insurance Requirements in respect of such Mortgage).

Section 5.12.    *Security Interests; Further Assurances.*

Promptly, upon the reasonable request of the Administrative Agent or any Lender, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Security Document, or obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent as the Administrative Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Security Documents. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may reasonably require. If the Administrative Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of the Borrower or any Subsidiary Guarantor constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA or are otherwise in form and substance satisfactory to the Administrative Agent.

Section 5.13.    *Information Regarding Collateral.*

Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers'

Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

Section 5.14.  *Post-Closing Collateral Matters.*

Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule.

Section 5.15.  *License Subsidiaries; Other Subsidiaries.*

Hold and retain, or cause to be held or retained, as applicable, (i) all Material Licenses (other than the One Dot Six Lease Authorization and other Communications Licenses issued by the FCC authorizing the use of the 1670-1675 MHz band) issued by the FCC to any Company in one or more License Subsidiaries; and (ii) the One Dot Six Lease Authorization and the other Communications Licenses authorizing the use of the 1670-1675 MHz band issued by the FCC to any Company in Reorganized One Dot Six Corp.

ARTICLE 6
NEGATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document have been paid in full, it will not, nor will it cause or permit any Subsidiaries to:

Section 6.01.  *Indebtedness.*

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)       (i) Indebtedness incurred under this Agreement and the other Loan Documents and (ii) Permitted Refinancings thereof;

(b)       (i) Indebtedness outstanding on the Closing Date and listed on Schedule 6.01(b) and (ii) Permitted Refinancings thereof;

(c)       Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor; *provided* such Indebtedness is subject to the Intercompany Note and pledged by such party as Collateral pursuant to the Security Documents;

(d)    Indebtedness permitted by Section 6.04(d) and Section 6.04(e); *provided* such Indebtedness is subject to the Intercompany Note and pledged by such party as Collateral pursuant to the Security Documents;

(e)    Indebtedness of any Loan Party in respect of Purchase Money Obligations and Capital Lease Obligations and, in each case, any modification, refinancing, refunding, renewal or extension thereof;

(f)    subject to the Intercreditor Agreement, Indebtedness in an aggregate original principal amount not to exceed (i) $500,000,000 outstanding at any time, plus the amount of any accreted or capitalized paid-in-kind interest thereon, *less* (ii) any Indebtedness incurred pursuant to Section 6.01(k)(ii); *provided* that (A) no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(f); (B) the proceeds of which shall be used for the general corporate purposes of the Companies; (C) no Loan Party shall incur Indebtedness under this Section 6.01(f) at any time prior to the date that is eighteen (18) months after the Closing Date, except where the proceeds of such Indebtedness incurred by such Loan Party are used to acquire spectrum rights or other long-term assets useful in the business of a Loan Party; (D) such Indebtedness shall be secured by a Lien on the Collateral that is permitted by Section 6.02(h), which Lien shall not extend to any assets of the Borrower or any Subsidiary thereof that do not constitute Collateral, subject only to the Intercreditor Agreement; (E) an authorized representative on behalf of the holders or lenders of such Indebtedness, as applicable, shall execute a joinder, supplement or amendment to the Intercreditor Agreement pursuant which the holders or lenders of such Indebtedness, as applicable, and any agent, trustee or person or institution holding a similar title therefor shall become bound by, and subject to the terms of, the Intercreditor Agreement; and (F) the definitive documentation governing such Indebtedness shall permit the incurrence and existence of the Obligations, including the accretion of PIK Interest;

(g)    Indebtedness and obligations of any Company in respect of letters of credit and bank guarantees, including without limitation, letters of credit in respect of bid, performance or surety bonds, workers' compensation claims, health, disability or other benefits to former employees or their families or property, casualty or liability or self-insurance obligations and completion guarantees and bankers acceptances issued for the account of any Company in the ordinary course of business, *provided* that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(g) outstanding at any time shall not exceed $[        ];

(h)    Contingent Obligations of any Loan Party in respect of Indebtedness of any other Loan Party otherwise permitted under this Section 6.01;

(i)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five (5) Business Days of incurrence;

(j)    Indebtedness representing the financing of installments of insurance premiums;

(k)      subject to the Intercreditor Agreement, Indebtedness arising under the Senior Lien Loan Documents (including any incremental loans thereunder) and Permitted Refinancings thereof in an aggregate original principal amount not to exceed (i) $1,250,000,000, less any principal prepayments thereof, plus the amount of any accreted or capitalized paid-in-kind interest thereon, *plus* (ii) (A) $500,000,000, plus the amount of any accreted or capitalized paid-in-kind interest thereon, *less* (B) any Indebtedness incurred pursuant to Section 6.01(f)(i); *provided* that (I) notwithstanding any other provision herein to the contrary, no person other than a Loan Party shall at any time be an obligor in respect of any such Indebtedness incurred pursuant to this Section 6.01(k) and (II) the definitive documentation governing such Indebtedness shall permit the incurrence and existence of the Obligations, including the accretion of PIK Interest;

(l)      Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(m)      other unsecured Indebtedness of any Loan Party; and

(n)      Indebtedness of Foreign Subsidiaries in an aggregate principal amount not to exceed $[      ] at any one time outstanding.

Section 6.02.    *Liens*.

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)      inchoate Liens for taxes (including Taxes), assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes (including Taxes), assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)      Liens in respect of property of the Borrower or any Subsidiary imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(c)      any Lien in existence on the Closing Date and set forth on Schedule 6.02(c) and any Lien granted as a replacement or substitute therefor; *provided* that any such replacement or substitute Lien (i) does not secure an aggregate amount of Indebtedness, if any, greater than that secured on the Closing Date except as permitted pursuant to a Permitted Refinancing and (ii)

does not encumber any property other than the property subject thereto on the Closing Date (any such Lien, an "**Existing Lien**");

(d)　　easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Borrower or its Subsidiaries at such Real Property;

(e)　　Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(f)　　Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeals bonds, letters of credit, statutory bonds, bids, leases, government contracts, trade contracts, deposits as security for contested taxes (including Taxes) or import duties or for the payment of rent, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x), (y) and (z) of this paragraph (f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(g)　　Leases and subleases of Real Property of the Borrower or any Subsidiary granted by such Company to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(h)　　Liens on Collateral securing Indebtedness permitted by Section 6.01(f); *provided* that (i) the agent or representative under such Indebtedness has become a party to the Intercreditor Agreement and (ii) such Liens shall not extend to any assets of the Borrower or any Subsidiary thereof that do not constitute Collateral (it being understood that such Liens may be senior to the Liens under the Loan Documents);

(i)　　Liens securing Indebtedness incurred pursuant to Section 6.01(e); *provided* such Liens do not extend beyond the assets being financed or refinanced in connection with such Purchase Money Obligations and Capital Lease Obligations;

(j)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)      Liens granted pursuant to the Security Documents to secure the Obligations;

(l)      non-exclusive licenses of Intellectual Property granted by the Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Borrower and its Subsidiaries;

(m)      the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(n)      Liens on the Second Satellite securing the Incentive Payments;

(o)      Liens securing Indebtedness incurred pursuant to **(k)6.01Section** ; *provided* that (x) such Liens do not extend to any assets that are not Collateral and (y) such Liens are subject to the terms of the Intercreditor Agreement;

(p)      [reserved];

(q)      [reserved];

(r)      Liens existing with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary securing cash management obligations not in excess of $[      ] in the aggregate; and

(s)      Liens not otherwise permitted by this Section 6.02 so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $[      ] in the aggregate;

*provided*, *however*, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens permitted under Section 6.02(h), (k) and (o).

Section 6.03.    *Sale and Leaseback Transactions*.

Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

Section 6.04.    *Investments, Loan, Advances and Acquisition*.

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person (other than to customers in the ordinary course of business), or purchase or acquire any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)     the Borrower and its Subsidiaries may consummate the Transactions and the Plan of Reorganization in accordance with the provisions of the Transaction Documents;

(b)     Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(c)     the Borrower and its Subsidiaries may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) prepay expenses and endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(d)     Investments made by the Borrower in any Subsidiary Guarantor and by any Subsidiary Guarantor in the Borrower or any other Subsidiary Guarantor; *provided* that if such Investment constitutes Indebtedness, such Investment is subject to the Intercompany Note and pledged by such party as Collateral pursuant to the Security Documents;

(e)     Investments made by (i) any Loan Party in any Canadian Subsidiary in the form of a loan or advance for purposes of funding operations of such Canadian Subsidiary in the ordinary course of business; *provided* that such loan or advance shall be evidenced by the Intercompany Note and pledged by such Loan Party as Collateral pursuant to the Security Documents and (ii) any Foreign Subsidiary in any other Foreign Subsidiary;

(f)     Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(g)     mergers, amalgamations and consolidations in compliance with Section 6.05 (other than Section 6.05(b));

(h)     Investments made by the Borrower or any Subsidiary received in connection with an Asset Sale made in compliance with Section 6.06;

(i)     Capital Expenditures made by the Borrower or any Subsidiary in the ordinary course of business;

(j)    purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business or as required by Governmental Authorities, including in order to maintain or review Communication Licenses;

(k)    leases of real or personal property in the ordinary course of business and in accordance with the Security Documents;

(l)    Investments described on Schedule 6.04(l);[4]

(m)    Investments made by Loan Parties in Foreign Subsidiaries in an amount not to exceed $[    ] at any time outstanding; *provided* that if any such Investment constitutes Indebtedness, such Investment is subject to the Intercompany Note and pledged by such party as Collateral pursuant to the Security Documents;

(n)    [reserved];

(o)    Investments consisting of nonexclusive licensing of intellectual property pursuant to joint marketing arrangements with other persons, for which license or contribution the Borrower and the Subsidiary Guarantors receives fair market value;

(p)    Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(q)    Investments in loans or advances to employees made in the ordinary course of business consistent with past practices of the Borrower or such Subsidiary Guarantor not to exceed $[    ] at any time outstanding;

(r)    other Investments in an aggregate amount not to exceed $[      ] at any time outstanding; and

(s)    Investments consistent with the Borrower's business plan as described to the Lenders prior to the Closing Date and made using proceeds of Indebtedness incurred pursuant to Section 6.01(f), 6.01(k)(ii) or 6.01(m), proceeds of Asset Sales or Casualty Events to the extent such proceeds are not required to repay or prepay Loans pursuant to Section 2.10 or the issuance of Qualified Capital Stock by the Borrower.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment to the Borrower or any Subsidiary Guarantor.

Section 6.05.    *Mergers and Consolidations*.

---

[4]    Schedule 6.04(l) to include, to the extent construed as "Investments," the Companies' expenditure or contribution of funds to facilitate the relocation of facilities from the 1675-1680 MHz band as necessary to satisfy any FCC condition in connection with relief granted in response to a Material Regulatory Request or substantively similar request.

Wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution) or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), except that the following shall be permitted:

(a)    Asset Sales in compliance with Section 6.06 (other than Section 6.06(m));

(b)    acquisitions in compliance with Section 6.04;

(c)    any Company may merge, amalgamate or consolidate with or into the Borrower or any Subsidiary Guarantor (as long as the Borrower is the surviving person in the case of any merger, amalgamation or consolidation involving the Borrower and a Subsidiary Guarantor is the surviving person and remains a Wholly Owned Subsidiary of the Borrower in any other merger, amalgamation or consolidation); *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Administrative Agent under the Security Documents shall be maintained or created in accordance with the provisions of Section 5.11 or Section 5.12, as applicable;

(d)    any Subsidiary may dissolve, liquidate or wind up its affairs at any time; provided that such dissolution, liquidation or winding up, as applicable, would not reasonably be expected to have a Material Adverse Effect; and

(e)    any Subsidiary that is not a Guarantor may merge or consolidate with or into another Subsidiary that is not a Guarantor.

Section 6.06.    *Asset Sales*.

Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)    disposition of used, worn out, obsolete or surplus property by the Borrower or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Borrower and its Subsidiaries taken as a whole;

(b)    Asset Sales at fair market value; *provided* that (i) at the time of such Asset Sale, no Default shall exist or would result from such Asset Sale, (ii) the aggregate fair market value of assets disposed in respect of all Asset Sales pursuant to this clause (b) shall not exceed $[      ] in any four consecutive fiscal quarters of the Borrower and (iii) at least 75% of the consideration received by the Borrower or such Subsidiary in connection with any such Asset Sale shall be in the form of cash and/or Cash Equivalents;[5]

(c)    Asset Sale of the Second Satellite at fair market value, which shall be paid for in cash; *provided* that such sale is in compliance with all Communications Laws; *provided*, *further*

---

[5] For purposes of clarity, Section 6.06(b) hereof shall not permit the sale of all or substantially all of the Borrower's assets or a material portion of the Borrower's spectrum assets.

that the consideration paid to the Borrower with respect to the sale of the Second Satellite may be set off against the amount owing to Boeing by a Subsidiary of the Borrower that is a Guarantor;

(d)    [reserved];

(e)    the licensing or sublicensing of Intellectual Property; *provided*, *however*, that such licensing or sublicensing shall not interfere in any material respect with the Borrower's continued use of such Intellectual Property in its business;

(f)    to the extent constituting an Asset Sale, the creation of a Lien permitted by Section 6.02 (but not any Asset Sale of the property subject to such Lien);

(g)    Asset Sales described in Schedule 6.06(g)[6];

(h)    [reserved];

(i)    [reserved];

(j)    Asset Sales pursuant to the agreements outstanding on the date hereof and set forth on Schedule 6.06(j) attached hereto;

(k)    leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(l)    [reserved]; and

(m)    to the extent constituting Asset Sales, mergers, consolidations and amalgamations in compliance with Section 6.05 (other than Section 6.05(a)).

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 6.06 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.06, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the Security Documents, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Section 6.06, the Administrative Agent shall take all actions it deems appropriate in order to effect the foregoing.

Section 6.07.  *Dividends*.

Authorize, declare or pay, directly or indirectly, any Dividends with respect to the Borrower or any of its Subsidiaries, except that the following shall be permitted:

---

[6]    Schedule 6.06(g) to include, to the extent construed as "Asset Sales," the surrender of terrestrial spectrum rights in the nominal 1546-1556 MHz band or acceptance of limitations on the use of or access to spectrum in that band as part of the exchange of terrestrial spectrum rights contemplated by the Material Regulatory Requests.

(a)    Dividends by any Company to the Borrower or any Guarantor that is a Wholly Owned Subsidiary of the Borrower; and

(b)    so long as no Default or Event of Default then exists (or would result therefrom), other Dividends, in an amount not to exceed $[      ] in the aggregate from and after the Closing Date.

Section 6.08.    *Transactions with Affiliates.*

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among the Borrower and one or more Subsidiary Guarantors or among Subsidiary Guarantors), other than any transaction or series of related transactions on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)    Dividends permitted by Section 6.07;

(b)    [reserved];

(c)    Asset Sales at fair market value permitted by Section 6.06;

(d)    reasonable and customary director, officer and employee compensation (including bonuses), retention arrangements, and other benefits (including retirement, health and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of the Borrower;

(e)    the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organizational Document or securityholders agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date, and which has been disclosed to the Lenders in writing as in effect on the Closing Date, and similar agreements that it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by any Loan Party of obligations under, any amendment to any such existing agreement or any such similar agreement entered into after the Closing Date shall only be permitted by this Section 6.08(e) to the extent not more adverse to the interests of the Lenders in any material respect, when taken as a whole, than any of such documents and agreements as in effect on the Closing Date;

(f)    [reserved];

(g)    [reserved];

(h)    (i) any issuance or sale of securities permitted under Section 6.11, and (ii) any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the Board of Directors of the Borrower;

(i)        Investments permitted by Section 6.04 (other than Sections 6.04(f), (g), (i), (r) and (s));

(j)        the payment of reasonable and customary fees to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Borrower or the Subsidiary Guarantors;

(k)        [reserved]; and

(l)        the Transactions contemplated by the Transaction Documents and the transactions contemplated by the Plan of Reorganization.

Section 6.09. *Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc*.

Directly or indirectly:

(a)        make (or give any notice in respect thereof) any payment or prepayment of principal on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Indebtedness incurred pursuant to Section 6.01(e), except (i) any payment of principal at scheduled maturity, (ii) any repayment of such Indebtedness with the proceeds of a Permitted Refinancing thereof, or (iii) with proceeds of an Asset Sale or Casualty Event with respect to property subject to a Lien securing such Indebtedness;

(b)        (i) amend or modify, or permit the amendment or modification of, any provision of any Senior Lien Loan Document or the definitive documentation governing the Indebtedness permitted to be incurred under Section 6.01(f) in violation of the Intercreditor Agreement or (ii) amend or modify, or permit the amendment or modification of the One Dot Six Lease in any manner that is materially adverse to the interests of the Lenders or that would make such agreements more restrictive to any Loan Party in any respect;

(c)        (i) terminate, amend or modify any of its Organizational Documents (including (x) by the filing or modification of any certificate of designation and (y) any election to treat any Pledged Securities (as defined in the Security Agreement) as a "security" under Section 8-103 of the UCC or under the Securities Transfer Act (Ontario), as applicable, other than concurrently with the delivery of certificates representing such Pledged Securities to the Administrative Agent) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such amendments or modifications or such new agreements which are (x) made in connection with a winding up, liquidation, dissolution, merger or consolidation in compliance with Section 6.05 or (y) not adverse in any material respect to the interests of the Lenders or (ii) amend or modify, or permit any amendment or modification of, any of its Organizational Documents or any agreement to which it is a party with respect to its Equity Interests to permit any Harbinger Entity to vote for the Board of Directors of the Borrower; or

(d)        either individually or jointly, except as may be provided in the Cooperation Agreement Order, (i) terminate, amend or modify, or permit the amendment or modification of,

or assume, or permit the assumption of, the Inmarsat Agreement in each case in any way that is or would reasonably be expected to be materially adverse to the interests of the Lenders or (ii) enter into any agreement or arrangement of any nature to sell, assign, allocate value and/or liabilities or otherwise dispose of, or agree to sell, assign, allocate value and/or liabilities or otherwise dispose of, any Company's material rights and/or obligations under the Inmarsat Agreement, in the case of either clause (i) or (ii) above, without the prior written consent of the Required Lenders.

Section 6.10.   *Limitation on Certain Restrictions on Subsidiaries.*

Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by the Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or a Subsidiary, (b) make loans or advances to the Borrower or any Subsidiary or (c) transfer any of its properties to the Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement and the other Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by Section 6.02 restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale; (vii) any agreement in effect at the time such Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into in connection with or in contemplation of such person becoming a Subsidiary of the Borrower; (viii) without affecting the Loan Parties' obligations under Section 5.11, customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; (x) in the case of any joint venture which is not a Loan Party in respect of any matters referred to in clauses (b) and (c) above, restrictions in such person's Organizational Documents or pursuant to any joint venture agreement or stockholders agreements solely to the extent of the Equity Interests of or property held in the subject joint venture or other entity; or (xi) any encumbrances or restrictions imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (vii) above; provided that such amendments or refinancings are no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

Section 6.11.   *Limitation on Issuance of Capital Stock.*

Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest, except (i) issuances by the Borrower of common stock or Qualified Capital Stock; *provided* such issuance does not constitute a Change in Control, (ii) for stock splits, stock dividends and additional issuances of

Equity Interests which do not decrease the percentage ownership of the Borrower or any Subsidiaries in any class of the Equity Interest of such Subsidiary; (iii) Subsidiaries of the Borrower formed after the Closing Date in accordance with Section 6.12 may issue Equity Interests to the Borrower or the Subsidiary of the Borrower which is to own such Equity Interests; and (iv) issuances of Equity Interests pursuant to the Plan of Reorganization and the Plan Confirmation Order. All Equity Interests issued in accordance with this Section 6.11 shall, to the extent required by Sections 5.11 and 5.12 or any Security Document, be delivered to the Administrative Agent as Pledged Collateral.

Section 6.12.    *Limitation on Creation of Subsidiaries*.

Establish, create or acquire any additional Subsidiaries without the prior written consent of the Required Lenders; *provided* that, without such consent, the Borrower may (i) establish or create one or more Wholly Owned Subsidiaries of the Borrower or (ii) establish, create or acquire one or more Subsidiaries in connection with an Investment made pursuant to Section 6.04.

Section 6.13.    *Business*.

With respect to the Borrower and the Subsidiaries, engage (directly or indirectly) in any material respect in any business other than those businesses in which the Borrower and its Subsidiaries are engaged in or contemplated to be engaged in on the Closing Date or as may otherwise be described in the Disclosure Statement.

Section 6.14.    *Fiscal Year*.

Change its fiscal year-end to a date other than December 31.

Section 6.15.    *No Further Negative Pledge*.

Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of the Borrower or any Subsidiary Guarantor to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement and the other Transaction Documents, and indebtedness issued under Sections 6.01(f) and/or (k); (2) covenants in documents creating Liens permitted by Sections 6.02(c), (h), (i), (k), (n), (o) and (r) prohibiting further Liens on the properties encumbered thereby; (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; or (4) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale, (c) restricts subletting or assignment of leasehold interests contained in any Lease governing a leasehold interest of the Borrower or a Subsidiary, (d) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of

such person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (3) or (4)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

Section 6.16.    *Compliance with Anti-Terrorism Laws.*

(a)    Directly or indirectly, in connection with the Loans, knowingly (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)    Directly or indirectly, in connection with the Loans, knowingly cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Anti-Terrorism Law.

(c)    Knowingly cause or permit (i) an Embargoed Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Loan Parties in violation of any Anti-Terrorism Law or any other applicable law, (ii) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, an Embargoed Person in violation of any Anti-Terrorism Law or any other applicable law or (iii) any payments to any governmental official or employee, political party, official or a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

(d)    The Borrower shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming its compliance with this Section 6.16.

Section 6.17.    *Canadian Pension Plans.*

(a)    Terminate any Canadian Pension Plan in a manner, or take any other action with respect to any Canadian Pension Plan which could reasonably be expected to result in any material liability of a Company.

(b)    Fail to make full payment when due of all amounts which, under the provisions of any Canadian Pension Plan, any agreement relating thereto or applicable Requirements of Law, the Borrower or any other Loan Party is required to pay as contributions thereto, except where the failure to make such payments could not reasonably be expected to have a Material Adverse Effect.

(c)     Permit to exist any accumulated funding deficiency, whether or not waived, with respect to any Canadian Pension Plan in an amount which could reasonably be expected to have a Material Adverse Effect.

(d)     Contribute to or assume an obligation to contribute to, or permit any other Loan Party to contribute to or assume an obligation to contribute to, any "multi-employer pension plan" as such term is defined in the federal *Pension Benefits Standards Act, 1985*.

(e)     Acquire, or permit any other Loan Party to acquire, an interest in any Person if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to any "multi-employer pension plan" as such term is defined in the federal *Pension Benefits Standards Act, 1985*; *provided* that, any Loan Party may acquire an interest in any such Person if such Person is acquired as a Permitted Acquisition and no Loan Party has any legal liability to perform such Person's obligations or assume such Person's liabilities.

(f)     Permit, or allow any other Company to permit, the actuarial present value of the benefit liabilities (computed on an accumulated benefit obligation basis in accordance with GAAP and/or Canadian GAAP) under all Canadian Pension Plans in the aggregate to exceed the current value of the assets of all Canadian Pension Plans in the aggregate that are allocable to such benefit liabilities, in each case only to the extent such liabilities and assets relate to benefits to be paid to employees of the Companies, by an amount that could reasonably be expected to cause a Material Adverse Effect.

Section 6.18.    *Permitted Activities of License Subsidiaries and Other Subsidiaries*.

With respect to any License Subsidiary, Reorganized One Dot Six and Reorganized LightSquared Inc. of Virginia, (a) incur, directly or indirectly, any Indebtedness other than (i) the Indebtedness permitted under this Agreement, the other Loan Documents, the Senior Lien Loan Documents and the definitive documentation in respect of Indebtedness permitted to be incurred under Section 6.01(f) and 6.01(k) and (ii) in the case of Reorganized One Dot Six and Reorganized LightSquared Inc. of Virginia, as described on Schedule 3.24; (b) create, or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Security Documents to which it is a party; (c) engage in any business or activity or own any assets other than (i) holding the Communications Licenses, (ii) in the case of Reorganized One Dot Six and Reorganized LightSquared Inc. of Virginia, as described on Schedule 3.24 and (iii) performing its obligations and activities incidental thereto under this Agreement, the other Loan Documents, the Senior Lien Loan Documents and the definitive documentation in respect of Indebtedness permitted to be incurred under Section 6.01(f) and 6.01(k); (d) consolidate with or merge or amalgamate with or into, or convey, transfer or lease all or substantially all its assets to, any person other than a License Subsidiary and in accordance the other provisions of this Agreement; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries other than to a License Subsidiary and in accordance with the other provisions of this Agreement; (f) create or acquire any Subsidiary or make or own any Investment in any person; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

Section 6.19.  *Communications Licenses*.    Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease in all material respects.  No Company shall fail to file any report or application or pay any regulatory or filing fee pertaining to its businesses which is required to be filed with or paid to any Governmental Authority pursuant to Communications Laws, unless such failure to file a report or pay any regulatory or filing fee would be immaterial. No Company shall take any action that reasonably could be expected to cause a Governmental Authority to institute any proceedings for the cancellation, revocation, non-renewal, short-term renewal or adverse modification of any Material License or the One Dot Six Lease, or take or permit to be taken any other action within its control that reasonably could be expected to result in non-compliance with the requirements of Communications Laws in any material respect.

ARTICLE 7
GUARANTEE

Section 7.01.  *The Guarantee*.

The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code after any bankruptcy or insolvency petition under the Bankruptcy Code) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"); *provided*, that Excluded Swap Obligations in respect of any Guarantor shall at no time constitute Guaranteed Obligations of such Guarantor. The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02.  *Obligations Unconditional*.

The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment

in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto and each Guarantor hereby expressly renounces all benefit of division or discussion. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to

the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03.  *Reinstatement*.

The obligations of the Guarantors under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 7.04.  *Subrogation; Subordination*.

Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(c) shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note.

Section 7.05.  *Remedies*.

The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06.  *Instrument for the Payment of Money*.

Each Guarantor hereby acknowledges that the guarantee in this Article 7 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07.  *Continuing Guarantee*.

The guarantee in this Article 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08.  *General Limitation on Guarantee Obligations*.

In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 7.09.  *Release of Guarantors*.

If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is the Borrower or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and the pledge of such Equity Interests to the Administrative Agent pursuant to the Security Agreement shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Security Documents.

Section 7.10.  *Right of Contribution*.

Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

ARTICLE 8
EVENTS OF DEFAULT

Section 8.01.  *Events of Default*.

Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)    default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)    default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three (3) Business Days;

(c)    any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in Section 5.02 or 5.03(a) or in Article 6;

(e)    default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 30 days after written notice thereof from the Administrative Agent or any Lender to the Borrower;

(f)    any Loan Party shall (i) fail to pay any principal or interest due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor; provided that it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds $[          ] at any one time (provided that, in the case of Hedging Obligations, the amount counted for this purpose shall be the amount payable by all Loan Parties if such Hedging Obligations were terminated at such time);

(g)    an involuntary proceeding shall be commenced or an involuntary petition or application shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Loan Party, or of a substantial part of the property or assets of any Loan Party, under the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA); (ii) the appointment of a receiver, monitor, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Company; or (iii) the winding-up or liquidation of any Loan Party; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or

ordering any of the foregoing shall be entered or in respect of which such Loan Party files an answer admitting the material allegations of a petition filed against it in any such proceeding;

(h)      any Loan Party shall (i) voluntarily commence any proceeding or file any petition or application seeking relief under the Bankruptcy Code, as now constituted or hereafter amended, or any other federal, state, provincial or foreign bankruptcy, insolvency, receivership or similar law (including, without limitation, the BIA and the CCAA or any plan of arrangement involving or affecting its creditors under corporate law in connection with a restructuring involving a compromise of the debts of a Loan Party); (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition or application described in clause (g) above; (iii) apply for or consent to the appointment of a receiver, monitor, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property or assets of any Loan Party; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (vii) take any action for the purpose of effecting any of the foregoing; (viii) wind up or liquidate; or (ix) commit an act of bankruptcy under the BIA, or make an assignment of its property for the general benefit of its creditors under such Act, or make a proposal (or file a notice of its intention to do so) under such Act;

(i)      one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $[      ] shall be rendered against any Loan Party or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Loan Party to enforce any such judgment;

(j)      one or more ERISA Events, Canadian Plan Events or similar events with respect to Foreign Plans shall have occurred that, when taken together with all other such ERISA Events, Canadian Plan Events and similar events with respect to Foreign Plans that have occurred, could reasonably be expected to result in a Material Adverse Effect or in the imposition of a Lien on any properties of a Loan Party;

(k)      any security interest and Lien (other than a security interest or Lien on Collateral with a de minimis value) purported to be created by any Security Document shall cease to be in full force and effect, or shall cease to give the Administrative Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document (including a perfected second priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document and other than Liens permitted under Section 6.02(h) and (o))) in favor of the Administrative Agent, or shall be asserted by the Borrower or any other Loan Party not to be a valid, perfected, second priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby;

(l)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority,

seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(m)    the Inmarsat Agreement shall have been terminated;

(n)    a Change in Control shall have occurred; or

(o)    (i) the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order shall have been revoked, rescinded or otherwise cease to be in full force and effect, (ii) any Loan Party shall have challenged the effectiveness or validity of the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order, (iii) any Loan Party shall have violated the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order or (iv) the Plan Confirmation Order, the Recognition Order or the Cooperation Agreement Order shall have been amended, supplemented or otherwise modified (A) in any material manner adversely impacting the loan facility under this Agreement or the capitalization of the Loan Parties or (B) in any other material manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans and other Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal amount of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees, the applicable Payment Premium and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans (including all PIK Interest that has been added to the principal amount) then outstanding, together with accrued interest thereon, the applicable Payment Premium and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.02.    *Application of Proceeds*.

The proceeds received by the Administrative Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent pursuant to this Agreement, promptly by the Administrative Agent as follows:

(a)    *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)    *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest, the applicable Payment Premium and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)    *Fourth*, to the indefeasible payment in full in cash, pro rata, of the amount of the Obligations constituting principal on the Loans; and

(e)    *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

Section 8.03.    *Government Approval*.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses, the One Dot Six Lease or any company holding the Communications Licenses or the One Dot Six Lease shall be pursuant to the Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority.  Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, Industry Canada, the CRTC or any other applicable Governmental

Authority, without first obtaining such approval of the FCC, Industry Canada, the CRTC or such other Governmental Authority.  Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Loan Party's commercially reasonable efforts to assist in obtaining any approval of the FCC, Industry Canada, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, to the extent permitted by the Communications Laws, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for Industry Canada's Spectrum Management System and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, Industry Canada, the CRTC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or the Communications Licenses.

ARTICLE 9
THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number

or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.02) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Notwithstanding anything to the contrary in this agreement, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower and such resignation shall become effective immediately upon delivery of such notice and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  Upon any such resignation, the retiring Administrative Agent may, on behalf of the Lenders and in consultation with the Borrower, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank, or the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 10.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of

any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges and agrees that the extensions of credit made hereunder (or deemed to have been made hereunder) are commercial loans and not investments in a business enterprise or securities. Each Lender further represents that it is engaged in making, acquiring or holding commercial loans in the ordinary course of its business and has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Lender, and to make, acquire or hold Loans hereunder. Each Lender shall, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Borrower and its Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder and in deciding whether or to the extent to which it will continue as a lender or assign or otherwise transfer its rights, interests and obligations hereunder.

The Administrative Agent is hereby authorized to enter into the Intercreditor Agreement to the extent contemplated by the terms hereof, and the parties hereto acknowledge that they have reviewed the Intercreditor Agreement and that the Intercreditor Agreement is binding upon them. Each Lender (a) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (b) hereby authorizes and instructs the Administrative Agent to enter into the Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof. In addition, each Lender hereby authorizes the Administrative Agent to enter into (i) any amendments to the Intercreditor Agreement, and (ii) any other intercreditor arrangements, in the case of clauses (i), and (ii) to the extent required to give effect to the establishment of intercreditor rights and privileges as contemplated and required by .of this Agreement 6.02Section

Each Lender acknowledges and agrees that (i) the Administrative Agent (or one or more of its respective affiliates) is acting as a "Junior Priority Representative" under the Intercreditor Agreement and (ii) the Administrative Agent (or one or more of its affiliates) may (but is obligated to) act as the "Representative" or like term for the holders of Indebtedness incurred as a Permitted Refinancing under the security agreements with respect thereto and/or under the Intercreditor Agreement or other intercreditor agreement entered into in accordance with the terms hereof. Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against any Agent or any of its affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

ARTICLE 10
MISCELLANEOUS

Section 10.01. *Notices*.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)    if to the Borrower, to it at [NewCo], 10802 Parkridge Boulevard, Reston, VA 20191, Attention of General Counsel [_____] (Telecopy No. (___) ___-____), with a copy to [_____], [_____] Attention of [  ] (Telecopy No. (___) ___-____ ];

(ii)    if to the Administrative Agent, to [          ], Attention of [   ] (Telecopy No. [          ]), with a copy to [          ], Attention of [       ] (Telecopy No. [   ]);

(iii)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through Electronic Systems, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)    Electronic Systems.

(i)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)    Any Electronic System used by the Administrative Agent is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Loan Parties, any Lender or any other person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 10.02. *Waivers; Amendment*.

(a)    *Generally*. No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)    *Required Consents*. Subject to Sections 10.02(c), (d) and (e), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)    increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)    reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(b)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii)    (A) change the scheduled final maturity of any Loan, or any scheduled date of payment of or the installment otherwise due on the principal or accrual amount of any Loan under Section 2.09, (B) postpone the date for payment of any interest, premium or fees payable hereunder or (C) reduce the amount of, waive or excuse any such payment or accrual (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby; *provided* that waiving or excusing, in whole or in part, any Mandatory Prepayment shall not be subject to this clause (iii);

(iv)    permit the assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender (other than an assignment by the Borrower to a Loan Party who assumes all of the Borrower's rights and obligations under this Agreement) (such consent not to be unreasonably withheld, conditioned or delayed);

(v)    release (x) all or any material Subsidiary Guarantors from their Guarantee, or limit their liability in respect of such Guarantee, without the written consent of each Lender (in each case, except as expressly provided in Article VII) or (y) all or substantially all of the Collateral from the Liens of the Security Documents, in each case without the written consent of each Lender;

(vi)    change Section 2.14(b), (c) or (d) in a manner that would alter the pro rata sharing of payments or setoffs required thereby or any other provision in a manner that would alter the pro rata allocation among the Lenders of payments in respect of the Loans, including the requirements of Sections 2.02(a), without the written consent of each Lender; *provided* that this clause (vi) shall not apply to any change made to any of such Sections 2.14(b), (c) or (d) or any such other provision (or any change thereto) that allows the Borrower or any Subsidiary to make payments (as consideration for an assignment, sale or participation or otherwise) on Loans without any Loan Party, the payor or the recipient of such payments complying with the pro rata sharing of payments and setoffs required by such Sections or provisions, so long as such provisions (or any change thereto) require that (x) the Borrower and its Subsidiaries offer to make such payments to all Lenders on a pro rata basis based on the aggregate principal amount of Loans then outstanding, (y) such payments are actually allocated to the Loans whose holders have elected to make them subject to such offer on a pro rata basis based on the aggregate principal amount of all Loans that have been made so subject to such offer and

(z) all Loans that are paid in any such offer are deemed fully repaid and extinguished for all purposes and may not be reborrowed.

(vii)    change any provision of this Section 10.02(b) or Section 10.02(c) or (d), without the written consent of each Lender directly affected thereby;

(viii)    change the percentage set forth in (x) the definition of "Required Lenders" without the written consent of each Lender or (y) any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, in each case of clauses (x) and (y), other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(ix)    subordinate the right to receive payments in respect of the Obligations to the prior payment in full of any other obligation or Indebtedness, without the written consent of each Lender;

(x)    change or waive any provision of Article 9 as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent;

(xi)    change or waive the definition of Permitted Holders, without the written consent of each Permitted Holder that is a party hereto; or

(xii)    alter the relative priorities of the Liens on the Collateral securing the Obligations or otherwise subordinate the Liens on the Collateral securing the Obligations with any other obligations or Indebtedness secured by a Lien on the Collateral or make the Liens on the Collateral securing the Obligations rank *pari passu* with any other obligations or Indebtedness that is secured by a Lien on the Collateral, in each case without the written consent of each Lender directly and adversely affected thereby (other than in connection with the occurrence of any obligations or Indebtedness permitted by Section 6.01(f) and/or (k)).

Neither the Borrower nor any of its Subsidiaries or Affiliates will, directly or indirectly, pay or cause to be paid any consideration, to or for the benefit of any Lender for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Agreement or any other Loan Document unless such consideration is offered to be paid to all Lenders and is paid to each Lender in respect of such Lender's Loans that are voted in favor of such consent, waiver or amendment, within the time frame set forth in the documents relating to such consent, waiver or amendment; *provided* that, notwithstanding the foregoing, in the event any Equity Investor Entity or any Affiliate Debt Fund is subject to any restriction on affirmatively voting its respective Loans in favor of any consent, waiver or amendment (or is deemed to have not voted in favor of any consent, waiver or amendment), such Equity Investor Entity or Affiliate Debt Fund (as applicable) shall receive its pro rata share (based on the

aggregate principal amount of Loans held by such Equity Investor Entity or Affiliate Debt Fund that are subject to such restriction) of any such consideration paid to Lenders that vote in favor of any such consent, waiver or amendment.

Notwithstanding anything to the contrary herein:

(A)    no Affiliate Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder; and

(B)    any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent (without the consent of any Lender) solely to cure a defect or error, or to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property.

(c)    *Collateral*. Without the consent of any other person, the applicable Loan Party or Parties and the Administrative Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)    *Dissenting Lenders*. If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 10.02(b), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right (within five (5) Business Days of obtaining such consent of the Required Lenders) to replace all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.16(b) so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination.

(e)    *Lender Certification*.  Notwithstanding any provision of this Agreement to the contrary, prior to each vote or other consent solicitation on each matter requiring a vote, waiver, consent or affirmative approval by any Lender or group of Lenders, the Administrative Agent must receive a written certification from each Lender that no Disqualified Company has any direct or indirect interest (including, without limitation, pursuant to any participation or voting agreement) in such Lender's Loans.  The failure by a Lender to provide such certification shall result in such Lender's Loans being excluded from such vote or consent solicitation for all purposes hereunder.

Section 10.03. *Expenses; Indemnity; Damage Waiver*.

(a)    The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, including the fees, charges and disbursements of any

counsel for the Administrative Agent, in connection with (i) the negotiation, preparation, execution, delivery and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made and (ii) the creation, perfection or protection of the liens under the Loan Documents (including all reasonable search, filings and recording fees, expenses, stamp, documentary or similar taxes, and title insurance premiums). The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Lenders in connection with the enforcement or protection of its rights in connection with this Agreement and the Loans hereunder, including all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent on behalf of itself and/or on behalf of the Lenders during any workout, restructuring or negotiations in respect of such Loans in connection with such enforcement or protection of rights (but excluding fees and expenses of financial advisors and other similar professionals); *provided* that the reimbursement of any fees, charges or disbursements of counsel shall be limited to one counsel to the Administrative Agent and the Lenders, taken as a whole (which counsel shall be designated by the Administrative Agent) (and (x) appropriate local counsel in applicable local jurisdictions, but limited to one local counsel for the Administrative Agent and the Lenders, taken as a whole, in each such jurisdiction (which counsel shall be designated by the Administrative Agent) and (y) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction for the Administrative Agent and/or group of similarly situated Lenders, taken as a whole).

(b)    The Borrower shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of one counsel for all Indemnitees, taken as a whole (which counsel shall be designated by Indemnitees holding a majority of the aggregate principal amount of Loans held by all Indemnitees) (and solely in the case of a conflict of interest, one additional counsel for all similarly situated Indemnitees, taken as a whole (which counsel shall be selected by similarly situated Indemnitees holding a majority of the aggregate principal amount of Loans held by all similarly situated Indemnitees), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, in or from any property owned, leased, licensed or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, willful misconduct or a material breach of the obligations under Section 2.01 or Section 2.02 by such Indemnitee and (y) to the extent arising

from any dispute solely among Indemnitees other than (i) any claims against the Administrative Agent acting in such capacity or in fulfilling such role or any similar role under this Agreement and (ii) any claims arising out of any act or omission on the part of the Borrower or its Subsidiaries. This Section 10.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)    To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that, nothing in this clause (d) shall relieve the Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts due under this Section 10.03 shall be payable promptly after written demand therefor.

Section 10.04. *Successors and Assigns*.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (which consent shall not be unreasonably withheld, conditioned or delayed) (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), except for an assignment or other transfer of its rights or obligations hereunder to any Loan Party and (ii) no Lender may consummate any Transfer of Loans or any of its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in Section 10.04(b)(ii), any Lender may assign to a Lender, an Affiliate of a Lender, a Participant or any other person that is an Eligible Assignee (and any attempted assignment or transfer to a person that is not an Eligible Assignee shall be null and void) all or a portion of its rights and obligations under this Agreement

(including all or a portion of its Commitment and the Loans at the time owing to it), in each case, with the prior written consent of:

(A)    the Borrower (such consent not to be unreasonably withheld, conditioned or delayed); *provided* that the Borrower shall be deemed to have consented thereto unless it shall have objected to such assignment by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(B)    the Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)    the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire in which the assignee designates one or more Credit Contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)    the Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee and is not a Disqualified Company;

(F)    no Loan may be assigned to an Affiliate Lender pursuant to this Section 10.04 if, after giving effect to such assignment, Affiliate Lenders in the aggregate would own Loans with a principal amount in excess of 25% of the principal amount of all Loans then outstanding; and

(G)    no Loans may be assigned or otherwise Transferred (including by or through a Participation) to a Disqualified Company or any other person that is not an

Eligible Assignee notwithstanding anything to the contrary herein and any such assignment or other Transfer shall be void ab initio.

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Eligible Assignee, the Administrative Agent shall have no liability with respect to any assignment made to a person that is not an Eligible Assignee and the Administrative Agent shall have no responsibility or obligation with respect to provisions concerning Affiliate Lenders, including without limitation Section 10.04(b)(ii)(F). Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.  The Administrative Agent and any Lender assigning all or a portion of its rights and obligations under this Agreement pursuant to this Section 10.04 may conclusively rely on the representation given by the assignee that it is not a Disqualified Company and that neither such Lender or Administrative Agent will have any liability for any breach by an assignee of such representation, and such Lender and Administrative Agent will be indemnified by the Borrower for any loss, cost or expense resulting thereof.

(iii)    Subject to acceptance and recording thereof pursuant to Section 10.04(b)(iv), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.15 and Section 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(c), to the extent such participation is not prohibited by Section 10.04(c); *provided* that if such participation would be prohibited by Section 10.04(c), then such proposed assignment shall be null and void.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be

available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to, Section 2.02(b), Section 2.14(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    Any Lender may sell participations to one or more banks or other entities that are Eligible Assignees and not Affiliates of the Borrower (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); (B) such Lender's obligations under this Agreement shall remain unchanged; (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; (D) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and (E) no participations may be sold or otherwise Transferred to any person that is not an Eligible Assignee. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, in each case, to the extent provided for herein; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant (such consent not to be unreasonably withheld, conditioned or delayed), agree to any amendment, modification or waiver (1) described in clause (i), (ii), (iii) or (v) of the first proviso to Section 10.02(b) and (2) that directly affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12 and Section 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.16 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.12 or Section 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender;

*provided* that such Participant agrees to be subject to Section 2.14(d) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or that such Participant is not a Disqualified Company. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to any person (other than a natural person or any Disqualified Company) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     If any Transfer under this Section 10.04 is to a person that is an Eligible Assignee at the time of such Transfer but such person (other than a Permitted Holder that is a Lender) subsequently becomes a Disqualified Company pursuant to clause (z)(ii) of the definition thereof, then the Borrower (i) shall have the right to repurchase such portion of the Loans held by such Disqualified Company at the then-prevailing market price, in addition to any other remedies against such Disqualified Company available to the Borrower at equity or law without posting a bond or presenting evidence of irreparable harm and (ii) shall have the right to require by notice to the Administrative Agent that such Disqualified Company shall have no right to approve or disapprove any amendment, waiver or consent under this Agreement.

(f)     Notwithstanding anything to the contrary in this Agreement, the Administrative Agent may exclude (by prior notice to) Affiliate Lenders, and shall exclude all Disqualified Companies, from (a) attending (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender to which representatives of the Borrower are excluded or (b) receiving any information or material prepared by Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders, except to the extent such information or materials are made available to the Borrower or their representatives; *provided*, that, in the case of clause (a) or (b), the Administrative Agent has been advised by counsel that a conflict of interest between the Affiliate Lenders and the other Lenders could exist.

Section 10.05. *Survival of Agreement*.

All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of (including all PIK Interest that has been added to the principal amount) or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Section 2.12, Section 2.15 and Section 10.03 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06. *Counterparts; Integration; Effectiveness*.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided*, *however*, that with respect to any Lender that is a Lender hereunder as a result of having received a distribution under the Plan of Reorganization, the signature of such Lender shall not be required and such Lender shall be deemed to have executed this Agreement concurrently with the consummation of the Plan of Reorganization.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07. *Severability*.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08. *Right of Setoff.*

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09. *Governing Law; Jurisdiction; Consent to Service of Process.*

(a)      This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)      The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

(c)      The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10. *Waiver of Jury Trial.*

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11. *Headings.*

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12. *Treatment of Certain Information; Confidentiality.*

Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "**Information**" means all information received from the Debtors, the Borrower or any of its Subsidiaries relating to the Debtors, the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is

available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Debtors, the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13. *Material Non-Public Information.*

(a)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14. *Authorization to Distribute Certain Materials to Public-Siders.*

(a)    None of the Loan Parties currently has any publicly traded securities outstanding (including, but not limited to, 144A Securities, commercial paper notes or American Depositary Receipts); provided that the Borrower agrees that if any of the Loan Parties issues any publicly traded securities at a future date, any of the information in the Loan Documents and the Financial Statements to be furnished pursuant to Section 5.01(a) or (b), to the extent then material, will be publicly disclosed or set forth in the related prospectus or other offering document for such issuance.

(b)    The Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents to the Lenders and Financial Statements to all Lenders, including their Public-Siders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of

the United States federal and state securities laws if the Companies had publicly-traded securities outstanding.

(c)     If the Borrower issues any 144A Securities during the term of this Agreement and its Financial Statements are not filed with the Securities and Exchange Commission, the Borrower (i) agrees to deliver to the Administrative Agent, and authorizes their posting by the Administrative Agent to the public-side view site of the Agency Site, the Financial Statements and (ii) represents, warrants and agrees that the Financial Statements will not constitute information that, upon disclosure to Public-Siders, would restrict them or their firms from purchasing or selling any of the 144A Securities under United States federal and state securities laws. The Borrower further agrees to clearly label such Financial Statements with a notice stating: "Confidential Financial Statements provided to 144A Holders" before delivering them to the Administrative Agent.

(d)     The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Parties' respective securities while in possession of the materials, documents and information distributed to them pursuant to the authorizations made herein.

Section 10.15. *USA PATRIOT Act Notice and Customer Verification*.

Each Lender that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**") and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.16. *Interest Rate Limitation*.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.17. *Obligations Absolute*.

To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.18. *AML Legislation*.

(a)    The Borrower acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or else-where (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Secured Parties or any future assignee of a Secured Party may be required, now or hereafter, to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby. The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)    If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

(i)    shall be deemed to have done so as an agent for each Secured Party (or any future assignee of a Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Secured Party (or any future assignee of a Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

(ii)     shall provide to each Secured Party (or any future assignee of a Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Secured Party or any future assignee of a Secured Party, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

[NEWCO]

By:_____
      Name:
      Title:

[SUBSIDIARY GUARANTORS]

By:_____
      Name:
      Title:

[                    ], as Administrative Agent

By:_____
      Name:
      Title:

[LENDERS]

By: _____
    Name:
    Title:

**<u>Exhibit B</u>**

**Fee Letter**

**JEFFERIES FINANCE LLC**
520 Madison Avenue
New York, New York 10022

<u>**CONFIDENTIAL**</u>

March 17, 2015

**SYNDICATION AND FEE LETTER**

LightSquared LP
10802 Parkridge Boulevard
Reston, Virginia 20191-5416

  *Re:* **$1,515,000,000 Second Lien Exit Facility**

Ladies and Gentlemen:

   We refer to the commitment letter dated the date hereof (including the exhibits, schedules and annexes thereto, the "***Commitment Letter***") among Jefferies Finance LLC ("***we***" or "***us***"), and LightSquared LP, a Delaware limited partnership (the "***Borrower***" or "***you***"). Terms used but not defined in this syndication and fee letter agreement (this "***Fee Letter***") shall have the meanings assigned thereto in the Commitment Letter. As used herein, the "***Company***" shall mean collectively the Borrower, each of the other Debtors and New LightSquared; the "***Closing Date***" shall mean the date upon which the conditions precedent set forth in Section 3 of the Commitment Letter have been satisfied; and the "***Transactions***" shall mean the consummation of the Modified Plan and the other transactions contemplated therein, including the entry into the First Lien Exit Facility and the Second Lien Exit Facility.

  1. <u>Compensation</u>.

   (a) <u>Fees</u>. As consideration for our commitments and agreements under the Commitment Letter with respect to the Second Lien Exit Facility, you shall pay, or cause to be paid, the following fees and amounts:

    (i) <u>Arrangement Fee</u>. An arrangement fee (the "***Arrangement Fee***") payable to us in an amount equal to $▓▓▓▓▓. The Arrangement Fee shall be payable in full in immediately available funds on the earlier of (A) the Effective Date and (B) the date of the termination of the Commitment Letter. The Arrangement Fee shall be payable to us regardless of whether the Effective Date occurs.

    (ii) <u>Administration Fee</u>. An annual administration fee (the "***Second Lien Exit Facility Administration Fee***") payable to us in the amount of $▓▓▓▓ *per annum*, due and payable in advance on the Closing Date and on each anniversary thereafter. The Second Lien

Exit Facility Administration Fee shall be in addition to reimbursement of our reasonable and documented out-of-pocket expenses.

(iii)     <u>Commitment Fee</u>.  The Commitment Fee as specified in Section 5 of the Commitment Letter, payable in accordance with the terms thereof.

(b)     <u>First Lien Exit Facility</u>.  You hereby retain us as a joint lead arranger and joint bookrunner in respect of (i) the First Lien Exit Facility or (ii) any similar financing issued, offered or placed in lieu of the First Lien Exit Facility ((i) and (ii) above, collectively, "***Senior Lien Financings***").  Notwithstanding the foregoing, nothing herein shall constitute a commitment to arrange any credit facilities or provide any financing by us or any of our affiliates.  Any commitment shall be subject to the execution and delivery of, and satisfaction of the conditions contained in, a loan agreement or credit agreement relating thereto. In connection with the foregoing, you will pay to us on and subject to the occurrence of the closing date relating to any commitments for any such Senior Lien Financings, a fee that shall not be less than ███% of the aggregate total amount of all of the fees and other economics to be paid to all arrangers in connection with the Senior Lien Financings, and you further agree that the aggregate arrangement fees payable to all arrangers in connection therewith will not be less than ███% of the aggregate total amount of the Senior Lien Financings.

(c)     <u>Alternative Transaction Fee</u>.  If on or before the date that is 12 months following the date of expiration or termination of the Commitment Letter, you or any of your affiliates, directly or indirectly, consummates one or more Senior Lien Financings in which we do not serve as a joint lead arranger and joint book runner (or similar capacities applicable to any such Senior Lien Financings) and with respect to which we have not been offered and declined such roles or similar capacities on substantially the same terms as such Senior Lien Financings actually consummated, you shall in each case pay us an amount equal to the fees that we would have earned pursuant to Section 1(b) above if we had acted in such capacities in connection with such transactions.

(d)     <u>Expenses</u>.  In addition to the compensation to be paid to us hereunder, without regard to any limitation set forth in Section 6 of the Commitment Letter and without regard to whether the Transactions are consummated or the Commitment Letter expires or is terminated or otherwise, you shall pay, or cause to be paid, to us promptly as billed, all reasonable and documented disbursements and out-of-pocket expenses incurred by us or on our behalf in connection with our services to be rendered hereunder and under the Commitment Letter and the Transactions (including (i) expenses of our due diligence investigation, consultants' fees, syndication expenses, travel expenses, fees, disbursements and other expenses of counsel, and (ii) the overnight cost of providing funds for the provision of loans under the Second Lien Exit Facility if the closing does not occur on the date specified by you as the closing date).

(e)     <u>Fees Nonrefundable</u>.  All fees hereunder, once paid, are nonrefundable and not creditable against any other fee payable in connection with the Commitment Letter or this Fee Letter (collectively, the "***Debt Financing Letters***") or otherwise.  All fees payable hereunder shall be earned on the date hereof, regardless of when payable hereunder and, except with respect to the Commitment Fee, such fees shall be payable in immediately available funds in U.S. dollars free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes). Without limiting the foregoing, your obligation to pay fees hereunder, or to cause such fees to be paid, shall be absolute and unconditional and shall not be subject to reduction by way of setoff or counterclaim or otherwise.  We reserve the right to allocate, in whole or in part, to our affiliates or any Lenders certain fees payable to us hereunder in such manner as we shall determine in our sole discretion.

2.      Syndication.

(a)      As consideration for the Commitment, you agree that you hereby retain and will cause your affiliates to retain us or our designee to act as the sole administrative agent, sole collateral agent, joint lead arranger and joint bookrunner for you and your affiliates in connection with the Second Lien Exit Facility and no other titles shall be awarded in connection with the Second Lien Exit Facility, unless mutually agreed.

(b)      We reserve the right, at any time prior to or after execution of the Loan Documents (as defined below), to syndicate all or part of the Commitments to a syndicate of banks, financial institutions and other entities identified by us in consultation with you (collectively, the "*Lenders*"); *provided* that we will not syndicate to any Disqualified Company (as defined in the Second Lien Exit Credit Agreement).  Our Commitments shall be irrevocably reduced dollar-for-dollar as and when corresponding commitments are received from any Lenders.  We will exclusively manage all aspects of any syndication in consultation with you, including decisions as to the selection of prospective Lenders to be approached, when they will be approached, when their commitments will be accepted, which prospective Lenders will participate, the allocation of the commitments among the Lenders, any naming rights and the amount and distribution of fees to such Lenders.  To assist us in our syndication efforts, you agree to prepare and provide promptly to us all customary information with respect to the Company, the Transactions and the other transactions contemplated hereby, including such Projections (defined below) as we may reasonably request in connection with the syndication of the Commitments.  You further agree to, (A) except to the extent it is not reasonably practical to do so, provide to us draft copies of all material motions, applications and other pleadings and documents you intend to file with the Bankruptcy Court that relate to or materially impact the Second Lien Exit Facility and/or the Modified Plan at least three (3) business days prior to the date on which you intend to file any such documents (provided that in exigent circumstances in which it is not feasible to comply with such three (3) business day notice period, you shall use commercially reasonable efforts to provide any such documents to us and our counsel as early as practicable in advance of filing, whenever possible), and consult in advance in good faith with us and our counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court and (B) reasonably cooperate with us in connection with any discovery and hearings in connection with the Second Lien Exit Facility and/or the Modified Plan and any transactions contemplated thereby.

(c)      We intend to commence our syndication efforts promptly upon your execution of this Fee Letter and the Commitment Letter, and you agree to assist us actively (and, in all events, using your commercially reasonable efforts) to complete a timely syndication that is reasonably satisfactory to us until the date that is the earlier of (i) 90 days after the Closing Date and (ii) the date on which a Successful Syndication (as defined below) is achieved but in no event shall such date be earlier than the Closing Date (such earlier date referred to in clause (i) and (ii), the "*Syndication Date*").  Such assistance shall include:

(i)      using commercially reasonable efforts to ensure that our efforts benefit materially from your existing lending and investment banking relationships,

(ii)      direct contact between your senior management, representatives and advisors, on the one hand, and the senior management, representatives and advisors of the proposed Lenders, on the other hand,

(iii)      your assistance in the preparation of one or more confidential information memoranda (each, a "*Confidential Information Memorandum*"), and other

3

marketing materials to be used in connection with the syndication of our Commitments (together with all Confidential Information Memoranda, the "***Materials***"), and

(iv)    upon our request, the hosting, with us, of meetings with prospective Lenders at such times and in such places as mutually agreed.

(d)    You agree, at our request, to assist in the preparation of a version of any Materials consisting exclusively of information and documentation that is either (i) publicly available or (ii) not material with respect to the Company, their affiliates or any of its or their securities for purposes of United States federal and state securities laws (such information and Materials, "***Public Information***"). In addition, you agree that, unless specifically labeled "Private – Contains Non-Public Information," no Materials disseminated to potential Lenders in connection with the syndication of the Second Lien Exit Facility, whether through an Internet website, electronically, in presentations, at meetings or otherwise, will contain any Material Non-Public Information (as defined below). Any information and documentation that is not Public Information is referred to herein as "***Material Non-Public Information.***" It is understood that in connection with your assistance described above, authorization letters will be included in any information package and presentation whereby you authorize the distribution of such information to prospective Lenders, it being understood that the authorization letter for Public Information shall contain a representation by you to the Lenders that the Public Information does not include any such Material Non-Public Information and each letter shall contain a customary "10b-5" representation. You acknowledge and agree that the following documents contain and shall contain solely Public Information (unless you notify us promptly that any such document contains Material Non-Public Information): (i) drafts and final definitive loan documents with respect to the Second Lien Exit Facility (the "***Loan Documents***"), (ii) administrative materials prepared by us for prospective Lenders (including a lender meeting invitation, Lender allocations, if any, and funding and closing memoranda), and (iii) notification of changes in the terms of the Second Lien Exit Facility. If reasonably requested by us, you shall identify Public Information by clearly and conspicuously marking the same as "PUBLIC".

(e)    You agree that all Materials and Information (as defined below) (including draft and execution versions of the Loan Documents and draft or final offering materials relating to contemporaneous or prior securities issuances by the Company) may be disseminated in accordance with our standard syndication practices (including through hard copy and via one or more internet sites (including an IntraLinks, SyndTrak or similar workspace), e-mail or other electronic transmissions). Without limiting the foregoing, you authorize the use of your logos in connection with any such dissemination. You further agree that, at our expense, we may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as we may choose, and circulate similar promotional materials, after the closing of the Transactions in the form of a "tombstone" or otherwise, containing information customarily included in such advertisements and materials, including (i) the names of the Company and its affiliates (or any of them), (ii) our and our affiliates' titles and roles in connection with the Transactions, and (iii) the amount, type and closing date of such Transactions.

(f)    For purposes of the Commitment Letter, "***Successful Syndication***" shall mean that we (together with our affiliates) hold zero dollars of the aggregate principal amount of loans and commitments under the Second Lien Exit Facility.

3.    <u>Information</u>.  You represent, warrant and covenant that:

(a)    all information and data other than the Projections and information of a general economic or industry-specific nature (including the Materials, the "***Information***") that has been or will be

made available to us by or on behalf of you or any of your representatives is or will be, when furnished, complete and correct in all material respects,

(b)     none of the Information shall, when furnished or on the Closing Date and when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made, and

(c)     all projections and other forward-looking information that have been or will be made available to us by or on behalf of you or any of your representatives (collectively, the "***Projections***") have been or will be prepared in good faith based upon (i) accounting principles consistent with the most recent historical audited financial statements of the Company and (ii) assumptions that are reasonable at the time made and at the time the related Projections are made available to us (it being understood that any such Projections are subject to uncertainties and contingencies, some of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material). You agree that, if at any time prior to the Closing Date, you become aware that any of the representations and warranties in the preceding sentence would be incorrect if the Information or Projections were then being furnished and such representations and warranties were then being made, you shall, at such time, supplement promptly such Information and/or Projections, as the case may be, in order that such representations and warranties will be correct under those circumstances.

You shall be solely responsible for Information and the Projections, including the contents of all Materials. We (i) will be relying on Information, the Projections and data provided by or on behalf of you or any of your representatives or otherwise available from generally recognized public sources, without having independently verified the accuracy or completeness of the same, (ii) do not assume responsibility for the accuracy or completeness of any such Information, the Projections and data and (iii) will not make an appraisal of your assets or liabilities. You shall (i) furnish us with all Information and data that we may reasonably request in connection with our activities on behalf of you and your affiliates and (ii) provide us full access, as reasonably requested, to your officers, directors, employees and professional advisors.

4.     <u>Clear Market</u>. You agree that, from the date hereof until the earlier of (a) the date on which a Successful Syndication has been achieved, *provided* that such date shall not be earlier than the Closing Date and (b) the date that is 90 days after the Closing Date, you will not, and you will not permit your affiliates, directly or indirectly, to (i) syndicate, place, sell or issue, (ii) attempt or offer to syndicate, place, sell or issue, (iii) announce or authorize the announcement of the syndication, placement, sale or issuance of, or (iv) engage in discussions concerning the syndication, placement, offering, sale or issuance of, any debt facility, or debt, equity-linked or equity security of you or any of your or its respective affiliates (other than the Second Lien Exit Facility contemplated hereby and any other debt or equity issuance or financing expressly contemplated pursuant to the Modified Plan), including any renewals or refinancings of any existing debt facility, without our prior written consent, which may be given or withheld in our sole discretion.

5.     <u>Confidentiality</u>. This Fee Letter is delivered to you on the understanding that neither the existence of this Fee Letter nor any of the terms or substance will be disclosed by you, directly or indirectly, to any other person or entity except (a) as required by applicable law or compulsory legal process (in which case you agree to inform us promptly thereof and to cooperate with us in securing a protective order in respect thereof to the extent lawfully permitted to do so), (b) to your officers, directors, employees, attorneys, accountants and advisors on a confidential and need-to-know basis and only in connection with the Transactions, (c) with our consent, to any Lender that provides a commitment to all

or a portion of the Second Lien Exit Facility, (d) to the extent necessary to obtain the Approval Order or as otherwise required in connection with the Bankruptcy Proceedings, you may disclose this Fee Letter; provided, that the Company agrees to use its reasonable efforts to prevent the amount of any fees set forth in this Fee Letter from becoming publicly available, including, without limitation, by the filing of a motion or an ex parte request pursuant to sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, as applicable, in each case seeking an order of the Bankruptcy Court authorizing you to file such portions of this Fee Letter under seal, and to take such other actions as we may reasonably request to preserve the confidentiality of information in connection with any such disclosure. You may also disclose, on a confidential basis, the aggregate amount of fees payable under this Fee Letter as part of a generic disclosure regarding sources and uses (but without disclosing any specific fees set forth therein) in connection with consummation of the Modified Plan.

6.    <u>Conflicts of Interest; Absence of Fiduciary Relationship</u>.  You acknowledge and agree that:

(a)    we and/or our affiliates and subsidiaries (including Jefferies Group LLC and its affiliates, the "***Jefferies Group***"), in our and their respective capacities as principal or agent are involved in a wide range of commercial banking and investment banking activities globally (including investment advisory, asset management, research, securities issuance, trading, and brokerage) from which conflicting interests or duties may arise and, therefore, conflicts may arise between (i) our interests and duties hereunder and (ii) the duties or interests or other duties or interests of another member of the Jefferies Group,

(b)    we and any other member of the Jefferies Group may, at any time, (i) provide services to any other person, (ii) engage in any transaction (on our or its own account or otherwise) with respect to you or any member of the same group as you or (iii) act in relation to any matter for any other person whose interests may be adverse to you or any member of your group (a "***Third Party***"), and may retain for our or its own benefit any related remuneration or profit, notwithstanding that a conflict of interest exists or may arise and/or any member of the Jefferies Group is in possession or has come or comes into possession (whether before, during or after the consummation of the transactions contemplated hereunder) of information confidential to you; *provided* that such confidential information shall not be used by us or any other member of the Jefferies Group in performing services or providing advice to any Third Party.  You accept that permanent or *ad hoc* arrangements/information barriers may be used between and within our divisions or divisions of other members of the Jefferies Group for this purpose and that locating directors, officers or employees in separate workplaces is not necessary for such purpose,

(c)    information that is held elsewhere within us or the Jefferies Group, but of which none of the individual directors, officers or employees having primary responsibility for the consummation of the transactions contemplated by this Fee Letter actually has knowledge (or can properly obtain knowledge without breach of internal procedures), shall not for any purpose be taken into account in determining our responsibilities to you hereunder,

(d)    neither we nor any other member of the Jefferies Group shall have any duty to disclose to you, or utilize for your benefit, any non-public information acquired in the course of providing services to any other person, engaging in any transaction (on our or its own account or otherwise) or otherwise carrying on our or its business,

(e)    (i) neither we nor any of our affiliates have assumed any advisory responsibility or any other obligation in favor of the Company or any of its affiliates except the obligations expressly provided for under the Debt Financing Letters, (ii) we and our affiliates, on the one hand, and the

Company and its affiliates, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor does the Company or any of its affiliates rely on, any fiduciary duty on the part of us or any of our affiliates and (iii) we are (and are affiliated with) full service financial firms and as such may effect from time to time transactions for our own account or the account of customers, and hold long or short positions in debt, equity-linked or equity securities or loans of companies that may be the subject of the transactions contemplated by this Fee Letter (and, in particular, we and any other member of the Jefferies Group may at any time hold debt or equity securities for our or its own account in the Company). With respect to any securities and/or financial instruments so held by us, any of our affiliates or any of our respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of such rights, in its sole discretion. You hereby waive and release, to the fullest extent permitted by law, any claims you have, or may have, with respect to (i) any breach or alleged breach of fiduciary duty (and agree that we shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors) and (ii) any conflict of interest arising from such transactions, activities, investments or holdings, or arising from our failure or the failure of any of our affiliates to bring such transactions, activities, investments or holdings to your attention, and

(f)     neither we nor any of our affiliates are advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated by the Debt Financing Letters, and neither we nor our affiliates shall have responsibility or liability to you with respect thereto. Any review by us, or on our behalf, of the Company, the Transactions, the other transactions contemplated by the Debt Financing Letters or other matters relating to such transactions will be performed solely for our benefit and shall not be on behalf of you or any of your affiliates.

7.     Notices.  Notice given pursuant to any of the provisions of this Fee Letter shall be in writing and shall be mailed or delivered (a) if to you, at the address set forth above and (b) if to us, at our offices, at 520 Madison Avenue, New York, New York 10022, Attention:  General Counsel.

8.     Counterparts.  This Fee Letter may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Delivery of an executed signature page of this Fee Letter by facsimile or other electronic transmission shall be as effective as delivery of an originally-executed counterpart thereof.

9.     Assignment.  You may not assign any of your respective rights, or be relieved of any of your respective obligations, under this Fee Letter without our prior written consent, which may be given or withheld in our sole discretion (and any purported assignment without consent, at our sole option, shall be null and void), except that you may assign your rights and obligations under this Fee Letter to New LightSquared but in the event of any such assignment you shall remain responsible for all of your obligations hereunder).  Any and all obligations of, and services to be provided by, us hereunder may be performed and any and all of our rights hereunder may be exercised by or through any of our affiliates or branches.

10.     Third Party Beneficiaries.  This Fee Letter has been and is made solely for the benefit of you, us and our affiliates, including Jefferies, and your, our and their respective successors and assigns, and nothing in this Fee Letter, express or implied, is intended to confer or does confer on any other person or entity any rights or reason under or by reason of this Fee Letter or your or our agreements contained herein.

11.    <u>Entire Agreement; Survival</u>.    The Debt Financing Letters incorporate the entire understanding of the parties and supersede all previous agreements relating to the subject matter hereof should they exist.  This Fee Letter shall survive the expiration or termination of the Commitment Letter, the execution and delivery of the Definitive Debt Documents and the closing and funding of the Facilities.

12.    <u>Choice of Law;  Jurisdiction; Waivers</u>.    The Debt Financing Letters, and any claim, controversy or dispute arising under or related to the Debt Financing Letters (whether based upon contract, tort or otherwise), shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflict of law principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).   To the fullest extent permitted by applicable law, you hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in respect of any claim, suit, action or proceeding arising out of or relating to the provisions of any Debt Financing Letter and irrevocably agree that all claims in respect of any such claim, suit, action or proceeding may be heard and determined in any such court and that service of process therein may be made by certified mail, postage prepaid, to your address set forth above.   You and we hereby waive, to the fullest extent permitted by applicable law, any objection that you or we may now or hereafter have to the laying of venue of any such claim, suit, action or proceeding brought in any such court, and any claim that any such claim, suit, action or proceeding brought in any such court has been brought in an inconvenient forum.   You and we hereby waive, to the fullest extent permitted by applicable law, any right to trial by jury with respect to any claim, suit, action or proceeding (whether based upon contract, tort or otherwise) arising out of or relating to the Debt Financing Letters, any of the Transactions or any of the other transactions contemplated hereby or thereby.   The provisions of this Section 9 are intended to be effective upon the execution of this Fee Letter without any further action by you, and the introduction of a true copy of this Fee Letter into evidence shall be conclusive and final evidence as to such matters.

13.    <u>Headings</u>.    The section headings in this Fee Letter have been inserted as a matter of convenience of reference, are not part of this Fee Letter and shall not affect the interpretation of this Fee Letter.

14.    <u>Amendment; Waiver</u>.    This Fee Letter may not be modified or amended except in a writing duly executed by you and us.  No waiver by any party of any breach of, or any provision of, this Fee Letter shall be deemed a waiver of any similar or any other breach or provision of this Fee Letter at the same or any prior or subsequent time.  To be effective, a waiver must be set forth in writing signed by the waiving party and must specifically refer to this Fee Letter and the breach or provision being waived.

*[Remainder of page intentionally blank]*

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement among you and us.

Very truly yours,

**JEFFERIES FINANCE LLC**

By:  _____
Name: Brian Buoye
Title: Managing Director

Accepted and agreed to as of the
date first above written:

**LIGHTSQUARED LP**

By:  _____
Name: _____
Title: _____

## <u>Exhibit C</u>

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIGHTSQUARED INC., _et al._, | ) | Case No. 12-12080 (SCC) |
|  | ) |  |
| Debtors.[1] | ) | Jointly Administered |
|  | ) |  |

_____

### ORDER, PURSUANT TO 11 U.S.C. §§ 105(A) AND 363, AUTHORIZING LIGHTSQUARED TO (A) ENTER INTO AND PERFORM UNDER LETTERS RELATED TO $1,515,000,000 SECOND LIEN EXIT FINANCING ARRANGEMENTS, (B) PAY FEES AND EXPENSES IN CONNECTION THEREWITH, AND (C) PROVIDE RELATED INDEMNITIES

Upon the motion (the "Motion")[2] of LightSquared Inc. and certain of its affiliates,

as debtors and debtors in possession (collectively, "LightSquared") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases"), at the direction of the special committee of the boards

of directors (the "Special Committee") for LightSquared Inc. and LightSquared GP Inc., and on

behalf of the Plan Proponents, for entry of an order (the "Order"), pursuant to sections 105(a)

and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101−1532, authorizing

LightSquared to (a) enter into and perform under (i) a commitment letter (substantially in the

form attached to the Motion as Exhibit A, the "Commitment Letter") with Jefferies Finance LLC

("Jefferies") and (ii) a fee letter (substantially in the form attached to the Motion as Exhibit B,

---

[1] The debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each debtor's federal or foreign tax or registration identification number, are:  LightSquared Inc. (8845), LightSquared Investors Holdings Inc. (0984), One Dot Four Corp. (8806), One Dot Six Corp. (8763), SkyTerra Rollup LLC (N/A), SkyTerra Rollup Sub LLC (N/A), SkyTerra Investors LLC (N/A), TMI Communications Delaware, Limited Partnership (4456), LightSquared GP Inc. (6190), LightSquared LP (3801), ATC Technologies, LLC (3432), LightSquared Corp. (1361), LightSquared Finance Co. (6962), LightSquared Network LLC (1750), LightSquared Inc. of Virginia (9725), LightSquared Subsidiary LLC (9821), Lightsquared Bermuda Ltd. (7247), SkyTerra Holdings (Canada) Inc. (0631), SkyTerra (Canada) Inc. (0629), and One Dot Six TVCC Corp. (0040).  The location of the debtors' corporate headquarters is 10802 Parkridge Boulevard, Reston, VA 20191.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the "Fee Letter" and, together with the Commitment Letter, the "Exit Financing Letters") with

Jefferies, (b) pay certain fees and expenses associated with the Exit Financing Letters, and

(c) provide related indemnities to Jefferies, all as more fully set forth in the Motion; and it

appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and it

appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it

appearing that venue of this proceeding and the Motion in this Court is proper pursuant to 28

U.S.C. §§ 1408 and 1409; and notice of the Motion appearing adequate and appropriate under

the circumstances; and the Court having found that no other or further notice is needed or

necessary; and the Court having reviewed the Motion and having heard statements in support of

the Motion at a hearing held before the Court (the "Hearing"); and the Court having determined

that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for

the relief granted herein; and it appearing, and the Court having found, that the relief requested in

the Motion is in the best interests of LightSquared, its estates, its creditors, and other parties in

interest; and any objections to the relief requested in the Motion having been withdrawn or

overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is

hereby **ORDERED** that:

1.        The Motion is granted to the extent set forth herein.

2.        LightSquared's entry into and performance under the Exit Financing

Letters is approved in all respects.  LightSquared is authorized, but not directed, to enter into and

perform its obligations under the Exit Financing Letters, pursuant to sections 105(a) and 363 of

the Bankruptcy Code, to pay fees and reimburse expenses in connection with the Exit Financing

Letters, and to indemnify Jefferies in connection therewith.

2

3.      LightSquared is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5.      The requirements set forth in rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York are satisfied.

6.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  _____, 2015
          New York, New York

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE